## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

2012 APR -6  A 9:34

~~REBCA P. HACKETT, CLK~~
~~U.S. DISTRICT COURT~~
~~LE DISTRICT ALA~~

| | |
|---|---|
| **CAREY DALE GRAYSON** | ) |
| **Plaintiff** | ) |
| | ) |
| **vs.** | ) Case No. 2:12-CV-316-MHT-CSC |
| | ) |
| **KIM THOMAS, Commissioner,** | ) **DEATH PENALTY CASE** |
| **Alabama Department of Corrections,** | ) **EXECUTION SET FOR APRIL 12, 2012** |
| **in his official capacity,** | ) |
| | ) |
| **ANTHONY PATTERSON, Warden** | ) |
| **Holman Correctional Center,** | ) |
| **in his official capacity,** | ) |
| | ) |
| **OTHER UNKNOWN EMPLOYEES** | ) |
| **AND AGENTS OF THE ALABAMA** | ) |
| **DEPARTMENT OF CORRECTIONS,** | ) |
| **in their official capacities.** | ) |
| | ) |
| **Defendants.** | ) |

## NATURE OF ACTION

1.   Plaintiff, Carey Dale Grayson, is a death row inmate in Alabama.   He is

scheduled to be executed on April 12, 2012.  Mr. Grayson brings this action pursuant to

42 U.S.C. §1983 for violations and threatened violations of his right to be free of cruel

and unusual punishment under the Eighth Amendment to the United States Constitution,

his right to due process of law under the Fourteenth Amendment to the United States

Constitution and his right to the equal protection of the laws under the Fourteenth

Amendment to the United States Constitution. Defendants intend to execute Mr. Grayson using a lethal injection protocol that is developed in secrecy, not consistently followed, and not subject to any oversight except through court action.

2. Alabama employs lethal injection as its default method of execution. Ala.Code §15-18-82.1(a) (1975).   While many States make their execution protocols publicly available, Defendants keep their lethal injection protocol confidential and offer no justification for keeping it from public view.  Further, under Ala. Code §15-18-82.1(g), the policies and procedures of the Alabama Department of Corrections for executing death-sentenced inmates are exempt from the Alabama Administrative Procedures Act. This abdication of legislative oversight stands in stark contrast to the oversight provided in the context of animal euthanasia procedures.  Ala. Code §§ 34-29-69; 34-29-131.

3. In furtherance of preserving the veil of secrecy surrounding executions in Alabama, Defendants routinely deny death-sentenced inmates and their counsel access to the protocol. *See Grayson v. Thomas*, 11-cv-438, Doc. #1, p. 4 (M.D. Ala. Filed 6/8/11); *Powell v. Thomas*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No. 2:11-cv-376 (M.D. Ala. May 19, 2011).  Mr. Grayson has requested a copy of the protocol, (*see* Exhibit A) but as of the time of this filing has not been given a copy

4. Alabama's lethal injection protocol has never been subjected to a trial on the merits in any court.  Defendant's continued strategy of secrecy combined with the ability to arbitrarily change any part of the protocol, and the complete lack of oversight shows

2

that Alabama's protocol and the way the protocol is implemented, create "substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008).

5. Because the protocol is not subject to the requirements of the Administrative Procedure Act, Defendants have unfettered discretion to change it at any point in time, up to and including the moment of execution. Further, because the protocol is kept secret, it is virtually impossible for any witnesses to know whether the protocol is being followed. Finally, even if this Court upheld Alabama's protocol, there is no way to know if the protocol this Court views is the protocol that Defendant's will use to execute Mr. Grayson. Without the protocol being made available to Mr. Grayson's lawyers, without restriction of dissemination, it is impossible for Mr. Grayson's lawyers, or any other witness, to know if the protocol is being followed. Alabama's secrecy surrounding the protocol not only violates Mr. Grayson's due process rights, but threaten a violation of his right to equal protection under the law because there is no guarantee that the protocol will be applied to him in the same manner it has been applied to others.

6. Defendants plan to execute Mr. Grayson by lethal injection, yet refuse to provide him with the protocol they intend to follow to execute him. Mr. Grayson has a right to challenge the constitutionality of the method Defendants plan to use to execute him. That right is not just related to the drugs that are used, but covers all aspects of the mechanics of killing him. Merely having the same drugs as other states does not make Alabama's protocol constitutional. Even if Alabama's protocol was identical to a

3

protocol that has been ruled constitutional, it does not guarantee that Mr. Grayson's rights are secure – Defendants must still adhere to that protocol. Defendants' denial of access to the protocol, ability to make changes to the protocol without oversight, failure to provide notice of changes to the protocol when they occur, and refusal to provide any information that would allow observers to know if the protocol is being adhered to violates Mr. Grayson's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

7. Jurisdiction over this matter arises under 42 U.S.C. 1983, 28 U.S.C. 1331, 28 U.S.C. 1343(a)(3), 28 U.S.C. 2201 and 28 U.S.C. 2202.

8. Venue is appropriate in the Middle District of Alabama under 28 U.S.C. 1391(b).

## PARTIES

9. Plaintiff, Carey Dale Grayson, is a United States Citizen and a resident of the State of Alabama. He is currently a death-sentenced inmate under the supervision of Defendants.

10. Defendant Kim Thomas is the Commissioner of the Alabama Department of Corrections.

11. Defendant Anthony Patterson is the Warden of Holman Correctional Facility in Atmore, Alabama, where Mr. Grayson is currently incarcerated and where Alabama

conducts its executions. Defendant Patterson is also, by statute, Mr. Grayson's executioner, unless he designates someone else to perform that duty. Ala. Code §15-18-82(c).

12. Unknown employees and agents of the Alabama Department of Corrections are involved in the development and carrying out of executions in Alabama. Mr. Grayson does not know and cannot reasonably ascertain the identities or qualifications of these persons because the Alabama Department of Corrections refuses to make its execution protocol available to him.

13. All defendants are being sued in their official capacities. The named defendants are citizens of the United States and Alabama.

14. There is a real and justiciable case or controversy between the parties.

15. On information and belief, the Defendants and the Alabama Department of Corrections have adopted a written and confidential execution protocol for administering capital punishment by lethal injection.

16. On information and belief, this protocol differs in a material way from the protocol used in previous executions by lethal injection in Alabama because it substitutes pentobarbital, a sedative unapproved for usage in lethal injections, for sodium thiopental, an anesthetic. Recent executions in Alabama and Georgia demonstrate that this modification or others unknown to Mr. Grayson will create a substantial risk of serious harm. *Cf. Getsy* v. *Strickland*, 577 F. 3d 309, 313 (6th Cir. 2009).

5

17. Mr. Grayson challenges the constitutionality of Alabama's recently revised lethal injection procedures under 42 U.S.C. § 1983. This lawsuit does not challenge the fact of Mr. Grayson's conviction or his death sentence or the constitutionality of Alabama's statute requiring execution by lethal injection.

18. Upon information and belief, there is no administrative grievance process available at Holman Correctional Facility for Mr. Grayson or other death row inmates to challenge the procedures to be employed during their execution. Counsel for Mr. Grayson requested a copy of the entire lethal injection protocol on March 29, 2012 through Commissioner Kim Thomas. (Exhibit. A).  As of the date of this filing, Mr. Thomas has not provided counsel with the protocol.

22. Under Ala. Code § 15-18-82.1(g), the policies and procedures of the DOC for execution of persons sentenced to death are exempt from the Administrative Procedures Act.  Absent judicial intervention, Mr. Grayson can never be sure that the secret procedures used to execute him comply with constitutional requirements, or that Defendants are adhering to whatever protocol they choose to construct for his execution.

23. Absent judicial intervention, Mr. Grayson will be executed pursuant to Defendants' arbitrary and capricious lethal injection procedures. There is a justiciable case or controversy regarding the unconstitutionality of these lethal injection procedures, the unnecessary risk of pain and suffering inherent in the procedures, Defendants' secrecy surrounding the procedures, and their unfettered discretion to change the lethal injection

procedures.

## BACKGROUND

**Mr. Grayson's Procedural History**

24.  Mr. Grayson was convicted of capital murder in the Jefferson County Circuit Court and sentenced to death on March 8, 1996.

25.  Mr. Grayson's conviction and sentence were affirmed throughout the state courts.  That process was completed on May 19, 2006.  *Ex parte Grayson*, No. 1050612 (Ala. May 19, 2006) (unreported).

26.  Mr. Grayson timely filed a petition for writ of habeas corpus in the Northern District of Alabama, which denied relief on September 29, 2009.  *Grayson v. Allen*, Northern District of Alabama, 2:06-01444-CV-RDP-RRA (N.D. Ala. 2009) (unreported). Mr. Grayson timely sought a certificate of appealability, which the District Court denied on July 19, 2010.  Mr. Grayson timely filed an application for a certificate of appealability from the Eleventh Circuit Court of Appeals, which denied the application on October 13, 2010.

27.  Mr. Grayson timely petitioned the United States Supreme Court for a writ of certiorari, which was denied on October 3, 2011.

28.  On October 12, 2011, the State of Alabama moved the Alabama Supreme Court to set an execution date.  On February 22, 2012, the Alabama Supreme Court issued an order setting Mr. Grayson's execution date for April 12, 2012.

**Alabama's Lethal Injection Change**

29. On January 11, 2011, the State of Alabama filed a motion to set an execution date for death row inmate, Jason Williams.

30. On January 13, 2011, death row inmate Leroy White was executed by the State of Alabama. Upon information and belief, sodium thiopental was used as the first drug in a three-drug sequence to execute Mr. White by lethal injection.

31. On January 18, 2011, the State of Alabama moved the Alabama Supreme Court to set an execution date for another death row inmate, Eddie D. Powell. That motion made no reference to any possible shortage of sodium thiopental or a possible change in the execution protocol. State of Alabama's Motion to Set an Execution Date, *Alabama v. Powell* (January 18, 2011). (Attached as Exhibit B.)

32. On January 21, 2011, Hospira, the only remaining U.S. supplier of sodium thiopental, announced that it would exit the sodium thiopental market entirely. *Hospira Statement Regarding Pentothal (sodium thiopental) Market Exit*, Jan. 21, 2011. (Attached as Exhibit C.) Hospira's official statement noted that the company had "never condoned" the use of its product in capital punishment. *Id.* Although Hospira, a global pharmaceutical company, initially considered continuing to manufacture this drug in Italy, the Italian authorities required assurance that sodium thiopental would not be used in human executions if exported to the United States. *Id.* Despite attempts to obtain this assurance from its wholesalers, Hospira was informed that there was no means of

8

preventing the drug from being "diverted to departments of corrections for use in capital punishment procedures." *Id.* Fearing the company's liability to the Italian authorities and given "issues" with the product, Hospira discontinued all production, expressing regret that "many hospital customers who use the drug for its well-established medical benefits will not be able to obtain the product." *Id.*

33. Due to its inability to obtain sodium thiopental from manufacturers and faced with dwindling supplies, on January 25, 2011, Alabama, along with 13 other states, sent a letter to Attorney General Eric Holder requesting assistance in obtaining sodium thiopental to carry out executions. (Attached as Exhibit D.)

34. On March 15, 2011, Defendants secretly obtained a supply of eight grams of sodium thiopental from the Tennessee Department of Corrections, in apparent violation of the Federal Controlled Substances Act, 21 U.S.C. § 954(2) and 21 U.S.C. § 822(a)-(b).

35. One week later, on March 22, 2011, the DEA seized Tennessee's stock of sodium thiopental. The eight grams of sodium thiopental that Alabama covertly obtained from Tennessee appear to have come from the very same stock seized by the DEA.

36. Unbeknownst to the courts, inmates or their counsel, or the citizens of the State of Alabama, the eight grams of sodium thiopental Alabama obtained from Tennessee were also seized by the DEA, less than one week after Alabama had obtained them. Bob Johnson, *Alabama Switches Key Drug for Execution Next Month*, ASSOCIATED PRESS, Apr. 26, 2011, http://news.yahoo.com/s/ap/20110427/ap_on_re_us/

us_execution_drug_shortage_3. (Attached as Exhibit E.)

37. Defendants did not disclose to the public that they were no longer in possession of a supply of sodium thiopental, that the stock obtained from Tennessee had been seized by the DEA, or that Alabama intended to alter its lethal injection protocol because the State could no longer obtain the drug that made the execution protocol constitutional. The State also did not advise the Alabama Supreme Court of these crucial facts.

38. On March 31, 2011, the State of Alabama executed William Boyd. Upon information and belief, Mr. Boyd was executed using sodium thiopental. Aside from the illegal drugs obtained from Tennessee, upon information and belief, the only remaining sodium thiopental in Defendants' possession expired on April 1, 2011.

39. On April 15, 2011, unaware that Defendants had recently surrendered their existing batch of sodium thiopental from Tennessee and thus were missing a crucial ingredient in the lethal injection protocol, the Alabama Supreme Court set execution dates of May 19, 2011 for Jason Williams and June 16, 2011 for Eddie Powell.

40. On April 22, 2011, based on public records obtained from Tennessee, and aware that the DEA had already seized Alabama's sodium thiopental, attorneys from the Equal Justice Initiative wrote a letter to Attorney General Eric Holder asking that the United States Department of Justice investigate Alabama's receipt of sodium thiopental from Tennessee. (Attached as Exhibit F.)

10

41. On April 26, 2011, for the very first time, Defendants revealed that nearly a month earlier the State's sodium thiopental had been seized by the DEA—less than a week after it had been obtained from Tennessee. (Ex. E.) That same day, the State announced—without public comment or review—that it was switching the crucial drug in the lethal injection protocol from sodium thiopental, an anesthetic, to pentobarbital, a barbiturate. *Id.*

42. Indeed, the sole U.S. manufacturer of pentobarbital, Lundbeck, Inc., previously notified several states' departments of corrections, including the Alabama DOC, that the company adamantly opposes the use of pentobarbital for executions because the drug was not intended for such a purpose. *See* Letter from Lundbeck to Ohio Department of Rehabilitation and Correction (Jan. 26, 2011) (Attached as Exhibit G); *see also* David Jolly, *Danish Company Blocks Sale of Drug for U.S. Executions*, N.Y. TIMES, July 1, 2011, http://www.nytimes.com/2011/07/02/world/europe/02execute.html?_r=1 (Attached as Exhibit H.) ("'We were completely shocked and outraged' to learn that the drug was being used for executions, Mr. Kronborg said. 'States and prisons never asked. We only found about it from the media. If they had asked, we would have said no.'"); *Lundbeck's Position Regarding the Misuse of Pentobarbital in Execution of Prisoners,* LUNDBECK (July 22, 2011)*,* http://www.lundbeck.com/media/pentobarbital.asp. (Attached as Exhibit I.) ("The use of pentobarbital to carry out the death penalty in U.S. prisons falls outside its approved indications. Lundbeck cannot assure the associated safety and efficacy profiles

in such instances. Lundbeck does not promote pentobarbital for use as part of lethal injections and is doing everything in its power to put an end to this misuse.")

43. On May 19, 2011, Jason Williams became the first inmate to be executed in Alabama using pentobarbital in place of sodium thiopental in the State's three-drug lethal injection. Prior to his execution, Mr. Williams was denied discovery of the confidential Alabama lethal injection protocol. *Powell v. Thomas(Williams)*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No. 2:11-CV-376 (WKW) (M.D. Ala. May 19, 2011).

## II. ALABAMA'S MATERIALLY MODIFIED LETHAL INJECTION PROTOCOL WILL VERY LIKELY CAUSE NEEDLESS SUFFERING.

44. Although Alabama's lethal injection protocol is secret, and can be changed by Defendants at any time before or during an execution, based upon Defendants' own admissions, Defendants have used a series of three drugs, administered sequentially, to attempt to achieve first a loss of consciousness and sensation, then paralysis, and finally death by cardiac arrest. Upon information and belief, from 2002 until April 26, 2011, Defendants conducted lethal injections by successive injections of sodium thiopental, pancuronium bromide and potassium chloride.

45. Based upon Defendants' own admissions, Defendants still plan to administer pancuronium bromide and potassium chloride following administration of pentobarbital in the modified three-drug lethal injection protocol.

46. Pancuronium bromide paralyzes voluntary muscles, including the diaphragm. It

12

does not affect consciousness or the perception of pain, nor does it prevent the inmate from suffering a painful death by asphyxiation. Indeed, pancuronium bromide serves to preclude an accurate assessment of anesthetic depth by observers by paralyzing all of the muscles which would otherwise move when a prisoner is in excruciating pain. *See* Deposition of Mark Dershwitz, M.D., Ph.D., *Dickens v. Napolitano*, No. CV-07-01770 (D.Ariz. Dec. 9, 2008), at 126-27) (Attached as Exhibit J.) ("Pancuronium, because it's a paralytic drug . . . makes it less likely for witnesses to observe these involuntary muscle contractions.").

47. Potassium chloride disrupts the normal electrical activity of the heart and induces cardiac arrest by stopping the heart from pumping blood. As it travels in the bloodstream from the site of injection towards the heart, potassium chloride activates all of the nerve fibers inside the vein, causing a burning sensation as it travels through the body destroying the internal organs. Absent complete anesthesia, the injection of potassium chloride causes excruciating pain that is agonizing for a recipient. *Baze v. Rees*, 128 S.Ct. 1520, 1533 (2008). ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride").

48. Upon information and belief, the State of Alabama's existing lethal injection protocol does not require the personnel who perform the tasks of anesthetizing and

executing the prisoner to have any minimum qualifications or expertise. Training, experience and supervision are essential to ensuring that an execution will be humane and comport with the requirements of the Eighth Amendment. Upon information and belief, Defendants do not adequately ensure that the individuals responsible for inducing and maintaining unconsciousness are credentialed, licensed and proficient in the knowledge, skills and procedures necessary to establish an appropriate plane of anesthesia throughout the lethal injection process.

**A. The Substitution of Pentobarbital Creates a Substantial Risk that an Inmate Will Experience Pain from the Subsequent Injections of Pancuronium Bromide and Potassium Chloride.**

49. As noted above, the proper functioning of the anesthetic is crucial to ensuring that the execution procedures comport with the requirements of the Eighth Amendment that a lethal injection protocol not subject an inmate to an "objectively intolerable risk of harm." *Baze*, 553 U.S. at 50. In *Baze*, the Court noted that petitioners conceded that if Kentucky's protocol (sodium thiopental, then pancuronium bromide, then potassium chloride) were followed precisely, it would result in a humane execution because the proper injection of sodium thiopental "eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections of pancuronium and potassium chloride." *Id*. at 49.

50. Dr. David Lubarsky and Dr. Mark Heath, however, do not agree that Alabama's substitution of pentobarbital for sodium thiopental would result in a humane

execution. In fact, Dr. Lubarsky, a practicing anesthesiologist and the Emanuel M. Papper Professor and Chair of the Department of Anesthesiology at the University of Miami, concludes that "the use of pentobarbital as part of Alabama's lethal injection protocol would very likely cause serious harm or needless suffering." (Exhibit K, Lubarsky Decl. ¶ 16.) Dr. Heath, an Assistant Professor of Clinical Anesthesiology at Columbia University, has reviewed statements provided by the State's expert in another litigation, (Expert Report of Mark Dershwitz, *Powell v. Thomas*, No. 11-12613, 2011 U.S. Dist. LEXIS 52376, at \*25-26 (M.D. Ala. May 16, 2011) ("Dershwitz Rep.")) (Attached as Exhibit M).  While Dr. Dershwitz was permitted to see the State's protocol, Dr. Heath was not. After reviewing Dr. Dershwitz's report, Dr. Heath concludes that "the ADOC should reexamine its procedures." (Exhibit L, Heath Decl.¶ 5(o)).

51. Pentobarbital is not approved by the FDA as an anesthesia induction agent. Pentobarbital has been approved by the FDA as a sedative-hypnotic and as an anticonvulsant for patients with refractory status epilepticus. Accordingly, there is no scientific literature establishing the anesthetic dose of pentobarbital. (Ex. K, Lubarsky Decl. ¶7). There is an off-label use of pentobarbital for induction of barbiturate coma in severe brain injury patients, but this use involves slow administration of the drug over several hours. (Ex. M, Dershwitz Rep. ¶ 9.) ("Using the [typical dosing regimen for the institution and maintenance of barbiturate coma] in an 80-kg adult, it would take 5-10 hr to achieve the administration of 2,500 mg of pentobarbital.")

52. Unlike sodium thiopental, which takes effect within seconds, pentobarbital is less lipid soluble and crosses the blood-brain barrier much more slowly, taking 15 to 60 minutes to take full effect, according to the FDA-approved package insert for pentobarbital. (Ex. K, Lubarsky Decl. ¶ 8.); (Ex. M, Dershwitz Rep. ¶ 7) ("Pentobarbital is classified as an intermediate-acting barbiturate.") There is no body of clinical knowledge regarding the behavior of pentobarbital and its effects on human beings when rapidly administered in high dosages to a conscious person. (Ex. L, Heath Decl. ¶ 2(d).)

53. The change from a drug that is designed as an anesthetic (sodium thiopental) to a drug that is not a routine anesthetic and has not been designed to produce unconsciousness constitutes a significant change. (Ex. K, Lubarsky Decl. ¶ 6.) As a result, the use of pentobarbital before the use of pancuronium bromide and potassium chloride creates "a substantial risk of an excruciating and agonizing death process." (Ex. L, Heath Decl. ¶ 2(e)).

54. Before Alabama executed anyone using pentobarbital, Mark Dershwitz, a Professor of Anesthesiology and Biochemistry and Molecular Pharmacology at the University of Massachusetts, opined that Alabama's modified protocol (which no death-sentenced inmate or his counsel have seen) would "render an inmate unconscious quickly and cause rapid and painless death." (Ex. M, Dershwitz Rep. ¶ 5.) However, there is no scientific data to support this conclusory assertion. Dr. Dershwitz stated that "'to a reasonable degree of medical certainty that there is an exceedingly small risk that a

condemned inmate to whom 2,500 mg of pentobarbital is properly administered pursuant to the lethal injection protocol of the State of Alabama would experience any pain and suffering associated with the administration of lethal doses of pancuronium bromide and potassium chloride," since "a dose of 2,500 mg of pentobarbital will cause virtually all persons to stop breathing." (Ex. M, Dershwitz Rep. ¶¶ 12, 14.) Dershwitz thus further opined that, "even in the absence of the administration of pancuronium bromide and potassium chloride, the administration of 2,500 mg of pentobarbital by itself would cause death to almost everyone." (Ex. M, Dershwitz Rep. ¶ 12).

55. Dr. Dershwitz's statement that 2,500 mg of pentobarbital will quickly stop a patient's breathing is at odds with the fact that a typical lethal dose of pentobarbital used in animal euthanasia is up to 100 mg of pentobarbital per kilogram of body weight. (Ex. K, Lubarsky Decl. ¶¶ 5, 15.) To achieve a comparable dose, an inmate who weighs 75 kilograms (about 165 pounds) would require 7,500 mg of pentobarbital, or three times the amount provided for in Alabama's protocol. In addition, the FDA-approved package insert for pentobarbital states that no dose of intravenous pentobarbital "can be relied on to produce similar effects in different patients." (*Id.* ¶ 10.) This variability in the efficacy of pentobarbital only adds to the substantial risk that an execution will inflict severe pain. Because pentobarbital has only been tested on humans at much lower doses and is administered slowly, there is no data on the impact of acute intolerance or adrenergic overdrive. Acute intolerance, which refers to how quickly an inmate's body would

become desensitized to the drug, increases the risk that the inmate will regain consciousness and feel pain during the administration of pancuronium bromide and potassium chloride. (Ex. K, Lubarsky Decl. ¶ 9.) Moreover, just before execution, an inmate experiences adrenergic overdrive, a state in which the inmate's nervous system releases large amounts of epinephrine or related substances, in this case due to anxiety or fear. Adrenergic overdrive counteracts the effects of sedatives such as pentobarbital. This effect further increases the risk that pentobarbital will fail to render an inmate fully unconscious when the pancuronium bromide and potassium chloride are administered. (Ex. K, Lubarsky Decl. ¶ 11.) Furthermore, Dr. Dershwitz's statements illustrate the problem with Alabama using a three-drug protocol. If his statements are in fact true and it is the case that the first drug in the process kills the inmate, the gratuitous injection of two additional drugs is unnecessary, creates a substantial risk of serious harm, and unjustifiably prolongs the execution.

## B. In Two Recent Executions, Pentobarbital Did Not Adequately Anesthetize the Inmate.

56. On June 16, 2011, Eddie Powell became the second inmate executed in Alabama using pentobarbital. Following the administration of pentobarbital, Mr. Powell "raised his head and neck off the gurney. Seemingly confused and startled, he jerked his head to one side and began breathing heavily, his chest rose and contracted." Matthew Busch, *Powell Says He's Sorry Before Death by Lethal Injection at Alabama's Holman Prison*, THE BIRMINGHAM NEWS (June 16, 2011) (Attached as Exhibit N.) It took

over 20 minutes for Mr. Powell to die. *Id*.

57. One of Mr. Powell's attorneys, Christine Freeman, witnessed the execution. Ms. Freeman recalled that shortly after the chaplain stopped praying, "Mr. Powell violently jerked his head up off of the gurney. His eyes were wide open and looked glazed and confused. He seemed to be looking and he turned his head from side to side. His jaw muscles seemed to clench. He appeared to be in pain. He lay his head back down, but his eyes still appeared to be slightly open. Because we were seated in an observation room on Mr. Powell's side, it was difficult to tell how long this lasted, but his eyes appeared to remain open in this position for quite a while. The entire process lasted about 25 minutes and his eyes remained open in this fashion until towards the end." (Affidavit of Christine Freeman, (July 14, 2011) ("Freeman Affidavit") at ¶ 12.) (Attached as Exhibit O.)

58. Another of Mr. Powell's attorneys, Matt Schulz, stated in affidavit that Mr. Powell "also appeared to be clenching his teeth, and his blood appeared to be pumping quite strongly. I could see his [left neck] artery expanding and contracting, and blood apparently pumping into his face." (Affidavit of Matt D. Schulz (July 14, 2011) ("Schulz Affidavit") at ¶3). (Attached as Exhibit P.) Mr. Schulz recalled that after the guard ran his finger over Mr. Powell's eyelash to assess his consciousness, Mr. Powell's eyes were "slightly open again, perhaps 20% of being fully open . . . They remained slightly open for at least a few minutes." *Id*.

59. On June 23, 2011, Roy Blankenship became the first inmate executed in

Georgia using pentobarbital in a three-drug protocol. Media coverage reported that according to witnesses, once the pentobarbital was administered, Mr. Blankenship "grimaced, jerked, lunged from side-to-side, gasped and appeared to yell out . . . ." Rhonda Cook, *Attorney Asks Chief Justice, DOC to Investigate Execution Problems*, ATLANTA JOURNAL-CONSTITUTION(June 24, 2011) (Attached as Exhibit Q.) According to another witness account: Blankenship jerked his head several times, mumbled inaudibly and appeared to gasp for breath for several minutes... and that [a]s the injection began, Blankenship jerked his head toward his left arm and began rapidly blinking. He then lurched toward his right arm, lunging twice with his mouth wide open as if he were gasping for air. A minute later, he pushed his head forward while mouthing inaudible words. His eyes never closed. The movements stopped within three minutes, and he was declared dead 12 minutes later. Greg Bluestein, *Ga. Execution is Fodder for Challenges to New Drug*, ASSOCIATED PRESS, June 28, 2011. (Attached as Exhibit R.)

60. Based on a review of these eyewitness accounts of the executions of Mr. Powell and Mr. Blankenship, Dr. Heath concluded that the reactions of these inmates were inconsistent with the statement of Dr. Dershwitz that Alabama's lethal injection protocol "will render an inmate unconscious quickly and cause the inmate's rapid and painless death." (Ex. L, Heath Decl. ¶5(h)-(j).) They are also inconsistent with Dr. Dershwitz's statement that "there is an exceedingly small risk that a condemned inmate to

20

whom 2,500 mg of pentobarbital is properly administered pursuant to the lethal injection protocol of the State of Alabama would experience any pain and suffering associated with the administration of lethal doses of pancuronium bromide and potassium chloride." Dr. Lubarsky reached the same conclusion with respect to the execution of Mr. Powell (Ex. K, Lubarsky Decl. ¶ 14). In fact, following the executions of Powell and Blankenship, Dr. Dershwitz clarified that pentobarbital can sometimes cause pain even when properly injected. *See* Bluestein (Attached as Exhibit R.) ("Medical experts differ on whether the spasms indicate the execution was improperly carried out. Dr. Mark Dershwitz, a University of Massachusetts anesthesiologist, said pentobarbital can sometimes cause pain and involuntary jerking movements even when it's properly injected.")

61. The Eighth Amendment does not allow the deliberate indifference to serious medical needs of prisoners that proceeding without further scrutiny would permit. *Nelson v. Campbell*, 541 U.S. 637, 645 (2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In fact, following Blankenship's apparent struggle, Georgia state officials have promised to work with the state attorney general to ensure "execution procedures are medically appropriate." Bluestein (Attached as Exhibit R.) Similarly, the Ohio Attorney General decided not to appeal a federal court's decision holding Ohio's lethal injection procedures unconstitutional, *Cooey v. Kasich*, Nos. 2:04-cv-1156, 2011 U.S. Dist. LEXIS 73606, at *93 (S.D. Ohio July 8, 2011), but instead resolved to "to improve our procedures and practices in preparation for carrying out future lethal injection sentences."

*Executing the Law*, July 19, 2011, Toledo Blade. (Attached as Exhibit S). But the Constitution requires that the medical propriety of pentobarbital as an anesthetic be established *before*, not *after*, it is administered in an execution.

## C. Dr. Dershwitz's Credibility Must be Examined Before a Finder of Fact.

62. Dr. Dershwitz's credibility can only be assessed before a finder of fact. Despite recently testifying "'to a reasonable degree of medical certainty that there is an exceedingly small risk that a condemned inmate to whom 2,500 mg of pentobarbital is properly administered. . . would experience any pain and suffering associated with the administration of lethal doses of pancuronium bromide and potassium chloride," he has testified on numerous occasions regarding the lack of scientific data on the use of pentobarbital as an anesthetic. *See*, *e.g*, Deposition of Mark Dershwitz, M.D., Ph.D., *Dickens*, No. CV-07-01770 (D. Ariz. Dec. 9, 2008), at 168-69, Ex. J ("Pentobarbital given by the IV route is uncommonly used in humans, and we have very, very little high quality, high resolution kinetic data on Pentobarbital in humans, and we have even less pharmacodynamic data. And so my contention is that Thiopental should be the barbiturate of all the barbiturates used for lethal injection because there is more scientific data on it."); Transcript of Testimony of Dr. Dershwitz & Dr. Groner by Telephone, *Taylor v. Crawford*, No. 05-4173-CV-S-FJG (W.D. Mo. Jan. 30, 2006), at 55, Attached as Exhibit T("Q: Is there a medical reason, to the -- do you have an opinion to a reasonable degree of medical certainty, whether there is a medical reason to use sodium pentothal as

distinguished from pentobarbital? A: It is certainly a drug whose behavior is more accurately predicted because we have much more experience with it than we have with pentobarbital."); Deposition of Mark Dershwitz, M.D., Ph.D, *Walker v. Johnson*, No. 1:05CV934 (E.D. Va. Mar. 28, 2006), at 214, Attached as Exhibit U ("[T]here are no state-of-the-art kinetic studies on pentobarbital in humans. . . ."); Deposition of Mark Dershwitz, *Alderman v. Donald*, No. 1:07-CV-1474 (N.D. Ga. Oct. 2, 2007), at 133-34, Attached as Exhibit U ("The disadvantages of using pentaobarbital[sic] is that we do not have adequate human pharmacology information that would permit me to make the pharmacokinetic and pharmacodynamic predictions, as I have done. So, I view using pentaobarbital [sic] as a disadvantage compared to thiopental because of less available and less state of the art pharmacological information.").

63.  Indeed, the Fourth Circuit has recognized Dr. Dershowitz's inconsistent testimony on lethal injection protocols. In *Brown v. Beck*, 445 F.3d 752, 755 (4th Cir. 2006), the court criticized Dr. Dershwitz's "conclusory assertion" that the use of a brain wave monitor would ensure that an inmate would not be "awake" during the injection of pancuronium or potassium chloride precisely because the assertion was inconsistent with one of his previous opinions. *Id.* ("Dr. Dershwitz's opinion on this point is particularly suspect because just two months ago he opined in another case that, absent further testing, 'it would not be prudent to recommend the use of the BIS monitor during lethal injections.'" (citing Dershwitz Rebuttal Report, *Walker v. Johnson*, No. 1:05cv934, at 4-5

23

(E.D. Va. Feb. 3, 2006))). The *Brown* court accordingly rejected Dr. Dershwitz's testimony and allowed the execution to go forward on the condition that "personnel with sufficient medical training to ensure that Plaintiff is in all respects unconscious *prior to* and *at the time of* the administration of any pancuronium bromide or potassium chloride" were present. *Brown v. Beck*, No. 5:06CT3018 H, 2006 WL 3914717, at *8 (E.D.N.C. Apr. 7, 2006).

64. Further undermining Dr. Dershwitz's credibility is controversy surrounding his attempt to alter the minutes from two meetings with Tennessee officials where he discussed Tennessee's lethal injection protocol. Transcript of Testimony of Dr. Dershwitz, *Harbison v. Little*, No. 3:06-1206 (M.D. Tenn. [August 6, 2007]), at 792-98, 807-09 (Attached as Exhibit V). The original minutes reported that Dr. Dershwitz had provided a recommendation as to Tennessee's lethal injection protocol; however, American Medical Association guidelines "specifically prohibit[] physicians from acting as consultants for making recommendations or writing protocols...." *Id.* at 795. Accordingly, Dr. Dershwitz attempted to change the minutes to reflect that he did not provide a recommendation. *Id.* According to Dr. Dershwitz, he altered the minutes because "did not want anyone to misconstrue [his] role in [the] discussions with the Tennessee committee." *Id.*

## III. BASED ON THE EXECUTION OF EDDIE POWELL, DEFENDANTS FAILED TO ADHERE TO THE STATE'S PURPORTED LETHAL INJECTION PROTOCOL.

65. Neither Mr. Grayson nor his attorneys have been permitted to see the protocol that will allegedly be followed in his execution. However, the State's expert, Dr. Dershwitz, was provided access to this document According to Dr. Dershwitz, based on his review of a document entitled "Execution Procedures," provided to him by the Alabama Attorney General's Office, the State's lethal injection protocol provides that "[a] member of the execution team who is in the execution chamber will assess the consciousness of the condemned inmate by applying graded stimuli: the team member will begin by saying the condemned inmate's name; if there is no response, the team member will gently stroke the condemned inmate's eyelashes; if there is no response, the team member will then pinch the condemned inmate's arm." (Ex. M, Dershwitz Rep. ¶ 6).

66. Witnesses to Mr. Powell's execution, however, did not observe the third graded stimuli described by Dr. Dershwitz. According to Matt D. Schulz and Christine Freeman, although a guard called out to Mr. Powell and ran his finger lightly over his eyelash, Mr. Powell's arm was not pinched. (Ex. P, Schulz Affidavit ¶ 8; Ex. O, Freeman Affidavit ¶ 13).

67. Pinching an inmate's arm is the most painful and therefore the most likely stimuli, among the three provided for in Alabama's protocol, to reliably assess anesthetic depth. (Ex. L, Heath Decl. ¶ 5(m).) An inmate who is only partially anesthetized may not respond to name-calling or touching of the eyelashes. (*Id.* ¶ 5(m).) Failure to pinch the inmate's arm prior to paralyzing the inmate with pancuronium bromide and injecting

25

potassium chloride puts the inmate at a substantial risk of serious harm. *Baze*, 553 U.S. at 52.

68. There is no compelling reason for "selectively introducing risk into some executions but not others." *Cooey*, 2011 U.S. Dist LEXIS, at *94. In failing to ensure that all executions contain the graded stimuli contained in the State's expert's description of the protocol, Defendants selectively introduced risk into a recent execution.

69. Defendants' failure to abide by its own purported procedural safeguards to assess anesthetic depth—that Dr. Dershwitz asserts are part of Alabama's protocol—violates Mr. Grayson's right to Equal Protection under the United States Constitution.

70. Mr. Grayson did not discover Defendants' deviation from Alabama's lethal injection protocol—as reported by the State's expert—until the execution of Eddie Powell on June 16, 2011. His claim is therefore timely.

## IV. ALABAMA'S LETHAL INJECTION PROTOCOL AND DEFENDANTS' UNFETTERED DISCRETION TO CHANGE SUCH PROTOCOL ARE SHROUDED IN SECRECY.

71. Although Alabama's lethal injection protocol has been provided in discovery in civil rights cases, such disclosures have been made only under seal and subject to strict confidentiality requirements. *See, e.g., Siebert v. Allen*, No. 2:07-cv-295, 2007 WL 2903009, at *7 (M.D. Ala. Oct. 3, 2007) (noting that defendants were ordered to provide a copy of Alabama's lethal injection protocol under seal and that the parties signed a

confidentiality agreement regarding the protocol). As a result of this secrecy, no person under sentence of death in Alabama can ever know the drugs to be administered, or the method of administration that will be used to execute him, unless such inmate brings a lawsuit. Indeed, Defendants have yet to respond to Mr. Grayson's request for a copy of the lethal injection protocol, but it can be presumed that this will be denied, as it has been in all other cases.

72. Under the Eighth Amendment, Mr. Grayson has the right to be free from cruel and unusual punishment, which includes the right not to be subjected to execution protocols that will "very likely . . . cause serious illness and needless suffering." *Baze*, 553 U.S. at 50 (citations omitted). Due to Defendants' secrecy, Defendants have interfered with Mr. Grayson's ability to demonstrate the unconstitutionality of Alabama's lethal injection protocol.

73. Due process requires the opportunity to receive notice of how one's rights will be affected and the opportunity to respond and be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). Here, "[f]undamental fairness and due process requires that the lethal injection protocol that will regulate an inmate's death be made available to him in a prompt and timely fashion." *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004). Similarly, an inmate sentenced to death has a right to be notified of material changes to the lethal injection protocol. *Id.* (holding that an inmate had a right to review, with his counsel and before the court, a recent amendment to a protocol designed to "prevent the

27

barbituate from leaking all over the death chamber floor"), *stay* vacated, *Sizer v. Oken*, 542 U.S. 916 (2004); *see also Dickens v. Brewer*, No. CV07-1770 (PHX) (NVW), 2009 WL 1904294, at *24 n.9 (D. Ariz. July 1, 2009) (a plaintiff is entitled to notice of any amendment to protocol if the amendment will be in effect for the plaintiff's execution), *aff'd*, 631 F.3d 1139 (9th Cir. 2011). Indeed, an inmate does not have to "take Defendants' word that his rights will not be violated by what they propose to do." *Oken*, 321 F. Supp. 2d at 664-65.

74.   The Eleventh Circuit Court of Appeals has recently expressed concern with Alabama's secrecy concerning its execution protocol, holding: "There has been no finding about the manner in which Alabama administers its lethal injections, no evaluation of whether Alabama's representations are accurate, and no opportunity whatsoever to contradict the State's assertions with Arthur's own evidence. And the lack of factual development in this record is only exacerbated by Alabama's policy of maintaining secrecy surrounding every aspect of its three-drug execution method."(*Arthur v. Thomas*, No. 11-15548, Slip Op. at 7)).

**A. DOC's Exemption From Oversight**

75. Under Alabama law, Defendants are responsible for carrying out executions, all of which take place at Holman Correctional Facility. Alabama law merely states that death-sentenced inmates are to be executed by "lethal injection." Ala. Code §§ 15-18-82 to 82.1.

76. The Alabama legislature has exempted the DOC from complying with the Alabama Adminstrative Procedure Act with respect to the State's lethal injection protocol. Ala. Code § 15-18-82.1(g) ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41.").

77. This exemption stands in stark contrast to other areas where the DOC is subject to the AAPA. *See* Ala. Code §§ 41-22-2(d), 14-1-11. In promulgating rules, the DOC must give at least 35 days' notice of its intended action to give "all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing." Ala. Code § 41-22-5(a)(1), (2). The promulgated rule must then be kept in an official register with the agency secretary for public access. Ala. Code § 41-22-7(a). Thus, when the DOC decided to define, for example, the professional attire of its employees, it was required to propose that definition for 35 days, allow public comment and then maintain a public version of the resulting rules for public access. Ala. Code § 41-22-5(a)(1)-(2); Ala. DOC Reg. 217 (Dec. 1, 2010), http://www.doc.state.al.us/docs/AdminRegs/AR217.pdf. In sharp contrast, the DOC has not provided "all interested persons"—or any person for that matter—"reasonable opportunity to submit data, views, or arguments, orally or in writing" on its manner of human execution or maintained any version of the protocol for public or even inmate access.

78. The exemption from public comment of Alabama's lethal injection protocol

also contrasts sharply with the public comment process that the State of Alabama requires of the Alabama State Board of Veterinary Medical Examiners ("ASBVME") in the context of animal euthanasia. *See* Ala. Code § 34-29-69 (giving the ASBVME authority to "adopt, amend, or repeal all rules necessary for its governance and all regulations necessary to carry into effect the provisions of this article in accordance with the Administrative Procedure Act," and stating that the regulations enacted by the ABSVME "shall be published and distributed to all licensed Alabama veterinarians and to all applicants for licensing," that "[a]ny proposed changes to the administrative code shall be published in the official newsletter of the Alabama Veterinary Medical Association and mailed to all Alabama licensed veterinarians," and that "[a] period of 10 days shall be allowed to post publication or notification so that any Alabama licensed veterinarian opposing the changes has time to request a hearing as hereafter provided").

79. Despite the fact that a period of ten days is provided for all Alabama licensed veterinarians to oppose changes to an *animal* euthanasia protocol, and that 35 days of public comment were required to amend the length of the pants DOC officers could wear, no such period is given to licensed physicians, anesthesiologists or other medical personnel for human lethal injection protocols. Such a policy is not consistent with the "fundamental respect for humanity underlying the Eighth Amendment." *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976) (citing *Trop v. Dulles*, 356 U.S. 86, 100 (1985)).

80. Defendants' secrecy denies Mr. Grayson and other death-sentenced inmates the ability to effectively enforce their Eighth Amendment rights through the judicial system. Without notice of the adopted procedures, inmates are left to allege claims based only on the limited information occasionally made public at the State's discretion. Given the State of Alabama's grant of unfettered and unsupervised discretion to the DOC in implementing a lethal injection protocol, *see* Ala. Code § 15-18-82 to 82.1, Defendants could change the State's procedures for any reason, with no oversight and no notice to the public or to the inmate who is set to be executed.

81. Not only does the Defendants' secrecy effectively thwart Mr. Grayson and other death-sentenced inmates' ability to challenge the three drug protocol, but it also effectively eliminates the ability to raise other challenges that may be viable, should the information be public. Such challenges include the drugs to be utilized, the amount of each drug to be used, the time taken to administer the drugs, the training given to the staff carrying out the execution, protocols implemented to help ensure the inmate is properly anesthesized, whether such protocols have been followed, the expiration dates of the drugs to be used, whether those drugs have been stored in properly air-conditioned locations to ensure their continued potency, and a myriad of other matters vital to ensuring that the Eighth Amendment will not be violated. Indeed, even additional challenges, which courts have found meritorious, are thwarted by the Defendants' secrecy. For example, just last week, on March 27, 2012, the federal District Court for

the District of Columbia held that foreign-manufactured sodium thiopental was improperly approved by the Food and Drug Administration (FDA) for use in executions. *Beaty v. Food and Drug Administration*, __ F.Supp.2d __, 2012 WL 1021048, (D. D.C. March 27, 2012). The Court ordered any correctional departments in possession of the drug to return it to the FDA. *Id.* Through the Defendants' secrecy, the State of Alabama effectively thwarts the ability of Mr. Grayson and similarly-situated inmates to raise such challenges, and effectively dodges judicial review of such important questions.

82. The combination of these factors results in a system whereby Defendants receive no medical, judicial or public oversight—indeed, no oversight of any sort—of their execution procedures. Nothing prevents Defendants from changing the lethal injection protocol at any time up until and including the moment of an inmate's execution. Accordingly, even if a court were to find that Alabama's lethal injection protocol is constitutional based on a review on the merits (which has not yet happened), there is simply no way of knowing that this same protocol will be the one actually used to carry out the execution.

**B. Unlawful Delegation to the DOC**

83. Moreover, Defendants' unfettered discretion to modify Alabaman's lethal injection protocol violates the doctrine of separation of powers under the Alabama Constitution. The Alabama Legislature is required to provide "reasonably clear standards governing the administration and execution [of the laws]", in order to limit the discretion

32

of the Executive in carrying out the laws. *Folsom v. Wynn*, 631 So. 2d 890, 894 (Ala. 1993). Alabama's lethal injection statute, Ala. Code § 15-18-82.1(a), however, fails to provide adequate standards for governing the administration and execution of the statute. Alabama law does not prescribe specific drugs, dosages, drug combinations, or sequences or the manner of administering lethal chemicals to carry out executions. Nor does it prescribe any certification, training or licensing required of those who participate in either the anesthesia process or the execution. In stark contrast to this statute for human execution, Alabama's animal euthanasia law provides detailed requirements as to who is to conduct euthanasia, what training that person is to receive and even requires that rules be promulgated providing for the "humane comfort" of the euthanized animals. Ala. Code § 34-29-131(b).

## V. ALABAMA'S SECRECY IS CONTRARY TO THE EVOLVING PRACTICES AND PROCEDURES OF OTHER DEATH PENALTY STATES.

84. The State has no rational interest in keeping its lethal injection protocol(s) secret. The secrecy serves only to engender suspicion and prevent death-sentenced inmates from challenging the method of execution. Indeed, numerous states, including Arizona, California, Delaware, Florida, Idaho, Maryland, Nebraska, Ohio, Oklahoma, Oregon, Tennessee and Washington make their lethal injection protocols publicly available. Ariz. Dept. of Corr., *Execution Procedures, available at* http://www.azcorrections.gov/Policies/700/0710.pdf; Cal. Code Regs. tit. 15, § 3349 (2010), available at http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/4_LI_7-

28-10.pdf; State of Del., Dept. of Corr., *Execution Procedure*, *available at* http://www.doc.delaware.gov/pdfs/policies/procedure2-7redact_4.pdf; State of Fla., Office of the Governor, Exec. Order No, 06-260 (Dec. 15, 2006), *available at* http://edocs.dlis.state.fl.us/fldocs/governor/orders/2006/06-260-lethalinjection.pdf; Idaho Dept. of Corr., *Execution Procedures*, *available at* http://www.idoc.idaho.gov/sites/default/files/webfm/documents/about_us/policies_and_fo rms/policypublic/1350201001.pdf; Md. Code Regs. 12.02.28. (2009) , *available at* https://www.dpscs.state.md.us/tmp/NewProvisionalDeathPenaltyProcedures.pdf; 69 Neb.Admin. Code ch. 11 (2009), *available at* http://www.corrections.nebraska.gov/pdf/archivednews/Execution%20Protocol.pdf; State of Ohio, Dept. of Rehab. and Corr., *Execution Procedure*, *available at* http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-11.pdf; Okla. Dept. of Corr., *Execution Procedures*, *available at* http://www.doc.state.ok.us/offtech/op040301.pdf; Or. Admin. R. 291-024-0005 to -0090, *available at* http://arcweb.sos.state.or.us/rules/OARS_200/OAR_291/291_024.html; Tenn. Dept. of Corr., *Report on Administration of Death Sentences in Tennessee* (2007), *available at* http://www.tn.gov/correction/media/pdf/Letter&ExecutionProtocolReviewReportApril20 07.pdf; State of Wash. Dept. of Corr., *Capital Punishment Policy*, *available at* http://www.doc.wa.gov/policies/showFile.aspx?name=490200.

85. Arkansas, Delaware, Georgia, Missouri, Ohio and the federal government have made their protocols public through litigation. *See*, *e.g.*, Motion for Preliminary Injunction by Don William Davis, Exhibit 1, *Nooner v. Norris*, No. 5:06-cv-00110 (E.D. Ark. June 12, 2006); Appendix to Defendant's Opening Brief in Support of Their Motion for Summary Judgment, Attachment 1, *Jackson v. Danberg*, No. 1:06-cv-00300 (D. Del. Dec. 19, 2008); Defendants' Response to Plaintiffs' Notice of Filing, Attachment 1, *Alderman v. Donald*, No. 1:07-cv-00896 (N.D. Ga. June 15, 2007); Response to Order to Prepare a Written Protocol For the Implementation of Lethal Injection, Attachment 1, *Taylor v. Crawford*, No. 2:05-cv-04173 (W.D. Mo. July 14, 2006); Notice by Defendants, Attachment 1, *Cooey v. Kasich*, No.2:04-cv-01156 (S.D. Ohio Nov. 30, 2009); Notice of Filing Exhibits in Support of Defendants' Reply to Plaintiffs' and Intervenor Plaintiffs' Opposition to Defendants' Renewed Motion for Judgment on the Pleadings and Renewed Motion to Lift the Stay of the Plaintiffs' Executions, Attachments 1-3, *Roane v. Gonzales*, No. 1:05-cv-02337 (D.D.C. July 21, 2008).

86. Moreover, several states are required to go through the administrative process and promulgate their lethal injection protocols as rules. *See, e.g.*, *Bowling*, 301 S.W.3d at 481; *Evans v. Maryland*, 914 A.2d 25, 34 (Md. 2006); *Morales v. California Dep't of Corr.*, 168 Cal. App.4th 729, 739 (Cal. Ct. App. 2008); *Conner*, Nos. 07-GOV-0238, 07-GOV-0264 (N.C.O.A.H. Aug. 9, 2007); *Robinson v. Beck*, No. 07 CVS 001109 (W.C. Sup. Ct. Jan. 25, 2007). Many states do not exempt their lethal injection protocol from

their AAPA equivalents. *See, e.g.*, Colo. Rev. Stat. § 24-4-101; 5 Ill. Comp. Stat. 100/5-5; Ind. Code § 4-22-2-3; La. Rev. Stat. §49:968(B)(2), (12), (18); Neb. Rev. Stat. § 84-901(1); S.C. Code § 1-23-10; S.D. Codified Laws§ 1-26-1(8)(g).

87. Fourteen state statutes mandate the type of drugs that must be administered in lethal injections. *See* Ark. Code Ann. § 5-4-617(a) (mandating use of an "ultra-short-acting barbiturate"); 725 Ill. Comp. Stat. § 5/119-5 (same); Md. Code Ann., Corr. Servs. § 3-905(a) (same); Miss. Code Ann. § 99-19-51 (same); Mont. Code Ann. § 46-19-103(3) (same); N.H.Rev. Stat. Ann. § 630.5(XIII) (same); N.C. Gen. Stat. § 15-187 (same); Or. Rev. Stat. §137.473(1) (same); 61 Pa. Cons. Stat. Ann. § 4304(a)(1) (same); Wyo. Stat. Ann. § 7-13-904(a) (same); *see also* Cal. Code Regs. tit. 15, § 3349.1.1(q) (mandating use of sodium thiopental); Colo. Rev. Stat. § 18-1.3-1202 (same); 501 Ky. Admin. Regs. 16:330 § 3 (same); Utah Admin. Code r. 251-107-4(2)(a). Still more require the Department of Corrections to consult with other regulatory bodies in crafting their execution protocols. *See*, *e.g.*, Conn. Gen. Stat. § 54-100 (requiring consultation with the Commissioner of Public Health in the selection of lethal drugs); Kan Stat. Ann. § 22-4001(c) (requiring certification from the secretary of health and environment that "the substance or substances selected by the secretary of corrections will result in death in a swift and humane manner."); Nev. Rev. Stat. § 176.355(2)(b) (requiring consultation with the State Health Officer in the selection of lethal drugs). Three states explicitly include pentobarbital in their public protocols, further demonstrating that Alabama's secrecy is

u n n e c e s s a r y .   *See*   A r i z o n a   P r o t o c o l ,   *a v a i l a b l e   a t* http://www.azcorrections.gov/Policies/700/0710.pdf; Delaware Protocol, *available at* http://www.doc.delaware.gov/pdfs/policies/procedure2-7redact_4.pdf; Ohio Protocol, *available at* http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-11.pdf.

88. Even if security concerns are the driving force behind Alabama's total secrecy, there is no legitimate security reason to conceal details regarding substances and methods and details of administration. Several state procedures demonstrate that the identities of execution team members can be easily protected through mandatory confidentiality. *See, e.g.*, Cal. Code Regs. tit. 15, § 3349.1.2 ("Names of the members of the Lethal Injection Team shall remain confidential."); Idaho Protocol, *a v a i l a b l e   a t* http://www.idoc.idaho.gov/sites/default/files/webfm/documents/about_us/policies_and_fo rms/policypublic/1350201001.pdf ("The identity of the members of the execution team will be confidential . . . ."); Oklahoma Protocol, *a v a i l a b l e   a t* http://www.doc.state.ok.us/offtech/op040301.pdf ("The identities of [the executioners] will remain confidential."). In fact, some states have discovered an even simpler solution: b l a c k   m a r k e r .   *S e e ,   e . g . ,*   A r i z o n a   P r o t o c o l ,   *a v a i l a b l e   a t* http://www.azcorrections.gov/Policies/700/0710.pdf (redacting sensitive material whilemaintaining information about the chemicals used in executions); Delaware Protocol, *available at* http://www.doc.delaware.gov/pdfs/policies/procedure2-7redact_4.pdf (same).

37

## VI. ALABAMA'S LETHAL INJECTION PROTOCOL HAS NEVER BEEN REVIEWED ON THE MERITS.

89. Alabama routinely seeks and obtains dismissals of lawsuits challenging the constitutionality of Alabama's lethal injection protocol on procedural grounds. *See Hallford v. Allen*, 576 F.3d 1221, 1222 (11th Cir. 2009) (dismissed for unreasonable delay); *McNair v. Allen*, 515 F.3d 1168, 1170 (11th Cir. 2008) (dismissed on statute of limitations grounds); *Grayson v. Allen*, 248 Fed. App'x 128, 132 (11th Cir. 2007) (dismissed for unreasonable delay); *Grayson v. Allen*, 491 F.3d 1318, 1319 (11th Cir. 2007) (dismissed for laches). Defendants' lethal injection protocols have never been reviewed on the merits by any court, *see, e.g., Ex parte Belisle*, 11 So. 3d 323, 338-39 (Ala. 2008) (no trial on the merits), and inmates and their counsel are routinely denied even *access* to such protocol, *see*, e.g., *Powell v. Thomas*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No. 2:11-CV-376 (WKW) (M.D. Ala. May 19, 2011).

90. Unlike the procedures in Kentucky adjudicated in *Baze v. Rees*, 553 U.S. 35 (2008), Alabama's lethal injection protocol has not been subjected to a trial on the merits and should not enjoy a presumption of constitutionality. Defendants cannot be permitted to surreptitiously and hurriedly change the lethal injection protocol at any time without affording any public comment or sufficient scientific study to confirm that the procedure they intend to use creates no "substantial risk of serious harm." *Baze*, 553 U.S. at 50.

38

91. The State's reliance on *Baze* to uphold Alabama's protocol is misplaced because the protocol has never been subject to the type of trial the protocol in *Baze* was subjected to and even if it was, the Department of Corrections would be free to change the protocol before the parties had left the courthouse.

92. It would be a violation of Mr. Grayson's constitutional rights to execute him before the protocol the State intends to use on him is (i) disclosed to him and his counsel, and (ii) any material changes are reviewed and adjudicated by the courts after an evidentiary hearing.

**FIRST CAUSE OF ACTION**

**Violation of Mr. Grayson's Right to Be Free from Cruel and Unusual Punishment Pursuant to the Eighth Amendment to the United States Constitution**

93. Mr. Grayson repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

94. The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment. Cruel and unusual punishment is inflicted where a method of execution creates a "substantial risk of serious harm." *Baze*, 553 U.S. at 55. Upon information and belief, although it is possible to conduct executions in a constitutionally compliant manner, Defendants have deliberately chosen not to do so.

95. Defendants are acting under color of Alabama law in undertaking to execute Mr. Grayson by lethal injection through (i) the use of an insufficient, improperly designed and improperly administered procedure for inducing and maintaining loss of

consciousness and loss of sensation prior to execution, and (ii) the use of chemicals that cause severe pain in the process f causing death, in conjunction with chemicals used specifically and for no other purpose than o mask that severe pain, such that there is a substantial risk that Mr. Grayson will suffer serious harm in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

96. The Eighth Amendment requires that state conduct surrounding capital punishment not be arbitrary and capricious, *Furman v. Georgia*, 408 U.S. 238, 255 (1972), and that such conduct comports with "evolving standards of decency that mark the progress of a maturing society," *Atkins*, 536 U.S. at 311.

97. In addition, Defendants are acting under color of Alabama law in undertaking to execute Mr. Grayson by lethal injection under a secret state-administered protocol that was created and is administered without oversight, denying Mr. Grayson any assurance that the constitutional protections the Eighth Amendment requires will be satisfied by the procedures applied at his execution.

98. Defendants' confidential lethal injection protocol and confidential procedures for modifying such protocol deprives Mr. Grayson of notice or opportunity to challenge any newly adopted procedures or modifications in the administration of those procedures under *Baze*, in violation of Mr. Grayson's Eighth Amendment rights.

**SECOND CAUSE OF ACTION**

**Violation of Mr. Grayson's Right to Due Process of Law Pursuant to the Fourteenth Amendment to the United States Constitution**

99. Mr. Grayson repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

100. Procedural due process imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment.

101. Behind a veil of secrecy, Defendants have adopted and revised processes and procedures for carrying out executions in the State of Alabama. The DOC is specifically exempted from rulemaking requirements regarding lethal injection. Inmates may not file grievances respecting this process, and the protocol is kept secret. Because of the unfettered and unsupervised discretion of Defendants regarding the State's lethal injection protocol and procedures, no inmate can ever be certain of the protocol and procedures that the State will use to carry out his sentence. Absent notice of the protocols, procedures, and training involved in the execution process, and any modifications thereto, and the opportunity to comment on or challenge these provisions, Defendants are violating Mr. Grayson's right to due process of law under the Fourteenth Amendment to the United States Constitution.

102. Moreover, Mr. Grayson and inmates like him are prevented from meeting their burden under *Baze* because the State goes to great lengths to maintain the secrecy of

its lethal injection protocol, obtaining court orders to prevent even inmate-plaintiffs from viewing the protocol during litigation challenging that protocol. *See, e.g., Powell*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No 2:11-CV-376 (WKW) (May 19, 2011); *Siebert v. Allen*, No. 2:07-cv-295, 2007 WL 2903009, at *7 (M.D. Ala. Oct. 3, 2007) (requiring lethal injection protocol to be kept under seal and pursuant to a confidentiality agreement). It is a violation of Mr. Grayson's due process rights to be denied access to the protocol enabling him to satisfy *Baze. See Oken,* 321 F. Supp. 2d at 664-665 (a constitutional right to court review of the lethal injection protocol under *Baze* assumes production of the protocol).

103. Because Alabama can secretly change its lethal injection protocol at any time, Mr. Grayson has no reason to believe that he will be notified of material changes to the execution protocol.   Further, without knowledge of the protocol, it will be virtually impossible for him to discover any deviations in administration. Such secrecy further impedes Mr. Grayson's ability to ensure that his execution will comport with constitutional requirements in violation of Mr. Grayson's Fourteenth Amendment rights.

**THIRD CAUSE OF ACTION**

**Violation of Mr. Grayson's Right to Equal Protection Under the Law
Pursuant to the Fourteenth Amendment of the United States**

104. Mr. Grayson repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

105. To establish a claim for relief under the Equal Protection Clause, a plaintiff

must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Cooey v. Kasich*, Case Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 U.S. Dist. LEXIS 73606, at *93 (S.D. Ohio July 8, 2011); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

106. Mr. Grayson has a fundamental right under the Fourteenth Amendment to the United States Constitution to be free from cruel and unusual punishment. *Cooey*, 2011 U.S. Dist. LEXIS 73606, at *94. This right may be burdened when a State's execution team "negat[es] . . . precise procedural safeguards" or departs from core components of the execution process set forth in a written protocol. *Id*.

107. Upon information and belief, Defendants have materially deviated from their written execution protocol on at least one occasion, impermissibly burdening Mr. Grayson's right to be free from cruel and unusual punishment.

108. According to the State's expert, Alabama's lethal injection protocol provides for a consciousness assessment involving the pinching of a condemned inmate's arm. At the execution of Eddie Powell, however, witnesses did not observe this third graded stimuli. Failure to pinch the inmate's arm prior to paralyzing the inmate with

43

pancuronium bromide and injecting potassium chloride puts the inmate at a substantial risk of serious harm. *Baze*, 553 U.S. at 52.

109. There is no compelling reason for "selectively introducing risk into some executions but not others." *Cooey*, 2011 U.S. Dist LEXIS, at *94. In failing to ensure that all executions contain the graded stimuli contained in the State's expert's description of the protocol, Defendants selectively introduced risk into a recent execution.

110. Further, because the State refuses to make its execution protocol available for review, it is possible that there have been a myriad of other deviations from the core components of the protocol.

111. Deviations from the State's lethal injection protocol burden Mr. Grayson's fundamental right to be free from cruel and unusual punishment "by negating . . . precise procedural safeguards." *Id.* Not only is there no compelling reason for the State's failure to adhere to the State's own alleged protocol, such a deviation cannot even pass rational basis review. *Id.* at 96 ("[m]ere pursuit of administrative convenience that risks flawed executions is not a legitimate state interest.") Defendants' failure to adhere to the State's procedural safeguards to assess anesthetic depth—as reported by the State's expert—violates Mr. Grayson's right to Equal Protection under the United States Constitution.

**FOURTH CAUSE OF ACTION**

**Violation of Alabama's Doctrine of Separation of Powers**
**Pursuant to Article III, Section 43 of the Alabama Constitution**

112. Mr. Grayson repeats and realleges paragraphs 1 through 92 as though fully set forth herein.

113. Section 43 of the Alabama Constitution provides, "… the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men." Therefore, while the Alabama Legislature may delegate authority to execute and administer its laws, the Legislature may not "abdicate its legislative function by delegating power to another body to make the law." *Nelson v. Donaldson*, 255 Ala. 76, 81 (Ala. 1951).

114. Alabama's lethal injection statute, Section 15-18-82, unconstitutionally delegates to the DOC the unfettered authority to create the lethal injection protocol, without notice of its legal bounds, and to change the lethal injection protocol at any time. Besides the qualified requirement that an execution be administered by lethal injection, the statute does not provide the DOC with substantive or procedural guidelines to confine this authority, and the DOC is effectively given *carte blanche* in managing the protocol.

115. The Legislature is required to provide "reasonably clear standards governing the administration and execution [of the laws]", in order to limit the discretion of the

Executive in carrying out the laws. *Folsom v. Wynn*, 631 So.2d 890, 894 (Ala. 1993).

116. Section 15-18-82 does not provide sufficient standards for governing the administration and execution of the statute. Though Section 15-18-82 provides that an execution must be conducted by lethal injection (unless the inmate elects electrocution by electric chair) the statute is silent regarding the kind of drug required to be used, or even whether the injection is to be administered using a one-drug or multiple-drug protocol. The statute also does not require any training on how to administer the drug, and there is no guidance on what equipment is to be used in the administration of the lethal injection. Ala. Code § 15-18-82(b).

117. Alabama's unconstitutional delegation of the decision-making authority to devise the lethal injection protocol also allows the DOC to change the statute at a moment's notice, effectively allowing the lethal injection protocol to evade judicial review.

**PRAYER FOR RELIEF**

For these reasons, Mr. Grayson respectfully requests this Court to:

A. Enjoin Defendants from executing Mr. Grayson with inadequate anesthesia and execution procedures that violate Mr. Grayson's rights to due process and equal protection under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment;

B. Order Defendants to disclose to Mr. Grayson and his counsel the lethal injection

protocol that will be used during Mr. Grayson's execution at least 90 days in advance of such execution without restriction as to its dissemination.

C. Enter a declaratory judgment that Defendants' inadequate anesthesia and execution procedures violate Mr. Grayson's due process right and equal protection under the Fourteenth Amendment and Mr. Grayson's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States

Constitution;

D.  Order that the Alabama Department of Corrections submit any proposed changes to the execution protocol to the Court immediately upon making them.

E. Grant any further relief as it deems just and proper.

> Dated: April 6, 2012.

> > Respectfully submitted,

> > John Palombi
> > Federal Defenders
> > 817 South Court Street
> > Montgomery, Alabama 36104
> > Phone: (334) 834-2099
> > Fax: (334) 834-0353
> > E-mail: John_Palombi@fd.org
> > KY Bar Code: 86784

> > Counsel for Carey Dale Grayson, Plaintiff

As this is a new civil complaint, service will be effectuated through the normal court processes. However, as a courtesy to the Defendants, a copy of this complaint was hand-delivered on April 6, 2012 to:

> Luther Strange,
> Attorney General
> J. Clayton Crenshaw,
> Assistant Attorney General
> Office of the Attorney General
> Capital Litigation Division
> 501 Washington Ave.
> Montgomery, AL 36130

Additionally, a copy of this complaint was sent by first-class mail on April 6, 2012, to each of the following:

> Kim Thomas
> Commissioner
> Alabama Department of Corrections
> 3001 S. Ripley St.
> P.O. Box 301501
> Montgomery, AL 36130-1501
>
> Anthony Patterson
> Warden
> Holman Correctional Facility
> Holman 3700
> Atmore, AL 36503-3700

# EXHIBIT LIST

Exhibit A - Letter to DOC requesting protocol.

Exhibit B - *Alabama v. Powell* (January 18, 2011) Motion to Set Execution Date.

Exhibit C - *Hospira Statement Regarding Pentothal (sodium thiopental) Market Exit*, Jan. 21, 2011.

Exhibit D - Letter to Attorney General Eric Holder requesting assistance in obtaining sodium thiopental to carry out executions.

Exhibit E -  Bob Johnson, *Alabama Switches Key Drug for Execution Next Month*, ASSOCIATED PRESS, Apr. 26, 2011.

Exhibit F - Letter to Attorney General Eric Holder asking that the United States Department of Justice investigate Alabama's receipt of sodium thiopental from Tennessee.

Exhibit G - Letter from Lundbeck to Ohio Department of Rehabilitation and Correction (Jan. 26, 2011).

Exhibit H - David Jolly, *Danish Company Blocks Sale of Drug for U.S. Executions*, N.Y. TIMES, July 1, 2011.

Exhibit I - *Lundbeck's Position Regarding the Misuse of Pentobarbital in Execution of Prisoners,* LUNDBECK (July 22, 2011).

Exhibit J - *See*  Deposition of Mark Dershwitz, M.D., Ph.D., *Dickens* v. *Napolitano*, No. CV-07-01770 (D.Ariz. Dec. 9, 2008).

Exhibit K - Lubarsky Declaration.

Exhibit L - Heath Declaration.

Exhibit M - Dershwitz Report.

Exhibit N - Matthew Busch, *Powell Says He's Sorry Before Death by Lethal Injection at Alabama's Holman Prison*, THE BIRMINGHAM NEWS (June 16, 2011).

Exhibit O - Affidavit of Christine Freeman, (July 14, 2011).

Exhibit P - Affidavit of Matt D. Schulz (July 14, 2011).

Exhibit Q -  Rhonda Cook, *Attorney Asks Chief Justice, DOC to Investigate Execution Problems*, ATLANTA JOURNAL-CONSTITUTION(June 24, 2011).

Exhibit R -  Greg Bluestein, *Ga. Execution is Fodder for Challenges to New Drug*, ASSOCIATED PRESS, June 28, 2011.

Exhibit S - *Executing the Law*, July 19, 2011, Toledo Blade.

Exhibit T - Transcript of Testimony of Dr. Dershwitz & Dr. Groner by Telephone, *Taylor* v. *Crawford*, No. 05-4173-CV-S-FJG (W.D. Mo. Jan. 30, 2006).

Exhibit U - Deposition of Mark Dershwitz, *Alderman* v. *Donald*, No. 1:07-CV-1474 (N.D. Ga. Oct. 2, 2007).

Exhibit V - Transcript of Testimony of Dr. Dershwitz, *Harbison* v. *Little*, No. 3:06-1206 (M.D. Tenn. August 6, 2007).