# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

CAREY DALE GRAYSON,      )
                           )
        Plaintiff,       )
                           )
v.                        )     No.  2:12-cv-00316-MHT-CSC
                           )
KIM THOMAS,          )
Commissioner, Alabama     )
Department of Corrections,  )
et al,                    )
                           )
        Defendants.    )

---

## RESPONDENTS' MOTION TO DISMISS
## AND, IN THE ALTERNATIVE,
## MOTION FOR SUMMARY JUDGMENT

---

Luther Strange
*Alabama Attorney General*

J. Clayton Crenshaw*
*Alabama Assistant Attorney General*
 *Counsel of Record*

Stephanie Reiland
*Alabama Assistant Attorney General*

Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130-0152
Tel: (334) 242-7300, 242-7423 *
Fax: (334) 353-3637
sreiland@ago.state.al.us
ccrenshaw@ago.state.al.us

April 9, 2012

**EXECUTION SET FOR APRIL 12, 2012**

# TABLE OF CONTENTS

A.  Background of Grayson's Crime, Conviction, and Subsequent Litigation ....................................................................6

B.  Grayson's § 1983 Lethal Injection Action And Relevant Background........................................................................12

C.  Summary of the State's Evidence Filed With This Motion ..........14

   1.  Dr. Mark Dershwitz's Affidavit And Testimony in Pavatt v. Matthews ...............................................................15

   2.  Warden Patterson's Affidavit................................................18

   3.  Warden Culliver's Affidavit.................................................19

   4.  Anne Hill's Affidavit ...........................................................20

   5.  Christopher Summers's Affidavit .........................................21

   6.  Matt Schulz's Testimony In DeYoung .................................22

   7.  Dr. Heath's Previous Affidavits and Testimony Opining That Pentobarbital Is Preferable To Ultrashort-Acting Drugs Such As Sodium Thiopental .....................23

   8.  Miami-Dade Circuit Court's Order Denying Manuel Valle's Motion For A Stay Of Execution ...........................26

D.  Standards Of Review .................................................................30

ARGUMENT ...................................................................................31

I.  Grayson's Eighth Amendment Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.....................31

A. Grayson's Eighth Amendment claim should be dismissed because it is barred by the statute of limitations. ...................................................................31

B. Grayson's Eighth Amendment claim should be dismissed because it fails to state a claim for which relief can be granted. ..........................................39

II. Grayson's Due Process Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.......................45

A. Grayson's Due Process claim should be dismissed because it is barred by the statute of limitations. ................................45

B. Grayson's Due Process claim should be dismissed because it fails to state a claim for which relief can be granted. ........................................................47

III. Grayson's Equal Protection Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.......................53

A. Grayson's Equal Protection claim should be dismissed because it is barred by the statute of limitations. ................................54

B. Grayson's Equal Protection claim should be dismissed because it fails to state a claim for which relief can be granted. ........................................................55

IV. Grayson's Claim That Alabama's Lethal Injection Statute Violates The Separation Of Powers Clause Of The Alabama Constitution Should Be Dismissed For Lack Of Jurisdiction And For Failure To State A Cognizable Claim For Relief Under § 1983. ........................................................60

V.   In Addition, And In The Alternative, In The Event This Court Determines That Any Of Grayson's Claims Do Not Warrant Summary Dismissal, The Defendants Are Entitled To Summary Judgment On The Basis Of The Evidence Before This Court. ..........................................................................71

    A.   The defendants are entitled to summary judgment with regard to Grayson's Eighth Amendment claim. .........................71

    B.   The defendants are entitled to summary judgment with regard to Grayson's Due Process claim. .....................................79

    C.   The defendants are entitled to summary judgment with regard to Grayson's Equal Protection claim. .............................81

CONCLUSION ...........................................................................................84

CERTIFICATE OF SERVICE ...................................................................85

Six days before his scheduled execution, on April 6, 2012, Alabama death row inmate Carey Dale Grayson filed the instant action pursuant to 42 U.S.C. § 1983 challenging the lethal injection protocol adopted by the Alabama Department of Corrections ("ADOC").[1]  Doc. 1.  His complaint presents the same allegations that this Court and the Eleventh Circuit have considered and rejected in recent § 1983 litigation filed by other Alabama death row inmates.  Specifically, Grayson's complaint raises the following four claims: (1) that Alabama's lethal injection protocol, and particularly the use of pentobarbital as the first drug in the three-drug protocol, violates the Eighth Amendment's prohibition against cruel and unusual punishment; (2) the ADOC's "veil of secrecy" regarding its lethal injection protocol violates his right to due process under the Fourteenth Amendment; (3) that the ADOC's alleged failure to comply with its execution protocol during a previous execution constitutes a violation of his rights to equal protection under the Fourteenth Amendment; and (4) that Alabama's lethal injection statute violates the separation of powers clause of the Alabama constitution.

---

[1]  In addition to the Commissioner of the ADOC and the Warden of Holman Correctional Facility, Grayson's complaint also purports to bring claims against other unknown employees and agents of the ADOC involved in the development and execution of lethal injections.  Of course, there is no fictitious party practice in federal courts.  See, e.g., Fed.R.Civ.P. 10(a); New v. Sports & Recreation, Inc., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997); Harris v. Palm Harbor Homes, Inc., 198 F.Supp. 2d 1303, 1304 n.6 (M.D.Ala. 2002); Edwards v. Ala. Dep't of Corr., 81 F.Supp. 2d 1242, 1257 (M.D.Ala. 2000).  Accordingly, there are only two proper party defendants to this lawsuit.

As discussed below, this Court should dismiss all four of the claims raised in Grayson's complaint. In addition, and in the alternative, should this Court find that any of Grayson's claims do not warrant summary dismissal, the defendants respectfully move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with regard to such claim(s) because "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."

## A.    Background of Grayson's Crime, Conviction, and Subsequent Litigation

Grayson was charged with, convicted of, and sentenced to death for the capital murder of Vickie Deblieux. On direct appeal, the Alabama Court of Criminal Appeals recounted the facts of the crime as follows:

> On the night of [February 21, 1994,] Vickie Deblieux, age 37, was dropped off by a friend on I-59 near Chattanooga, Tennessee, to hitchhike to her mother's home in Louisiana.
> Four teenagers, the defendant, Kenny Loggins, Trace Duncan, and Louis Mangione, all who had been drinking alcohol and using drugs, saw her hitchhiking on I-59 at the Trussville exit in Jefferson County, Alabama. They offered to take her to Louisiana; instead they took her to a wooded area, on the pretense of picking up another vehicle.
> After arriving in this area, they all got out of the vehicle, and began to drink. The defendant, along with the others threw bottles at Ms. Deblieux, who began to run from them. They tackled her to the ground and began to kick her repeatedly all over her body. When they noticed that she was still alive, one of them stood on her throat, supported by the Defendant, until she gurgled blood and said "Okay, I'll party," then died.

They then put her body in the back of a pickup truck and took her and her luggage to Bald Rock Mountain, after removing her clothing and a ring, and they played with her body and then threw her off a cliff.

They then went to a car wash in Pell City to wash the blood out of the truck.   After rummaging through her luggage, they hid the luggage in the woods.

On their return to Birmingham, they took Mangione home and then returned to Bald Rock Mountain, where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung, and removing her fingers and thumbs.

The next morning defendant's girlfriend found the three of them in Birmingham asleep in the truck all covered in mud and blood. The defendant told her they got blood on them from a dog.

On [February 26, 1994,] three rock climbers found Ms. Deblieux's body and called the police.   Her body was taken to the medical examiner's office.

The medical examiner found the following injuries; almost every bone in her skull was fractured, every bone in her face was fractured at least once, lacerations on the face over these fractures, a missing tooth, left eye was collapsed, right eye was hemorrhaged, tongue discolored, 180 stab wounds (postmortem), two large incisions in her chest, her left lung had been removed and all her fingers and both thumbs were cut off.

The medical examiner opined that the cause of death was blunt force trauma to the head and that she was alive during the beating.

All defendants were later arrested after Mangione began showing one of Ms. Deblieux's fingers to friends.

Grayson v. State, 824 So. 2d 804, 809–10 (Ala. Crim. App. 1999) (quoting the trial

court's sentencing order) (alterations in original).

Following a jury trial in the Circuit Court of Jefferson County, Alabama,

Grayson was convicted of murder made capital because it occurred during the

course of a kidnapping, See Ala. Code § 13A-5-40(a)(1) (2010).  Grayson v. State,

824 So. 2d at 808.[2]  After hearing the evidence and arguments during the penalty phase of his trial, the jury unanimously recommended that Grayson be sentenced to death for his capital murder conviction.  The trial court ultimately sentenced Grayson to death, in accordance with the jury's recommendation.

On direct appeal, Grayson raised numerous issues.  He argued that during the guilt phase, the court should have permitted him to question the victim's mother concerning a civil suit, id. at 811, granted his motion for a judgment of acquittal on the charge of murder during the course of a kidnapping due to insufficient evidence, id. at 816, prohibited the introduction into evidence of books and drawings that were characterized as "satanic," id. at 818, supplied defense counsel with copies of the transcripts from his co-defendants' trials, id. at 822, suppressed the evidence seized as the result of the search of his car, id. at 827, and suppressed his statement to police, id. at 831.  He contended that during the sentencing phase, the court should have prohibited the prosecutor from repeatedly questioning a witness concerning Grayson's co-defendants' statements, id. at 836,

---

[2] In connection with this crime, Grayson was charged with two counts of capital murder: (I) murder made capital murder made capital because it occurred during the course of a kidnapping, see Ala. Code § 13A-5-40(a)(1), and (II) murder made capital because it occurred during the course of a robbery, see Ala. Code § 13A-5-40(a)(2).  Grayson, 824 So. 2d at 808. As noted above, Grayson was convicted of capital murder as charged in Count I.  With regard to Count II, however, Grayson was convicted of the lesser-included offense of intentional murder. Id.  The jury unanimously recommended that Grayson be sentenced to death as to Count I, and during a separate sentencing hearing, Grayson was sentenced to death as to Count I and life imprisonment as to Count II.  Id. at 808–09. The Alabama Court of Criminal Appeals later reversed Grayson's conviction and sentence as to Count II for reasons of double jeopardy.  Id. at 843–44.

not instructed the jury that the offense was "especially 'heinous, atrocious, or cruel' when compared to other capital murders," id. at 838–39, and re-instructed the jury following closing arguments, id. at 839.  In addition, Grayson argued that he was denied his constitutional right to a jury panel composed of a fair cross-section of the community.  Id. at 835–36.  The Court of Criminal Appeals affirmed Grayson's conviction and sentence under Count I, but reversed and remanded as to Count II for reasons of double jeopardy.  Id. at 843–44.

Grayson's application for rehearing was overruled without opinion.  Id. at 824.  In 2000, the Supreme Court of Alabama granted Grayson's petition for a writ of certiorari, which raised the issues raised previously in the Court of Criminal Appeals.  Ex parte Grayson, 824 So. 2d 844 (Ala. 2001).  That court found no reversible error and affirmed both the decision of the lower court and the propriety of the sentence.  Id.  Grayson's rehearing application was subsequently denied in 2002, id. at 848, and the United States Supreme Court denied his petition for a writ of certiorari later that year, Grayson v. Alabama, 537 U.S. 842 (2002).

Having failed to obtain relief on direct appeal, Grayson next filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  Grayson v. State, No. CC-94-3700.60 (Cir. Ct. Jefferson County. Mar. 19, 2004).  In an amended Rule 32 petition, he alleged that he was denied the effective assistance of trial counsel, that he was denied the effective assistance of

appellate counsel, that the State discriminated against female jurors during jury selection, that the trial court erred in failing to sustain his counsel's objections, that pretrial publicity rendered his trial unfair, that prosecutorial misconduct deprived him of a fair trial, that the State violated <u>Brady v. Maryland</u>, that jurors had been untruthful during voir dire, that his constitutional rights were violated when the State introduced different theories at his trial than at those of his co-defendants, and that Alabama's sentencing scheme was unconstitutional. In denying all of Grayson's claims, the state circuit court remarked that his Rule 32 petition was "filled with frivolous claims and thrust before this Court" in a "wasteful manner." <u>Id.</u> at 26. The Court of Criminal Appeals affirmed, <u>Grayson v. State</u>, No. CR-03-1208 (Ala. Crim. App. Dec. 23, 2005); and the Alabama Supreme Court denied certiorari, <u>Ex parte Grayson</u>, No. 1050612 (Ala. May 19, 2006).

Following the denial of his state post-conviction appeal, Grayson sought habeas corpus relief in the United States District Court for the Northern District of Alabama. <u>Grayson v. Allen</u>, No. 2:06-cv-1444-RDP-RRA (N.D. Ala. Sept. 29, 2009). He raised ten claims,[3] all of which were denied. <u>Id.</u> at 171. Grayson then requested a certificate for appealability ("COA") on seven issues. <u>Grayson v. Allen</u>, No. 2:06-cv-1444-RDP-RRA, at 1–2 (N.D. Ala. July 19, 2010). The district

---

[3] Grayson's eleventh claim, that "[t]he cumulative effect of the errors of law discussed in this petition violated Petitioner's rights to due process, a fair trial, and a reliable sentencing protected by the 4th, 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution," was dismissed on the grounds that it did not constitute a separate and distinct constitutional claim. *Id.* at 171.

court denied his petition for lack of "a substantial showing of the denial of a constitutional right." Id. at 2–3. On appeal to the Eleventh Circuit, Grayson's COA was again denied. Grayson v. Comm'r, No. 10-13409-P (11th Cir. Oct. 13, 2010). Grayson filed a motion for reconsideration of the Eleventh Circuit's denial of his request for a COA, Grayson v. Comm'r, No. 10-13409-P (11th Cir. May 13, 2011) In that motion, he focused on the following four issues:

> (1) [W]hether the trial court erred in not allowing defense counsel to question a State witness concerning a wrongful death civil suit involving the victim, the witness's daughter;

> (2) [W]hether Grayson's constitutional rights were violated by the admission of irrelevant and highly prejudicial evidence concerning Satanism;

> (3) [W]hether trial counsel were ineffective for failing to challenge the aggravating circumstances of heinous, atrocious, or cruel; and

> (4) [W]hether trial counsel were ineffective for failing to thoroughly investigate and present extensive and available mitigating evidence during the sentencing hearing.

Id. at 2. Before the Eleventh Circuit had an opportunity to respond, on March 11, 2011, Grayson filed a petition for writ of certiorari in the United States Supreme Court. Grayson also applied separately to Justice Thomas for a COA; that application was denied on March 16, 2011. Letter from Danny Bickell for William K. Suter, Clerk of the Court, to J. Clayton Crenshaw, Assistant Attorney General of Alabama (Mar. 16, 2011), see Appl. to the Honorable Justice Clarence Thomas for a Certificate of Appealability, Grayson v. Thomas, No. 10A917 (Mar. 11,

2011). On May 13, 2011, the Eleventh Circuit issued a ten-page order by a three-judge panel (Chief Judge Dubina and Judges Tjoflat and Barkett) concerning Grayson's motion to reconsider the denial of a COA. Grayson v. Comm'r, Ala. Dep't of Corr., No. 10-13409-P. In this order, the Eleventh Circuit again denied Grayson's motion due to his failure to "show that the district court's assessment of [his] claims is debatable among reasonable jurists."[4] The United States Supreme Court denied Grayson's petition for writ of certiorari on October 3, 2011. Grayson v. Thomas, __ U.S. __, 132 S.Ct. 124 (2011).

## B.    Grayson's § 1983 Lethal Injection Action And Relevant Background

The ADOC has slightly amended its lethal injection protocol to allow for the use of pentobarbital as the first drug in Alabama's three-drug lethal injection protocol if sodium thiopental is unavailable. See Ex. A.[5] In 2010, stories abounded in the media regarding a shortage of sodium thiopental because the drug's sole manufacturer, Hospira, did not have the necessary raw materials to make it. See, e.g., Exhibit B (press account dated September 27, 2010). Hospira eventually ceased manufacturing sodium thiopental "amid a broad global campaign

---

[4] Judge Barkett dissented, finding that Issues 2 and 4 warranted a COA. .

[5] As discussed below, Alabama has employed lethal injection since 2002. The only modification that has recently been made to Alabama's lethal injection protocol is to allow for the use of pentobarbital if sodium thiopental is unavailable.

by opponents of the death penalty." <u>See</u> Exhibit C, "Drug Halt Hinders Executions in the U.S.", <u>Wall Street Journal</u>, January 22, 2011.

Because of the unavailability of sodium thiopental, numerous states began switching from using sodium thiopental to using pentobarbital in their respective lethal injection protocols.  Indeed, in 2011-12, twelve states (including Alabama) have used pentobarbital in carrying out forty-eight executions.  <u>See</u> http://www.deathpenaltyinfo.org/execution-list-2011 (last visited April 9, 2012).

As noted above, Grayson's complaint (which is virtually identical to the recent complaints filed in this district by Alabama death row inmates Jason Williams, Eddie Powell, and Thomas Arthur) alleges four causes of action: (1) an Eighth Amendment cruel and unusual punishment violation; (2) a Fourteenth Amendment due process violation; (3) a Fourteenth Amendment equal protection violation; and (4) a violation of Alabama's doctrine of separation of powers pursuant to Article III, Section 43 of the Alabama Constitution. <u>See</u> Doc. 1.  In his prayer for relief, Grayson asks this Court to: (1) enjoin the state defendants from executing him with inadequate anesthesia and execution procedure that violate his rights to due process and equal protection under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment; (2) require the ADOC to provide him notice of its complete lethal injection protocol at least 90 days before his execution; (3) enter a declaratory

judgment that the ADOC's execution procedures are unconstitutional under the Eighth and Fourteenth Amendments; and (4) order that the ADOC submit any "proposed changes" to the lethal injection protocol to this Court.  Doc. 1 at 46-47.

## C.    Summary of the State's Evidence Filed With This Motion

In support of this motion, the State provides several exhibits concerning Alabama's execution protocol and the recent amendment allowing for the use of pentobarbital when sodium thiopental is not available.   In addition, the State submits several affidavits from witnesses to Powell's execution that counter Grayson's meritless allegation that Powell suffered during his execution.  See Doc. 1 at 18-22 (allegations regarding Powell's execution).   In fact, these affidavits establish that during his execution, Powell raised his head for a brief moment, at the most a few seconds.   These affidavits also demonstrate that the execution protocol was followed, including the graded stimuli to be performed during the consciousness assessment that take place after the administration of pentobarbital. The State presents several affidavits and testimony from Dr. Heath, one of Grayson's expert witnesses, who when evaluating execution protocols using the ultra-short acting drug sodium thiopental testified that using a longer lasting barbiturate (such as pentobarbital) would be preferable.  The State also attaches as an exhibit a memorandum opinion from the Circuit Court of Miami-Dade County that addressed evidence concerning the Blankenship and Powell executions and

ruled for the State and denied the requested stay of execution.  See Florida v. Manuel Valle, F78-5281A (Miami-Dade Cir. Ct. Aug. 3, 2011) (Ex. N).

> **1.    Dr. Mark Dershwitz's Affidavit And Testimony in Pavatt v. Matthews**

Dr. Mark Dershwitz, a board certified anesthesiologist at the University of Massachusetts and Professor of Anesthesiology and Biochemistry and Molecular Pharmacology at the University of Massachusetts, prepared an affidavit opining that Alabama's lethal injection protocol, "when implemented as written, will render an inmate unconscious quickly and cause the inmate's rapid and painless death."  Ex. D at ¶ 5.  Dr. Dershwitz is uniquely qualified to serve as an expert witness in lethal injection cases because he is an anesthesiologist with a Ph.D. in pharmacology.  Ex. D at ¶ 2.  In Pavatt v. Matthews, 627 F.3d 1336 (10th Cir. 2010), the Tenth Circuit credited Dr. Dershwitz's opinion in upholding Oklahoma's use of pentobarbital in an execution by lethal injection.  Dr. Dershwitz has "done extensive research and written numerous review articles and research papers on the use of anesthetics" and has performed time course studies of the effects of those drugs.  Ex. D at ¶ 3.  In addition, he has reviewed the execution protocols in the states of Arkansas, Alabama, Arizona, Delaware, California, Florida, Georgia, Kentucky, Maryland, Missouri, Montana, North Carolina, Ohio, Oklahoma, South Carolina, Texas, Virginia, and Washington, as well as the federal government's protocol.  Ex. D at ¶ 5.

As Dr. Dershwitz noted in his affidavit, the first step of a lethal injection in Alabama is the intravenous administration of an anesthetic drug – specifically, 2,500 milligrams of sodium thiopental, or if sodium thiopental is unavailable, 2,500 milligrams of pentobarbital.  Ex. D at ¶ 6b.  After the anesthetic drug is administered, a member of the execution team who is in the execution chamber performs a "consciousness check," during which he assesses the consciousness of the inmate by performing graded stimuli.  Ex. D ¶ 6d.  Dr. Dershwitz stated, "once 2,500 mg of pentobarbital have been administered intravenously to an inmate, there is an exceedingly small risk that the inmate could experience the effects of the subsequently administered pancuronium bromide or potassium chloride" (the second and third drugs serially administered during Alabama's lethal injection procedure).  Ex. D at ¶ 11.  Dr. Dershwitz went on to explain that "a dose of 2,500 mg of pentobarbital will cause virtually all persons to stop breathing."  Ex. D at ¶ 12.  Indeed, 2,500 mg of pentobarbital "by itself would cause death to almost everyone."  Ex. D at § 12.

Pentobarbital is a barbiturate just like sodium thiopental.  Ex. D at ¶ 7.  Moreover, as Dr. Dershwitz explained, "[p]entobarbital is the most common agent used for physician-assisted suicide in those jurisdictions where the practice is legal."  Ex. D at ¶ 13.  Pentobarbital is not commonly used in general anesthesia in surgery because its duration is considered too long for this purpose.  Ex. D at ¶ 13.

Thus, because the goal in surgery "is to have the patient awaken quickly and recover promptly following completion of the surgical procedure," pentobarbital is generally not used.  Id.  Pentobarbital is administered in clinical settings "to produce barbiturate coma in the attempt to decrease the degree of brain damage following head trauma, stroke, and other causes of brain damage."  Id. Pentobarbital is "also used to prevent brain damage during surgical procedures in which there will be the planned and deliberate interruption of blood flow to the brain."  Id.  Dr. Dershwitz stated that the amount of pentobarbital administered during an execution pursuant to Alabama's lethal injection protocol is "far in excess of that used to induce and maintain barbiturate coma, and since this is a depth of anesthesia far greater than that needed for any surgical procedure, once 2,500 mg of pentobarbital have been administered intravenously to an inmate, there is an exceedingly small risk that the inmate could experience the effects of the subsequently administered pancuronium bromide or potassium chloride."  Ex. D at ¶ 11.

Dr. Dershwitz testified recently in a case in Oklahoma that pentobarbital is considered to be an anesthetic drug and would be used in surgery "except for the fact that it's too long lasting for our present purposes."  Ex. G at 10, 34 (from Pavatt v. Jones).  Dr. Dershwitz also stated that "there is no measurable difference in onset from thiopental to pentobarbital in a typical patient."  Ex. G at 77.  Dr.

Dershwitz opined that a dose of 2.5 grams of pentobarbital, the dose used by Alabama, is a lethal dose on its own. Exhibit G at 27, 32, 53.

### 2.    Warden Patterson's Affidavit

The affidavit of Anthony Patterson, the Senior Warden of Holman Correctional Facility, establishes that Alabama's lethal injection protocol is carefully and deliberately followed during executions. Ex. E. In his affidavit, Warden Patterson describes his knowledge of, and experience with, executions by lethal injection in Alabama. As Senior Warden of Holman, he is charged with ensuring that execution warrants are properly carried out in compliance with the law and with Alabama's execution protocol, and he is responsible for overseeing the execution team. Ex. E at 1. Since becoming Senior Warden of Holman in November of 2009, Warden Patterson presided over nine executions, all of which took place by lethal injection. Ex. E at 1. In addition, he served as a member of the execution team in connection with ten other executions that took place at Holman between 2005 and 2009. Ex. E at 2. Thus, Warden Patterson has participated in a total of 19 executions by lethal injection (more than half of the 29 such executions that had taken place in Alabama). Ex. E at 2. Warden Patterson averred: "In each of the nineteen executions in which I have participated, Alabama's lethal injection protocol was properly administered. And, each of these executions took place without mishap." Ex. E at 2.

Warden Patterson presided over Eddie Powell's execution and stated that there was "no deviation from the protocol whatsoever."  Ex. E at 4.  He noted that "[a]t the beginning of the execution, I saw that Powell raised his head for a few seconds; shortly after he raised his head, he rested it back down on the gurney." Id.  Warden Patterson stated that the consciousness assessment was conducted in accordance with the execution protocol:

> After the first drug (pentobarbital) was administered and Powell appeared to be unconscious, a consciousness assessment was conducted using graded stimulation, in accordance with the execution protocol.  I saw a member of the execution team, who was stationed in the execution chamber, approach Powell.  I heard that team member say Powell's name aloud.  I also saw the team member reach his hand toward Powell's face, presumably to brush Powell's eyelashes.  Finally, I saw the team member reach his hand toward Powell's arm, presumably to perform the pinch test portion of the consciousness assessment.  I did not see or hear Powell respond to any of these stimuli.  Following the consciousness assessment, the execution continued in accordance with the protocol.  Throughout the entire execution, I observed nothing that would indicate Powell suffered any pain.

Ex. E at 4-5.  Warden Patterson stated that he did not observe anything that indicated Powell suffered any pain.  Ex. E at 5.

### 3.   Warden Culliver's Affidavit

Grantt Culliver, the Senior Warden at Holman Correctional Facility from August of 2002 until November of 2009, also provided an affidavit regarding

Alabama's execution process.  See Ex. F.  As Senior Warden, Culliver oversaw and carried out the first execution by lethal injection in Alabama in 2002, as well as the next 19 executions until October 8, 2009, all of which were carried out by lethal injection.  Id.  Warden Culliver personally observed the inmates in all 20 executions.  In each instance, the anesthesia was properly administered to the inmate and there was no indication whatsoever that the inmate experienced any pain.  Id.

### 4.    Anne Hill's Affidavit

Anne Hill, General Counsel for ADOC, submitted an affidavit that is an eyewitness account of Powell's execution.  Ex. I.  Hill viewed the execution in a room directly in front of Powell.  Ex. I at 2.  Hill said that at approximately 6:03 p.m., Powell gave a final statement.  Ex. I at 2.  After Powell gave his statement, the Warden exited the execution chamber and went into the control room.  Id.  At approximately 6:04 p.m., the Warden, through intercom transmission, asked the Commissioner if the execution should proceed.  Id. at 3.   After receiving the directive to proceed, the Warden began his preparations to carry out the execution.  Id.  At the time the Warden was given the directive to proceed, the chaplain was praying with Powell.  Id. at 5.  While the chaplain was praying, Powell closed his eyes briefly.  Id.  Hill described what happened next:

> [Powell] then simply lifted his head with his eyes open
> and appeared disoriented – this lasted at the most three

seconds – and then placed his head back down on the gurney.  He closed his eyes, took a few deep breaths, and appeared to go to sleep.  Within about two minutes of the Warden being given the order to proceed, Powell appeared unconscious.

Id.[6]  Approximately a minute later, "the execution team member stationed in the execution chamber to Powell's left approached Powell and, in keeping with the protocol, conducted a consciousness assessment using graded stimulation – saying Powell's name, stroking his eyelashes, and pinching the back of his left arm."  Id. Powell gave no response indicating that he was unconscious.  Id.  Hill stated that "[t]he fact that Powell picked-up his head, appeared disoriented, put his head back down, and took a few last breaths is not unique and certainly in no way exhibited any pain or distress."  Id. at 5.

### 5.    Christopher Summers's Affidavit

Christopher Summers, the Institutional Chaplain at Holman, submitted an affidavit regarding his observations of Powell's execution.  Ex. J.  As a part of his duties, Chaplain Summers is in the execution chamber to be available to the condemned inmate for prayer.  Ex. J at 1.  Chaplain Summers stated as follows:

After the Warden read the execution warrant, left the execution chamber, and received orders from the Commissioner to proceed with the execution, I was given

---

[6] An exhibit submitted by Grayson corroborates Hill's affidavit.  See Doc. 12, Ex. N (Birmingham News article).  The reporter stated that Powell closed his eyes after the chaplain began praying but, after a moment, opened his eyes and raised his neck and head off the gurney.  Id.  Powell looked "confused and startled" and then looked to one side.  Id.  "After a few seconds his breathing slowed again and he closed his eyes."  Id.

> the signal from the Captain to proceed with prayer. I
> stepped over to the gurney, got on one knee, placed my
> left hand on Powell's left leg, held his left hand with my
> right hand, and began to pray. As I prayed, I bowed my
> head and closed my eyes. I generally offer prayer for a
> minute or two and sometime during that time period, the
> inmate's hand that I am holding releases, signifying to
> me that the inmate is unconscious. Powell was no
> different than any other inmate to whom I have
> ministered during an execution.

Id. at 1-2. After Powell released the Chaplain's hand, he stood up, stepped away

from the gurney, and looked at Powell, who appeared to be asleep. Id. at 2.

### 6.    Matt Schulz's Testimony In <u>DeYoung</u>

The next exhibit presented by the State is the testimony of Matt Schulz from

the <u>DeYoung</u> district court proceedings giving his eyewitness account of Eddie

Powell's execution. <u>See</u> Ex. K. The State offers Schulz's testimony solely because

it differs from his affidavit, <u>see</u> Doc. 1, Ex. P, on some facts.

After the Warden read the execution warrant, Schulz began to pray but

insisted he was still "paying attention." Ex. K at 118. Schulz did not indicate in

his affidavit that he prayed during Powell's execution. Doc. 12, Ex. P. Powell

looked to his left to the room where Schulz was located and then laid his head back

as the chaplain was praying. Id. at 119. Powell remained relaxed "for a minute,"

but then "sat up very abruptly" and looked to the left with "a look of confusion on

his face." Id. at 120. Schulz claimed that Powell sat up for about a minute, then

his eyes glazed over and he laid his head back down and closed his eyes. Id. at

121.  There was no more movement from Powell when he laid his head back down.

Id.  During the consciousness assessment, Schulz saw the "guard" call Powell's name and stroke his eyelash to which Powell did not respond.  His testimony indicated Schulz then looked away.  Id. at 122.  Specifically, Schulz testified, "after that point at some point I was looking again."  Id.  Schulz stated that at some point during the execution Powell's eyes "appear[ed] to be open, not all the way, by any stretch, not even halfway, but perhaps maybe twenty, twenty-five percent just sort of barely open, but again not, not completely closed."  Id. at 121-22.

### 7.  Dr. Heath's Previous Affidavits and Testimony Opining That Pentobarbital Is Preferable To Ultrashort-Acting Drugs Such As Sodium Thiopental

Dr. Mark Heath submitted an affidavit as an attachment to the Arthur complaint, which Grayson also submits.  See Doc. 1, Ex. L.  Dr. has a long track record of testifying against states in lethal injection actions brought by convicted capital murderers.  As the following affidavits and testimony demonstrate, Dr. Heath, contrary to his affidavit in the case at hand, previously extolled the benefits of barbiturates (such as pentobarbital) that lasted longer than the ultrashort-acting sodium thiopental.  For example, Dr. Heath opined in a case in Ohio that sodium thiopental was dangerous to use because it has "a quick onset and short duration."  Ex. L at ¶ 37.  Dr. Heath spoke approvingly of the Ohio veterinary regulations that required the use of pentobarbital because it "vastly reduces the risk of the

anesthetic wearing off prematurely." Id. at ¶ 40.  In another affidavit, Dr. Heath criticized the Virginia Department of Corrections for using the ultrashort-acting barbiturate sodium thiopental.  Ex. M at ¶ 33.  Heath stated that "[a]s the name implies, ultra-short acting barbiturates wear off faster than other classes of barbiturates that exhibit longer lasting effects [such as pentobarbital]." Id.  Heath stated the Virginia DOC should use different anesthetic drugs that would eliminate the risks, which he claimed to exist, from using an ultrashort-acting barbiturate.  Id.

In 2009, Heath testified before the Senate Judiciary Committee in the Nebraska legislature against a bill that proposed adopted lethal injection as that state's method of execution.  Heath testified that a longer lasting drug such as pentobarbital would be more preferable that the ultrashort-acting sodium thiopental.  Heath testified as follows:

> The most important thing to understand about lethal injection is that it is a humane way of killing so long as it is done properly.  If you need to put an animal to sleep and if you want to give it a humane death, lethal injection will achieve those goals so long as you know what you're doing and you do it the right way.  How do veterinarians put animals to sleep?  Generally, they use a very large overdose of a drug called pentobarbital, which makes the animal fall asleep peacefully and stops all breathing.  Pentobarbital used by itself is a very reliable and very humane way of putting an animal to sleep.  The problem is that the kind of lethal injection that is used for executing humans is very different from what is used for animals.  With humans, a drug called Pentothal [sodium thiopental] is used and that's a very poor choice.  Pentothal is a very short-acting anesthetic, so if you don't

24

receive enough you'll wake up before the execution is completed.

See http://nebraskalegislature.gov/FloorDocs/101/PDF/Transcripts/Judiciary/2009-01-29.pdf (last visited April 9, 2012).

Heath testified in Baze v. Rees that longer lasting drugs (such as pentobarbital) were preferable over sodium thiopental:

Q: Do you know if thiopental is used in the euthanasia of animals?

A: Very, very rarely, if ever.

Q: Why is that?

A: Um, there are much better drugs for achieving the goal of euthanasia than thiopental.

Q: Uh, do you know if there are any risks associated with using thiopental to euthanize an animal?

A: Well, one of the issues is that it's a ultra-short-acting drug.  Uh, that's certainly a concern and it makes much more sense, uh, and what is done is to use is a much longer-acting drug.

Q: Does that concern you just mentioned also exist with human beings using thiopental?

A: Yes, it does.

Baze v. Rees, 2007 WL 4790797, (U.S.) Joint Appendix Vol. II at *455-*456.  Of course, pentobarbital fits within Dr. Heath's description of a "longer-acting drug."

At another point in his testimony, Dr. Heath was critical of a three-drug execution protocol that used an ultrashort-acting drug like sodium thiopental. He testified as follows:

> Q: What is it about those chemicals [used in a 3-drug execution protocol] that seemed peculiar to you?
>
> A: Uh, many things. As anesthesiologists, we tend to kind of to group our drugs by duration of action. And they had chosen an ultra-short-acting barbiturate, thiopental, or pentathlon as it is often called, very-short-acting drug, combine it with a very-long-acting drug, pancuronium. That's generally not how one would want to do things. They've also chosen a drug for stopping the heart, potassium, which is an extremely painful way of stopping the heart. There are many non-painful ways of stopping the heart that would achieve the same end.

Baze, 2007 WL 4790797, at *426-*427.

### 8. Miami-Dade Circuit Court's Order Denying Manuel Valle's Motion For A Stay Of Execution

The Miami-Dade Circuit Court denied Manuel Valle's request for a stay of execution after conducting an evidentiary hearing where evidence concerning the recent executions of Powell and Blankenship were presented. In a 21-page order, the court made findings of fact regarding those recent executions and the efficacy of pentobarbital in an execution protocol. See Ex. N. The court framed the issue as follows: "The question here is whether pentobarbital is an effective substitute for the sodium thiopental previously used." Ex. N at 2 (emphasis in original).

The court heard testimony from Matt Schulz, who witnessed the execution of his client, Eddie Powell, in Alabama, and from John Harper and Dr. Jacqueline Martin, who witnessed the execution of Roy Blankenship in Georgia.  Ex. N at 3-12.  The court also heard expert witness testimony from Dr. David Waisel, who testified on behalf of the capital defendant, and Dr. Mark Dershwitz, who testified for the State.

Schulz testified that he did not know when the administration of the drugs began in the Powell execution.  Ex. N at 4.  He stated that the chaplain spoke to Powell for 30-60 seconds and that "Powell lay there approximately one minute then suddenly jerked his head and his upper and lower body appeared as if pressing against the restraints."  Ex. N. at 4.  Schulz said that Powell attempted to sit up for about a minute and then laid his head back down and appeared to be unconscious.  Id.  Schulz also said that this was the first execution he had attended and it was a very stressful event.  Id. at 5.

John Harper viewed the execution of Roy Blankenship and as a part of his responsibilities as an employee of the Georgia Department of Corrections has witnessed all 28 executions by lethal injection in that state.  Id. at 9.  The court's order summarized Harper's testimony as follows:

> Blankenship had an intravenous line into each of his arms.  He saw Blankenship look around and look at his left arm about five seconds after the start of the first syringe.  However, the pentobarbital was first

administered to Blankenship's right arm.   He heard
Blankenship make a "grunt" sound.  Harper knew when
the drugs were administered because he was given a
signal and he was keeping a time log.  About ten seconds
passed between the time the syringe was pushed and
when Blankenship appeared to be unconscious.   There
was no flailing or thrashing.  After the pentobarbital was
administered a consciousness check was performed and
Blankenship did not respond.

Ex. N at 10.

Dr. Martin, the medical pathologist who performed Blankenship's autopsy,
viewed Blankenship's execution.  Id. at 11.  Dr. Martin stated that two to three
minutes after the warden left the execution chamber, Blankenship looked to his left
arm and moved his mouth and then looked at his right arm.  Id. at 12.  At that
point, he put his head on the pillow and "stayed put."  Id.

Dr. Mark Dershwitz, who has submitted an affidavit in the instant case, see
Ex. D, testified during the Valle evidentiary hearing.  Dr. Dershwitz testified that
pentobarbital is used in clinical settings "to induce a barbiturate coma or as a
sedative or to treat intractable seizures."  Id. at 13.  He stated that the dose of
pentobarbital used in an execution would cause the circulatory system and then the
respiratory system to shut down.  Id.  The dose would cause "a total flat line on the
EEG in brain activity" and the inmate "would have no perception of pain or
sensation."  Id. at 13-14.  Dr. Dershwitz testified that pentobarbital is not used as
an anesthetic "because it lasts longer and causes a longer 'hangover' after medical

28

procedures; doctors prefer their patients awake at the end of surgery." Id. at 14. The court found Dr. Dershwitz's testimony "credible and persuasive." Id. at 15.

The court noted that the "facts and testimony in this case are substantially similar to that in DeYoung v. Owens, 2011 WL 289974 (11th Cir. 2011)." Id. at 15. It quoted a portion of the Eleventh Circuit's opinion in DeYoung holding that Valle did not present any credible evidence to demonstrate that unconsciousness is not achieved after the complete administration of a lethal dose of pentobarbital. Id. at 17. The court held as follows:

> The defendant has failed to show that the substitution of pentobarbital as an anesthetic violated the Eighth Amendment's prohibition of cruel and unusual punishment. Defendant has attempted to use evidence of two earlier executions (Powell and Blankenship) to show that the administration of 5,000 mg of pentobarbital caused needless suffering in and of itself, and that the pentobarbital dose does not adequately render an inmate unconscious, thereby leading to needless suffering. The evidence presented did not establish substantial risk of serious harm from pentobarbital, or even that inmates who were executed earlier necessarily suffered any harm, much less serious harm, from intravenous administration of pentobarbital. Like the Federal District Courts in Powell, DeYoung, and Pavatt, this court finds that usage of pentobarbital does not create an objectively unreasonable risk of suffering.

Ex. N at 20.

D.    **Standards Of Review**

The Eleventh Circuit has held: "[i]njunctive relief is an equitable remedy that is not available as a matter of right."  Grayson v. Allen, 491 F.3d 1318, 1322 (11th Cir. 2007).  "Additionally, the equitable principles at issue when inmates facing imminent execution delay in raising their § 1983 method-of-execution challenges are equally applicable to requests for both stays and injunctive relief."  Id.; see also Rutherford v. McDonough, 438 F.3d 1087, 1092 (11th Cir. 2006) (commenting that "where petitioner's scheduled execution is imminent, there is no practical difference between denying a stay on equitable grounds and denying injunctive relief on equitable grounds in a § 1983 lawsuit"), vacated on other grounds, Rutherford v. McDonough, 547 U.S. 1204, 126 S.Ct. 2915 (2006).

In analyzing the sufficiency of pleading in the complaint, courts are guided by a two-prong approach: (1) the court is not bound to accept conclusory statements of the elements of a cause of action and (2) where there are well-pleaded factual allegations, this Court should assume their veracity and then determine whether they plausibly give rise to entitlement to relief.  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009).  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation and punctuation

omitted).  Although a complaint need not contain "detailed factual allegations," to survive a motion to dismiss, it must contain "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.  Further, the factual allegations "must be enough to raise a right to relief above the speculative level."  Id. at 555.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

## ARGUMENT

### I.   Grayson's Eighth Amendment Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.

#### A.   Grayson's Eighth Amendment claim should be dismissed because it is barred by the statute of limitations.

Grayson's Eighth Amendment claim is barred by the statute of limitations. Grayson's cause of action accrued on October 7, 2002, when Grayson's conviction and sentence became final.  See McNair v. Allen, 515 F.3d 1168, 1177 (11th Cir. 2008) (holding that a "method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital litigant

becomes subject to a new or substantially changed protocol"). Under Alabama's relevant two-year statute of limitations period, see Jones v. Preuit & Mauldin, 876 F.2d 1480, 1483 (11th Cir. 1989), Grayson's lethal injection action, to be timely, should have been filed no later than October 7, 2004. Grayson filed this action on April 6, 2012, see Doc. 1, almost eight years after the expiration of the statute of limitations.

The Eleventh Circuit has held that an inmate's "method of execution claim accrues on the later of the date on which state review is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." McNair, 515 F.3d at 1174. As discussed in McNair, in July 2002, the state of Alabama implemented a new execution protocol, changing the "preferred method of execution from electrocution to lethal injection." Id. at 1177. Inmates on death row at that time, including Grayson, had thirty days to opt out of the lethal injection protocol and elect execution by electrocution. For any death row inmate who did not choose electrocution, July 31, 2002 was "when it became clear he would be executed by lethal injection," and thus, was when the running of the statute of limitations commenced. Id. That meant that, in McNair, the death row inmate's § 1983 complaint challenging Alabama's lethal injection protocol began to run on July 31, 2002. And, "absent a significant change in the state's execution protocol (which did not occur in [that] case)," the inmate was required to

bring his claim by July 31, 2004, which was "more than two years before his complaint was filed." Id. at 1177. McNair's claim was, therefore, barred by the two-year statute of limitations. The same conclusion is required here.

Grayson's conviction and sentence became final on October 7, 2002, when the United States Supreme Court denied his petition for a writ of certiorari on direct appeal. Grayson v. Alabama, 537 U.S. 844. Pursuant to McNair, Grayson's challenge to execution by lethal injection accrued on October 7, 2002, absent a later "significant change" in the state's execution protocol. As stated below, under binding precedent from the Eleventh Circuit, there has not been a "significant change" to Alabama's lethal injection protocol. Accordingly, Grayson's complaint is barred by the statute of limitations.

Grayson contends that Alabama's intention to execute him pursuant to its lethal injection protocol violates his Eighth Amendment right to be free from cruel and unusual punishment. He further argues that the recent replacement of sodium thiopental with pentobarbital in the three-drug lethal injection sequence is a substantial change to the protocol that gives rise to a new method of execution claim not barred by the statute of limitations. The Eleventh Circuit has repeatedly rejected this precise argument. See Powell(Williams) v. Thomas, 641 F.3d 1255 (11th Cir. 2011); Powell v. Thomas, 643 F.3d 1300 (11th Cir. 2011); DeYoung v. Owens, 646 F.3d 1319 (11th Cir. 2011); Valle v. Singer, 655 F.3d 1223 (11th Cir.

33

2011).  In Powell(Williams), the Eleventh Circuit rejected the Williams's Eighth Amendment notice claim, specifically holding that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol, and we conclude that such an amendment does not violate the Eighth Amendment under the cases cited by Williams." Powell(Williams), 641 F.3d at 1258.  In Powell, the Eleventh Circuit affirmed the dismissal of a virtually identical § 1983 lethal injection action on statute of limitations grounds, holding that the state's replacement of sodium thiopental with pentobarbital did not restart the statute of limitations clock.  Powell, 643 F.3d at 1301-05.  In DeYoung, the Eleventh Circuit reiterated its holding in Powell, noting that it "rejected an identical claim as to Alabama's recent switch from sodium thiopental to pentobarbital."  DeYoung, 646 F.3d at 1325 (citing Powell, 643 F.3d at 1301-05).  In Valle, the Eleventh Circuit again reaffirmed its holdings in Powell and DeYoung.  Valle, 655 F.3d at 1231 (concluding that the inmate's lethal injection challenge was barred by the statute of limitations).  This Court should apply this binding precedent to this case and hold that Grayson's Eighth Amendment claim is barred by the statute of limitations.

The Eleventh Circuit, in a recent split-panel decision, concluded that it could ignore its binding precedent - namely, that the substitution of pentobarbital for sodium thiopental is not a significant change to restart the statute of limitations

clock - where the district court does not engage in a fact-dependent inquiry to make that determination for itself. Arthur v. Thomas, __ F.3d __, 2012 WL 934385 (11th Cir. Mar. 21, 2012).[7] But as Judge Hull's dissent in Arthur noted, Powell, DeYoung, and Valle, "reject[ed] the contention that we are not bound by our earlier precedent on the effect of the pentobarbital substitution on the statute of limitations. Arthur, at *21 (citing DeYoung, 646 F.3d at 1325; Powell, 643 F.3d at 1304-05; Valle, 655 F.3d at 1232) (Hull, J., dissenting). The legal principle that comes out of these cases is "the substitution of pentobarbital for sodium thiopental is not a significant change in Alabama's lethal injection protocol to restart the statute of limitations clock." Id., at *22 (citing Valle, 655 F.3d at 1233; DeYoung, 646 F.3d at 1325; Powell, 643 F.3d at 1304-05; Powell(Williams), 641 F.3d at 1258).

Because the split 2-1 decision in Arthur ignored this precedent, it conflicts with the holdings in Powell(Williams), Powell, DeYoung, and Valle, which all held, as a matter of law, that the substitution of pentobarbital for sodium thiopental is not a significant change that would restart the statute of limitations clock. Under the prior panel precedent rule it is absolutely clear that where decisions are inconsistent, the earlier decision (or in this instance the earlier four decisions) establish the law that must be followed. See United States v. Hornaday, 392 F.3d

---

[7] The Arthur panel opinion is not final because the state defendants' petition for rehearing *en banc* remains pending.

1306, 1316 (11th Cir. 2004); <u>Hurth v. Mitchem</u>, 400 F.3d 857, 862 (11th Cir. 2005).  This Court, therefore, must apply the Eleventh Circuit's precedent holding that claims such as Grayson's are time-barred because the substitution of pentobarbital for sodium thiopental does not change the statute of limitations accrual date.

The majority opinion in <u>Arthur</u> emphasized that the expert witness affidavits presented in that case, which are the same exact affidavits presented by Grayson, were not presented or considered in the previous on-point cases decided by the Eleventh Circuit.  <u>Arthur</u>, 2012 WL 934385, at *3.  But the majority opinion does not specifically discuss the contents of those affidavits, instead making broad assertions such as that the experts "were prepared to testify about specific defects in Alabama's administration of its execution protocol."  <u>Id.</u>, at *3.  In contrast, the dissent analyzed the specific information contained in the expert witness affidavits in determining that these affidavits did not establish that the substitution of pentobarbital for sodium thiopental is a significant change that restarts the statute of limitations clock.  As Judge Hull noted, Dr. Lubarsky's affidavit does not opine that 2,500 mg of pentobarbital will not cause unconsciousness in humans.  <u>Id.</u> at *6.  In addition, Dr. Lubarsky does not refute Dr. Dershwitz's opinion that 2,500 mg of pentobarbital causes unconsciousness and lack of sensation.  <u>Id.</u>  Moreover, Dr. Lubarsky's opinion, that it takes pentobarbital fifteen to sixty minutes to reach

maximum effect, is meaningless because he does not define "maximum effect" nor does he state that it would take that length of time to establish unconsciousness.[8] Id.  The dissent also analyzed Dr. Heath's affidavit and noted that like Dr. Lubarsky, Dr. Heath neither expressed an opinion as to whether the dose of pentobarbital administered will cause unconsciousness nor stated how long it would take for such a dose to render an inmate unconscious.  Id. at *7.  Finally, the dissent addressed the affidavit of Dr. Mark Dershwitz, the State's expert witness, because Arthur attached it to his complaint and referenced it repeatedly, as does Grayson.  Id. at *7-*8.  Dr. Dershwitz averred that he was familiar with the use of pentobarbital as an anesthetic and that the drug will induce an adequate depth of anesthesia and loss of consciousness.  Id. at *7.  Dr. Dershwitz also opined that the administration of 2,500 mg of pentobarbital alone will cause death to almost everyone.  Id.

Thus, the Arthur majority opinion's reliance on Arthur's expert witness affidavits to establish that Arthur's evidence was "sufficiently different" was misplaced because it did not specifically discuss the contents of those affidavits. In contrast, the dissenting opinion extensively analyzed the affidavits and showed that they were not sufficiently different from the allegations in other cases and that

---

[8] Dr. Lubarsky's opinion that it takes pentobarbital fifteen to sixty minutes to reach "maximum effect," appears to reference that drug's clinical use, where it is slowly administered to achieve a drug-induced coma in a patient.  See Doc. 12, Ex. A, ¶ 8.

they did not establish an Eighth Amendment violation.  As Judge Hull's dissent demonstrated, Arthur's allegations and evidence presented the same factual arguments that this Court considered and rejected in Powell (Williams), Powell, DeYoung, and Valle.  To the extent that this Court considers Grayson's expert witness affidavits, the same ones presented by Arthur, they do not establish that Grayson presents evidence that is different from that presented in other cases.  And even this Court considers this evidence to be substantially different, the prior panel precedent rule establishes that the Eleventh Circuit's decisions regarding the substitution of pentobarbital for sodium thiopental must be applied in holding that Grayson's Eighth Amendment claim is time barred.

The Eleventh Circuit has previously rejected the argument that allegations and evidence regarding the executions of Eddie Powell in Alabama and Roy Blankenship in Georgia restarts the statute of limitations clock on an inmate's Eighth Amendment claim.  See DeYoung, 646 F.3d at 1325-27; Valle, 655 F.3d at 1228-37.  DeYoung contended that the use of pentobarbital subjected him to a substantial risk of serious harm because pentobarbital was insufficiently tested for use as an anesthetic and that in prior executions using pentobarbital, specifically the executions of Blankenship and Powell, the drug failed to "painlessly anesthetize the prisoners."  DeYoung, 646 F.3d at 1323.  The Eleventh Circuit reiterated that the substitution of pentobarbital for sodium thiopental does not result

in a substantially changed protocol.  Id. at 1325.  Moreover, in addressing whether the evidence of the executions of Blankenship and Powell should restart the statute of limitations, the Eleventh Circuit observed, "the mere act of proffering additional reasons not expressly considered previously will not open the door to reconsideration of the question by a second panel."  Id. (quoting Smith v. GTE Corp., 236 F.3d 1292, 1302 (11th Cir. 2001)).  Finally, DeYoung held that the evidence concerning the executions of Powell and Blankenship did not undermine the statute of limitations holding in Powell because this evidence lacked merit.  DeYoung, 646 F.3d at 1325-27.  In the case at hand, Grayson presents the same evidence considered in DeYoung.  Accordingly, his claim is barred by the statute of limitations and he is not entitled to any relief.  See id.; Valle, 655 F.3d at 1228-38 (evaluating evidence regarding the Blankenship and Powell executions and ultimately holding that the appellant's lethal injection action was time-bared and meritless); see also Jackson v. Danberg, 656 F.3d 157, 164 (3rd Cir. 2011) (holding that the use of pentobarbital did not create a demonstrated risk of severe pain despite the inmate's presentation of evidence concerning the Blankenship and Powell executions).

###    B.    Grayson's Eighth Amendment claim should be dismissed because it fails to state a claim for which relief can be granted.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint is subject to dismissal if it does not "state a claim upon which relief can be granted."

When reviewing the sufficiency of a complaint, the question to be answered is whether the well-pleaded factual allegations give rise to a "plausible" suggestion of unlawful conduct. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 565-66, 127 S.Ct. 1955, 1971 (2007). Conclusory allegations are insufficient to meet the plausibility standard. Id., 550 U.S. at 555, 127 S.Ct. at 1965; Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009). Unsupported conclusory allegations are entitled to no presumption of truth and should be disregarded when deciding a motion to dismiss. Iqbal, 129 S.Ct. at 1950.

The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 1950. The facts necessary to meet the plausibility standard will depend on the constitutional provision at issue. Id. at 1948. "For a capital prisoner to establish an Eighth Amendment claim for exposure to future harm of severe pain constituting cruel and unusual punishment from an execution method, he is required to show that 'the conditions presenting the risk must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers.'" Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting Baze v. Rees, 553 U.S. 35, 50, 128 S.Ct. 1520 (2008)) (citation, emphasis, and punctuation omitted). Grayson must also overcome the Eleventh Circuit's recent holding that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the

ADOC's lethal injection protocol, and we conclude that such an amendment does not violate the Eighth Amendment under the cases cited by [the petitioner]." Powell (Williams), 641 F.3d at 1258.  Moreover, if the well-pleaded allegations are consistent with lawful behavior, the complaint must be dismissed.  Twombly, 550 U.S. at 557, 127 S.Ct. at 1966.  As established in this motion to dismiss, Grayson's complaint is replete with unsupported conclusory allegations.  When only the well-pleaded facts and the exhibits to the complaint are considered, it is clear that Grayson's claim fails to meet the plausibility standard.

The United States Supreme Court has upheld the use of lethal injection procedures similar to that used in Alabama.  See Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520 (2008).   In Powell (Williams) and Powell, the Eleventh Circuit specifically addressed the use of pentobarbital as the anesthetizing agent in the lethal injection protocol.  Noting that pentobarbital and sodium thiopental are both fast-acting barbiturates that differ only in the length of effect, with pentobarbital lasting longer, the Eleventh Circuit concluded that the use of pentobarbital does not create a substantial risk of harm.  Powell (Williams), 641 F.3d at 1257, Powell, 641 F.3d at 1258.  These precedents demonstrate that Grayson's challenge to ADOC's execution protocol is barred as a matter of law.  Because the ADOC's protocol is constitutional as a matter of law, Grayson's claims should be dismissed.

The Constitution does not "demand an avoidance of all risk of pain in carrying out executions."  Baze, 553 U.S. 35, 47, 128 S.Ct. 1520, 1529 (2008). Instead, to establish that the risk from a lethal injection procedure is sufficiently high to constitute cruel and unusual punishment in violation of the Eighth Amendment, "the condition presenting the risk must be 'sure or very likely' to cause serious illness and needless suffering, and give rise to 'sufficiently imminent dangers,'" Id., 553 U.S. at 50, 128 S.Ct. at 1531 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475 (1993)).  "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual." Baze, 553 U.S. at 50, 128 S.Ct. at 1531.

Thus, for Grayson's complaint to survive summary dismissal, he sufficiently allege facts that, if true, demonstrate that the ADOC's lethal injection protocol is "sure or very likely" to cause needless suffering that gives rise to "sufficient imminent dangers." Baze, 553 U.S. at 50, 128 S.Ct. at 1531.  Grayson argues in this regard that pentobarbital is not used clinically as an anesthetic and, therefore, there is no clinical experience to inform its use in the execution setting.  He submits expert witness reports from Dr. Lubarsky and Dr. Heath, who frequently testify on behalf of convicted murderers in lethal injection challenges.  These reports primarily rely on narrow bits of information concerning the executions of

Roy Blankenship and Eddie Powell to make conclusions concerning ADOC's execution protocol. The Eleventh Circuit, in denying a stay of execution in DeYoung, 646 F.3d at 1325-26, addressed the very evidence underlying Grayson's expert witnesses' opinions. The court noted that there were various versions describing Blankenship's movements but that "[t]he evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered." Id. Moreover, "[e]ven assuming Blankenship's movement was during the administration of the pentobarbital or right after, the evidence in this record does not establish a substantial risk of serious harm from the pentobarbital, or even that Blankenship necessarily suffered any harm, much less serious harm." Id., at 1326.

In its opinion denying a stay of execution in DeYoung, the Eleventh Circuit did not mention Matt Schulz's testimony regarding Powell's execution. However, even if Schulz's testimony regarding Powell lifting his head for approximately a minute is truthful, the evidence established that Powell was unconscious before the administration of the second and third drugs in the execution protocol. No matter how long Powell raised his head, it is clear that his execution did not proceed to the second drug until after he was fully unconscious. As DeYoung reiterated, "[t]he Eighth Amendment does not protect against all harm, only serious harm; and it does not prohibit all risks, only substantial risks." DeYoung, 646 F.3d at 1326.

"Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual." Baze, 553 U.S. at 50, 128 S.Ct. at 1531.

Grayson has wholly failed to state a plausible claim that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic. The ADOC's use of pentobarbital does not create a substantial risk of serious harm to inmates. In Iqbal, the Supreme Court reiterated that legal conclusions unsupported by well-plead factual allegations are not entitled to the assumption of truth. Iqbal, 129 S.Ct. at 1950. To be considered plausible, a claim must be more than merely conceivable. Twombly, 550 U.S. at 556. What this means is that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. The Supreme Court emphasized in Brewer v. Landrigan, 131 S.Ct. 445 (2010), that an inmate fails to carry his burden if his proof requires speculation. Under the principles set forth in these cases, Grayson has failed to sufficiently state a § 1983 claim showing that the modification of the ADOC's execution protocol to allow for the use of pentobarbital is sure or very likely to cause needless suffering. Consequently, his Eighth Amendment claim

should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**II.   Grayson's Due Process Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.**

Grayson's second claim is that the ADOC's "veil of secrecy" regarding its lethal injection protocol violates his right to due process under the Fourteenth Amendment.  Doc. 1 at 41-42.  He contends that this secrecy impedes his ability to discover deviations from the protocol and further, that it impedes his ability to raise and litigate an Eighth Amendment challenge to the protocol.  <u>Id.</u>   As discussed below, this claim does not warrant any relief, and it should be summarily dismissed for at least two separate reasons.  First, this claim is barred by the statute of limitations.  Second, it fails to state a claim for which relief can be granted.

**A.   Grayson's Due Process claim should be dismissed because it is barred by the statute of limitations.**

Grayson's Due Process Claim is barred by the statute of limitations. Alabama's lethal injection statute, <u>see</u> Ala. Code §§ 15-18-82 to– 82.1, has been in place since 2002, and it could have been challenged at any point after its promulgation.  See <u>Powell</u>, 643 F.3d at 1305 ("As the district court held, Powell could have challenged the ADOC's 'secrecy' surrounding the method of execution beginning July 31, 2002, as the facts supporting this cause of action should have

been apparent to any person with a reasonably prudent regard for his rights. . . . Powell fails to show how his claim about the secrecy surrounding the ADOC's recent change in lethal injection protocol was revived by the ADOC's 2011 switch in drugs.")  (internal citation and quotation omitted).  Grayson has pointed to no facts in this record that would indicate that his Due Process claim did not arise or could not have been brought in 2002, when Alabama established its lethal injection protocol.  See Powell, 643 F.3d at 1305.

In considering virtually identical claims raised by other Alabama death row inmates, this Court and the Eleventh Circuit have held that the claims were barred by the statute of limitations.  See Powell v. Thomas, 792 F.Supp.2d 1285, 1288, 1290-91 (M.D.Ala. 2011); Powell, 643 F.3d at 1303, 1304-05.  Most recently, in considering Thomas Arthur's Due Process claim "challenging ADOC's 'veil of secrecy' regarding its lethal injection protocol[,]" this Court held that under binding precedent, Arthur's claim was barred by the statute of limitations.  Arthur v. Thomas, No. 11-0438, 2011 WL 5294656, at *5 (M.D.Ala. Nov. 3, 2011).  Although the Eleventh Circuit later reversed this Court's opinion in Arthur, the appellate court never specifically addressed this Court's ruling regarding Arthur's Due Process claim.  Furthermore, Judge Hull correctly observed in a dissenting opinion: "the district court properly applied . . . [Eleventh Circuit] precedent" in dismissing the claim as time-barred.  Arthur v. Thomas, No. 11-0438, 2012 WL

934385, at *24 (11th Cir. Mar. 21, 2012) (Hull, J., dissenting).   As Judge Hull explained:

> In *Powell,* we expressly noted that the ADOC's alteration in its lethal injection protocol to substitute the use of pentobarbital for sodium thiopental was not a significant alteration *either* for purposes of an inmate's claim that he had a right to know the details of his execution *or* 'for purposes of a statute of limitations' triggering date.' *Powell,* 643 F.3d at 1304–05.   We also stated that Powell's very claim 'about the secrecy surrounding the ADOC's recent change in lethal injection protocol' was 'rejected by this Court in *Powell (Williams),* which . . . constitutes binding precedent.' *Id.* at 1305.   As with Arthur's Eighth Amendment claim, his Due Process claim rests upon the same factual allegations and legal arguments that were considered and rejected in *Powell (Williams)* and *Powell.*

Id. (emphasis in original).

In the case at hand, controlling Eleventh Circuit precedent dictates that Grayson's Due Process claim is barred by the statute of limitations applicable to an inmate's § 1983 claims.   See Powell, 643 F.3d at 1304-05.   Accordingly, this Court should dismiss the claim as time-barred.

**B.    Grayson's Due Process claim should be dismissed because it fails to state a claim for which relief can be granted.**

Grayson's Due Process claim also should be dismissed because it fails to state a plausible claim for relief.   See Fed. R. Civ. P. 12(b)(6).   To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient facts that, if true, would give rise to a "plausible" claim for relief.   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 565-66, 127 S.Ct. 1955, 1971 (2007).   The plausibility standard requires

"more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). Instead, factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. at 1964-65. In the case at hand, Grayson's Due Process claim fails to satisfy the requirements of Rule 12(b)(6). The claim is, on its face, both legally and factually meritless.

Both this Court and the Eleventh Circuit have repeatedly rejected virtually identical Due Process claims raised by death row inmates. E.g., Powell(Williams), 784 F.Supp. 2d at 1280 n. 5, 1282-83; Powell (Williams), 641 F.3d at 1257-58; Valle, 655 F.3d at 1237 n.13; see also Grayson v. Allen, 491 F.3d 1318, 1323-24 (11th Cir. 2007); Jones v. Allen, 485 F.3d 635, 640 n.3 (11th Cir. 2007). In rejecting the due process claim raised by Alabama death row inmate Jason Williams, this Court and the Eleventh Circuit explained that there is no authority supporting the proposition that a condemned inmate has a due process right to receive notice and an opportunity to be heard regarding changes to an execution protocol. Powell(Williams), 784 F.Supp. 2d at 1280 n. 5, 1282-83; Powell(Williams), 641 F.3d at 1257-58; see also Valle, 655 F.3d at 1237 n.13 (reiterating the holding in Powell (Williams) and concluding that Florida's "failure to disclose [its protocol] is not unconstitutional"). Indeed, in Powell(Williams),

this Court specifically held that a death row inmate is not entitled a copy of

Alabama's lethal injection protocol, stating:

> Williams does not cite any authority from any court in
> Alabama – federal or state – that has required the state of
> Alabama to disclose its lethal injection protocol as a
> constitutional or other requirement, and the court is aware
> of no such authority.  In fact, in the context of examining
> whether a condemned inmate unreasonably delayed in
> filing his § 1983 claim, the Eleventh Circuit has rejected
> the argument that the confidentiality of Alabama's lethal
> injection protocol precluded the inmate from filing his
> challenge to the method of execution any earlier.  See
> Grayson v. Allen, 491 F.3d 1318, 1323 (11th Cir. 2007).

Powell(Williams), 784 F.Supp. 2d at 1280 n.5.  Moreover, in affirming this Court's

decision, the Eleventh Circuit characterized Williams's Due Process claim as an

attempt "to avoid the legal prism typically used for analyzing similar Eighth

Amendment claims."   Powell(Williams),   641   F.3d   at   1258.   As   in

Powell(Williams), Grayson's Due Process claim does not warrant any relief.[9]  See

id.; see also Williams v. Hobbs, 658 F.3d 842, 851-52 (8th Cir. 2011) (concluding

that the district court properly dismissed a § 1983 claim alleging that the secrecy

encompassed in Arkansas's lethal injection statute denied plaintiffs their right to

---

[9] In Powell(Williams), this Court and the Eleventh Circuit addressed Williams's § 1983
claims in the context of his motion for a stay of execution.  The procedural posture of that case
had no effect on the courts' holdings that death row inmates have no due process right to
disclosure of a state's lethal injection protocol.   See Powell, 643 F.3d at 1305 (rejecting the
petitioner's attempt to distinguish Powell(Williams) on the ground that Powell(Williams) was
decided on an appeal from the district court's denial of a motion for a temporary stay of
execution).  In Powell(Williams), the courts addressed the merits of the due process issue, and
there is no reason that their holdings would mean something different when analyzing Grayson's
virtually identical claim.  See id.

access to courts and violated the Due Process Clause, and holding that the plaintiffs' allegations failed to raise a plausible claim for relief).

Grayson has failed to identify any authority which would establish that he has a due process right to disclosure of Alabama's lethal injection protocol. To be sure, he cites two cases in an attempt to support this argument: Mathews v. Eldridge, 412 U.S. 319 (1976) and Oken v. Sizer, 321 F.Supp. 2d 658 (D.Md. 2004). Neither case, however, provides controlling, or even persuasive, authority to support his due process claim. Contrary to Grayson's suggestion, Eldrige in no way supports his argument that the ADOC's failure to publicly disclose its execution protocol constitutes a violation of the Due Process clause. The Eleventh Circuit has previously rejected this very contention, explaining that Eldrige does not stand for the proposition that defendants are entitled "to a lethal injection protocol that is legislatively enacted and subjected to extensive litigation." Powell(Williams), 641 F.3d at 1258. Grayson's reliance on Oken is similarly misplaced. As another court recently explained, "this Court cannot rely on one district court's unsupported assertion that capital plaintiffs have such a due process right, especially in view of the fact that the United States Supreme Court vacated the stay of execution granted by the district court in Oken." Beaty v. Brewer, 791 F.Supp.2d 678, 685 (D.Ariz. 2011). Consequently neither Eldrige nor Oken support the viability of Grayson's Due Process claim.

Given the lack of authority to support Grayson's Due Process claim, this claim fails to state a cognizable claim for relief.   Grayson's argument – that Alabama's failure to disclose its lethal injection protocol prohibits him from ascertaining the method of his execution and raising and litigating an Eighth Amendment claim – ignores binding precedent and is meritless as a matter of law. See Powell(Williams), 784 F.Supp. 2d at 1280 n. 5, 1282-83; Powell (Williams), 641 F.3d at 1257-58; Valle, 655 F.3d at 1237 n.13; Grayson v. Allen, 491 F.3d 1318, 1323 (11th Cir. 2007).

Furthermore, Grayson's Due Process claim is based on the false premise that the ADOC's failure to disclose Alabama's lethal injection protocol prohibits him from ascertaining the method of his execution and raising an Eighth Amendment claim.   These allegations are clearly false in light of the detailed information regarding the protocol contained in his complaint.   In addition, as the Eleventh Circuit noted in Powell(Williams), "the State's representations regarding the amended execution protocol were accurate and adequately informed Williams of the process that would be used." Powell(Williams), 641 F.3d at 1258.   The representations made by the State in the Williams litigation, and in other cases challenging Alabama's lethal injection protocol, are available to Grayson and refute his contention that he lacks access to information regarding the protocol. Moreover, this Court's published opinion in Powell(Williams), described the

relevant portions of Alabama's lethal injection protocol.  <u>Powell (Williams)</u>, 784 F.Supp.2d at 1277. Information regarding the chemicals to be injected, including the quantity, method, and order of administration, as well as the relevant procedures, including the consciousness assessment, is thus publicly available. Accordingly, the information Grayson needs to challenge the method of execution under the Eighth Amendment is readily available to him.

And, indeed, Grayson's complaint describes the lethal injection protocol in terms that show his lawyers have reviewed this information. What's more, Grayson attached as exhibits to his complaint several documents filed in previous challenges to the ADOC's protocol.  Among his exhibits, Grayson includes the Expert Report that Dr. Mark Dershwitz prepared for the defendants in the case involving Jason Williams.  Ex. M.  Among other things, that document provides a detailed description of Alabama's lethal injection protocol.  <u>See</u> Ex. M at 2-3. Any assertion of reasonable ignorance of Alabama's lethal injection protocol is belied by Grayson's complaint, which discusses the three-drug protocol, specifically identifies the drugs employed, and refers to information from a number of previous cases challenging the protocol on substantially similar (if not identical) grounds.  Thus, it is clear that Grayson does, in fact, have sufficient knowledge about Alabama's execution protocol to formulate a challenge to that protocol.

Finally, Grayson argues that the ADOC may attempt to change its lethal injection protocol so close to the date of his execution that he will not have the opportunity to know or challenge the method of his execution. He does not allege that such a scenario has ever occurred, and he has alleged no facts indicating that such a scenario is even likely.  Rather, Grayson's allegations on this point are no more than speculation that the defendants may someday attempt to amend the protocol in a manner that will impose on inmates a substantial risk of serious harm, and that the defendants may attempt to do so without any notice or opportunity for review.  This baseless speculation is insufficient to state a colorable claim for relief and it cannot serve to overcome the binding precedent holding that death row inmates do not have a due process right to disclosure of the state's lethal injection protocol.  See Valle, 655 F.3d at 1237 n.13; Powell (Williams), 641 F.3d at 1257-58; Powell(Williams), 784 F.Supp. 2d at 1282-83; Grayson, 491 F.3d at 1323-24.

Because Grayson's Due Process claim is both factually and legally meritless on its face, it fails to state a plausible claim for relief.  Consequently, this claim is ripe for summary dismissal.

## III.   Grayson's Equal Protection Claim Should Be Dismissed Because It Is Barred By The Statute Of Limitations, And Furthermore, It Fails To State A Plausible Claim For Relief.

Grayson next contends that the ADOC's alleged failure to comply with its lethal injection protocol violates of his rights to Equal Protection under the

Fourteenth Amendment.  Doc. 1 at 42-44; <u>see</u> <u>also</u> Doc. 1 at 18-22, 24-26.  This claim should be dismissed for at least two reasons: (1) it is barred by the statute of limitations and (2) it fails to state a claim for which relief may be granted.

**A.    Grayson's Equal Protection claim should be dismissed because it is barred by the statute of limitations.**

To the extent Grayson's Equal Protection claim contends that the ADOC has repeatedly deviated from its execution protocol, or that it has a practice of doing so, <u>see</u> Doc. 1 at 42-44, this claim is barred by the statute of limitations and, therefore, is ripe for summary dismissal.  In <u>DeYoung</u>, the Eleventh Circuit held that a similar equal protection claim was barred by the statute of limitations. <u>DeYoung</u>, 646 F.3d at 1324-25.  The court evaluated the "novel proposition" that a recent slight deviation in a state's protocol gives rise to an Equal Protection claim and held that any such deviation does not undermine the fact that the claim was time-barred.  <u>Id.</u> at 1324-25, 1327-28.  For the same reasons expressed in <u>DeYoung</u>, this Court should conclude that Grayson's Equal Protection claim is barred by the statute of limitations and he is not entitled to any relief.

Furthermore, to the extent Grayson attempts to assert an Equal Protection violation solely on the basis of his allegation regarding a single deviation during a single recent execution, that claim is likewise barred by the statute of limitations. Grayson contends that that the ADOC's alleged deviation from the execution protocol during Eddie Powell's execution led to a violation of *Grayson's* right to

equal protection.  See Doc. 1 at 42-44.  This argument, although couched in terms of an Equal Protection claim, actually appears to raise an issue more properly characterized as a claim that execution pursuant to the ADOC's protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment.  See Doc. 1 at 18-22, 24-26, 42-44.  In fact, it appears that Grayson has attempted to place an "Equal Protection" label on this claim in an effort to avoid the legal analysis applicable to similar Eighth Amendment claims.  Notably, Grayson fails to cite, and the defendants are unaware of, any controlling legal authority holding that allegations of a single deviation from an execution protocol, in a single previous execution, would violate *another inmate's* right to Equal Protection.  Because it appears that Grayson's "Equal Protection" claim to this effect is really raising an Eighth Amendment challenge, this claim is time-barred for the same reasons discussed above, in subsection I(B) of this Argument.

**B.     Grayson's Equal Protection claim should be dismissed because it fails to state a claim for which relief can be granted.**

Furthermore, because Grayson's Equal Protection claim fails to state a plausible claim for relief, it should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."   City of Cleburne v.

Cleburne Living Ctr., 473 U.S. 432, 39 (1989).  To state a colorable Equal Protection claim, Grayson is required to show both: (1) "that the State will treat him disparately from other similarly situated persons" and (2) that the alleged disparate treatment interferes with a fundamental right, discriminates against a suspect class, or is not rationally related to a legitimate government interest. DeYoung, 646 F.3d at 1327-28.  Here, Grayson has failed to meet his burden of alleging facts that would plausibly show either disparate treatment or that the alleged disparate treatment interfered with a fundamental right.

Grayson's claim stems from his allegation that during the June 16, 2011 execution of Eddie Powell, the execution team failed to pinch Powell's arm, the third element of the consciousness assessment called for in Alabama's lethal injection protocol.  Doc. 1 at 18-22, 24-26, 42-44.  According to Grayson, this failure indicates that the ADOC may deviate from its lethal injection protocol during his own execution, thus treating him differently than other inmates who are executed pursuant to the protocol.  He alleges that this disparate treatment burdens his Eighth Amendment right to be free from cruel and unusual punishment because it creates a substantial risk that he will suffer serious harm during his execution.

In raising his equal protection argument, Grayson relies mainly on Cooey v. Kasich, No. 04-1156, 2011 WL 2681193 (S.D. Ohio Jul. 8, 2011), in which an Ohio district court found, in the course of evaluating an inmate's motion for a stay

of execution, that the inmate had established a likelihood of success on the merits of an Eighth Amendment claim.  Grayson's reliance on <u>Cooey</u> is misplaced. Evidence in that case revealed that Ohio officials "routinely deviate[d] from mandated or core provisions set forth in [Ohio's] written protocol," <u>Cooey</u>, 2011 WL 2681193, at *19, and as a matter of policy, treated the protocol merely as "an advisory compilation of guidelines subject to being ignored," <u>id.</u> at *20; <u>see</u> <u>also</u> <u>id.</u> at *27, *28.  The court found that in practice, "Ohio's execution policy now embraces a nearly unlimited capacity for deviation from the core or most critical execution procedures."  <u>Id.</u> at *21.  Further, "the deviations are substantive departures from some of the most fundamental tenets of Ohio's execution policy." <u>Id.</u>  Officials routinely, and deliberately, deviated from the requirements of Ohio's execution protocol in numerous ways, including: (1) "fail[ing] to document the preparation of the execution drugs, leading to the untenable possibility that the state has failed to use the correct drug dosages[,]" <u>id.</u> at *21; (2) failing to assess an inmate's veins to insure that an IV could be started, which ultimately contributed to a botched execution attempt, <u>id.</u> at *22, *32 - *33; (3) "fail[ing] to adhere to the systematic redundancies designed to minimize . . . the possibility of human error," <u>id.</u> at *23, for example, performing an execution despite the absence of a key execution team member, <u>id.</u>; and (4) "fail[ing] to exercise control over who participates in an execution," <u>id.</u> at *26.  The extent and pervasiveness of the

deviations caused the district court to disparage, "[i]t is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not." Id. at *1. The court further determined that Ohio's "only rationale" for its routine, deliberate deviations from its execution protocol "is to simply complete the executions at all or nearly all costs." Id. at *30. Ultimately, the district court found that the plaintiff established a likelihood of success on the merits of his equal protection claim based on extensive evidence of Ohio officials' pattern and practice of deviating from fundamental provisions of that state's execution protocol. Cooey, 2011 WL 2681193, at *19 - *33.

In contrast to Cooey, Grayson does not allege a pattern and practice of deviations from Alabama's lethal injection protocol. Rather, he merely alleges a single instance in a previous execution where he claims witnesses (who are the attorneys of the inmate being executed) did not observe officials performing one component of the consciousness assessment. Consequently, even if the Ohio district court's decision in Cooey constituted binding authority on this Court (which of course, it does not), Cooey's holding cannot be stretched to support the equal protection argument Grayson advances in the case at hand. See Cooey, 2011 WL 2681193, at *19 - *33; cf. DeYoung v. Owens, 11-02324, Doc. 27, at 20 (N.D.Ga Jul. 20, 2011), aff'd DeYoung, 646 F.3d 1319 (noting Cooey's holding that "a state could violate the Equal Protection Clause if it materially and

repeatedly deviates from its lethal injection protocols" and finding <u>Cooey</u> inapplicable to the plaintiff's claim).

In any event, Grayson's Equal Protection claim is meritless on its face, and he has failed to show that the alleged deviation in Eddie Powell's execution burdened a fundamental right.  Even if one assumes that the factual allegations underlying Grayson's claim are true, failing to pinch Powell's arm during his execution did not cause an Eighth Amendment violation.  The undisputed facts reveal that Powell was unconscious before the second and third drugs were administered.  Grayson himself acknowledges that ADOC officials performed the first two prongs of the consciousness assessment test and that Powell did not respond to the stimuli.  All of the evidence in this case, including that submitted by Grayson, indicates that Powell's consciousness was in fact assessed following the administration of the first drug and that he did not respond to the stimuli.

Further, contrary to Grayson's representations, neither the "pinch test" nor any other particular consciousness assessment test is constitutionally required. Indeed, <u>Baze</u> explicitly rejected the argument that any particular consciousness assessment test is necessary to prevent a substantial risk of serious harm that would give rise to an Eighth Amendment violation.  <u>Baze</u>, 553 U.S. at 60.  And, as noted above, the undisputed facts in this case demonstrate that Powell's consciousness was assessed, and that he did not respond to the stimuli.  Consequently, even if

Grayson pleaded sufficient facts that, if true, would establish that the alleged failure to pinch Powell's arm would result in *Grayson* receiving disparate treatment (which, as noted above, he failed to do), Grayson has failed to allege facts giving rise to a plausible claim that the failure to pinch Powell's arm resulted in any violation of the Eighth Amendment.

This conclusion is not altered by the decision in <u>Arthur v. Thomas</u>, No. 11-15548, 2012 WL 934385 (11th Cir. Mar. 21, 2012).   As noted above, the defendants have filed a petition for rehearing *en banc*, which is currently pending before the Eleventh Circuit.   As Judge Hull correctly explained in her dissenting opinion, this Court properly dismissed Arthur's Equal Protection claim because Arthur failed to plead facts that, if true, would establish either disparate treament or the burdening of a fundamental right.   <u>Id.</u> at *25-26 (Hull, J., dissenting).

As discussed above, because Grayson's Equal Protection claim fails to state a claim for which relief may be granted, he is not entitled to any relief, and this Court should dismiss his claim.

**IV.    Grayson's Claim That Alabama's Lethal Injection Statute Violates The Separation Of Powers Clause Of The Alabama Constitution Should Be Dismissed For Lack Of Jurisdiction And For Failure To State A Cognizable Claim For Relief Under § 1983.**

Alabama's capital punishment statute provides that death sentences shall be carried out by lethal injection but does not specify the specific procedures for

carrying out the sentence.  Ala. Code. § 15-18-82; id. § 15-18-82.1.  Instead, Alabama law confides to the Alabama Department of Corrections the duty of developing and implementing the State's lethal injection protocol.  Id.

The Alabama statute mirrors the pattern set by numerous other states: the legislature sets the methods of execution, while the details of the execution protocol are left to executive branch officials, and prison officials are given wide discretion over the processes for carrying out death sentences.  See, e.g., Ala. Code. § 15-18-82(a) (providing that a death sentence "shall be executed . . . by lethal injection unless the convict elects execution by electrocution as provided by law"); id. § 15-18-82.1(a); id. § 15-18-82.1(g) ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act . . . ."); Ariz. Rev. Stat. Ann. § 13-757(A) ("The penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections."); id. §41-1005(A)(23) (providing that "[r]ules made by the state department of corrections" are exempted from Arizona's Administrative Procedures Act); Ark. Code Ann. § 5-4-617(a)(1) ("The sentence of death is to be carried out by intravenous lethal injection of one (1) or more chemicals, as determined in kind and amount in the discretion of the Director of the Department of Correction."); id. § 5-4-617(a)(4)

("The director shall determine in his or her discretion any and all policies and procedures to be applied in connection with carrying out the sentence of death . . . ."); id. § 5-4-617(a)(5)(A) ("The policies and procedures for carrying out the sentence of death and any and all matters related to the policies and procedures for the sentence of death including but not limited to the director's determinations under this subsection are not subject to the Arkansas Administrative Procedures Act, §25-15-201 et seq."); Del. Code Ann. tit. 11, §4209(f) ("Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction."); id. § 4322(d) (providing that all policies and procedures developed by the Department of Correction "shall be confidential, and not subject to disclosure except upon the written authority of the Commissioner"); see also Jackson v. Danberg, 2008 WL 1850585, at *3-6 (Del. Super. Ct. Apr. 25, 2008) (unpublished opinion) (holding that under § 4322(d), the Delaware Department of Corrections's "policies and procedures, including those policies and procedures governing lethal injection[,]" are exempted "from compulsory promulgation to the public before official adoption under the APA"); State v. Jackson, No. 11C–06–080, 2011 WL 2750672, at *8 (Del. Super. Ct. Jul. 14, 2011) (unpublished opinion), aff'd 2011 WL 3198796 (Del. Jul. 27, 2011); Fla.

Stat. Ann. § 922.105(1) ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.  The sentence shall be executed under the direction of the Secretary of Corrections or the secretary's designee."); id. § 922.105(7) ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from [Florida's Administrative Procedure Act]."); Ga. Code Ann § 17-10-38(a) ("All persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection.  Lethal injection is the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead."); La. Rev. Stat. Ann. § 15:569(B) ("Every sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead."); id. § 15:569(D) (providing that Louisiana's Administrative Procedures Act "shall not apply to the procedures and policies concerning the process for implementing a sentence of death"); Mo. Ann. Stat. § 546.720(1) ("The manner of inflicting the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection. . . ."); Ringo v. Lombardi, 706 F.Supp. 2d 952, 955-56 (W.D.Mo. 2010) ("Missouri's lethal injection protocol is not statutory -- it

is issued by the Department of Corrections and sets out technical procedures for carrying out lethal injections, and it is exempt from Missouri's typical notice and comment rulemaking requirements."); Middleton v. Missouri Dep't of Corr., 278 S.W.3d 193, 194-98 (Mo. 2009) (holding that the lethal injection protocol adopted by the Missouri Department of Corrections was exempt from the Missouri Administrative Procedures Act); Neb. Rev. Stat. § 83-964 ("A sentence of death shall be enforced by the intravenous injection of a substance or substances in a quantity sufficient to cause death.  The lethal substance or substances shall be administered in compliance with an execution protocol created and maintained by the Department of Correctional Services."); id. 965(2) ("The director [of Correctional Services] shall create, modify, and maintain a written execution protocol describing the process and procedures by which an execution will be carried out consistent with this section.  The director shall (a) select the substance or substances to be employed in an execution by lethal injection, (b) create a documented process for obtaining the necessary substances, (c) designate an execution team composed of one or more executioners and any other personnel deemed necessary to effectively and securely conduct an execution, (d) describe the respective responsibilities of each member of the execution team, (e) describe the training required of each member of the execution team, and (f) perform or authorize any other details deemed necessary and appropriate by the director.");

State v. Elis, 799 N.W.2d 267, 289 (Neb. 2011) ("The only substantive direction provided by the Legislature regarding the execution protocol is that the protocol 'shall require that the first or only substance injected be capable of rendering the convicted person unconscious and that a determination sufficient to reasonably verify that the convicted person is unconscious be made before the administration of any additional substances, if any.'") (quoting Neb. Rev. Stat. § 83-965(3)); Nev. Rev. Stat. § 176.335(1) ("The judgment of death must be inflicted by an injection of a lethal drug."); id. § 176.335(2)(b) ("The Director of the Department of Correction shall: . . . . [s]elect the drug or combination of drugs to be used for the execution after consulting with the State Health Officer."); S.C. Code Ann. § 24-3-530(A) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection under the direction of the Director of the Department of Corrections."); S.D. Codified Laws § 23A-27A-32 ("The punishment of death shall be inflicted by the intravenous injection of a substance or substances in a lethal quantity.  The warden, subject to the approval of the secretary of corrections, shall determine the substances and the quantity of substances used for the punishment of death."); Tenn. Code Ann. § 40-23-114(a) ("For any person who commits an offense for which the person is sentenced to the punishment of death, the method for carrying out this sentence shall be by lethal injection."); id. § 40-23-114(c)

("The department of correction is authorized to promulgate necessary rules and regulations to facilitate the implementation of this section."); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 311-12 (Tenn. 2005) (holding that Tennessee's lethal injection protocol is not subject to the Uniform Administrative Procedures Act); Tex. Code Crim. Proc. Ann. art. 43.14 ("Whenever the sentence of death is pronounced against a convict, the sentence shall be executed . . . by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice."); Tex. Gov't Code Ann. § 2001.226 (providing that the Texas Administrative Procedures Act does not apply to rules or internal procedures of the Texas Department of Criminal Justice); Foster v. Texas Dept. of Criminal Justice, No. 03-11-00191, 2011 WL 2297709 (Tex. Ct. App. Jun. 10, 2011) (holding that pursuant to Tex. Gov't Code Ann. § 2001.226, the procedures adopted by the Texas Department of Criminal Justice for carrying out death sentences by lethal injection are exempt from the Texas Administrative Procedures Act); Va. Code Ann. § 53.1-234 ("The Director, or the assistants appointed by him, shall . . . cause the prisoner under sentence of death to be electrocuted or injected with a lethal substance, until he is dead. . . .  Execution by lethal injection shall be permitted in accordance with procedures developed by the Department."); Wash.

Rev. Code § 10.95.180(1) ("The punishment of death shall be supervised by the superintendent of the penitentiary and shall be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until the defendant is dead, or, at the election of the defendant, by hanging by the neck until the defendant is dead. . . ."); Brown v. Vail, 237 P.3d 263, 269 (Wash. 2010) ("The Department, through the superintendent of the state penitentiary, is charged with the duty to supervise executions by lethal injection under RCW 10.95.180(1), necessarily including the authority to establish the protocol by which lethal injection will be administered.").

In the case at hand, Grayson contends that Alabama's lethal injection statute violates the separation of powers clause of the Alabama Constitution. Specifically, he argues that this state statute violates the state Constitution in delegating the duty of developing and implementing the State's lethal injection protocol to the ADOC.

At the outset, it is important to note that this Court lacks jurisdiction to direct State officials to comply with State law. U.S. Const. Amend. XI; Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state

law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").  Accordingly, to the extent that Grayson's claim is an attempt to require state officials to comply with state law, this claim should be dismissed for lack of subject matter jurisdiction.

In addition, and in the alternative, this claim should be dismissed because it fails to state a cognizable claim under § 1983, it falls outside this Court's original jurisdiction, and this court should decline to exercise supplemental jurisdiction. Grayson's separation-of-powers claim falls outside the bounds of a proper § 1983 action, which does not extend to a claim that a state statute violates a state constitution.  In the context of § 1983 actions, "liability is appropriate solely for violations of federally protected rights."  Almand v. DeKalb County, 103 F.3d 1510, 1513 (11th Cir. 1997) (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  Section 1983 does not create a substantive right; rather, "it merely provides a remedy for deprivations of federal statutory and constitutional rights." Almand, 103 F.3d at 1512; accord Doe v. School Bd. of Broward County, 604 F.3d 1248, 1265 (11th Cir. 2010).  Accordingly, to state a claim under § 1983, a plaintiff must allege that the defendant violated a specific federal right.  See, e.g., Doe, 604 F.3d at 1265 ("a § 1983 plaintiff must allege a specific federal right violated by the defendant"); Griffin v. Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) ("In order to prevail on a civil rights action under § 1983, a plaintiff must

show that he or she was deprived of a federal right by a person acting under color of state law.")  (emphasis added).   Here, Grayson's separation-of-powers claim does not allege any violation of a federal right.   Instead, this claim alleges that Alabama's lethal injection statute violates the Alabama Constitution.   Grayson has thus failed to state a cognizable claim for relief under § 1983.

Furthermore, this Court lacks original jurisdiction over Grayson's state-law claim, and it should decline to exercise supplemental jurisdiction.[10]   Because this Court has jurisdiction over Grayson's federal claims under § 1983, it has the authority to exercise supplemental jurisdiction over the remaining state-law claims. See 28 U.S.C. § 1367(a) ("[I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy . . . ."). It should decline to do so in the instant case, for at least three separate reasons.   First, Grayson's separation-of-powers claim raises a novel and complex issue of State law.   See 28 U.S.C. § 1367(c)(1).   Second, this claim is not intertwined with Grayson's federal claims.  Finally, because all of Grayson's federal claims are ripe for dismissal, this court should decline to exercise supplemental jurisdiction over his state law claim.  See 28 U.S.C. § 1367(c)(3); see also Williams v. Hobbs, No.

_____

[10] Notably, Grayson does not cite, and the defendants are unaware of, any case in which a federal court has exercised its supplemental jurisdiction to review a claim that a state's lethal injection statute violates a *state* constitution.

09-00394, 2010 WL 749563, at *4 (E.D.Ark. Mar. 2, 2010) . As an Arkansas district court recently explained when declining to exercise supplemental jurisdiction over the plaintiff's claim that Arkansas's capital punishment statute violated the separation of powers clause set forth in the Arkansas constitution:

> A district court may decline to exercise supplemental jurisdiction over a claim under § 1367(a) if the district court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). Out of respect for the principles of federalism and for the courts of the State of Arkansas, the Court will exercise its discretion under 28 U.S.C. § 1367(c) to decline to exercise supplemental jurisdiction with respect to [the plaintiff's] state-law claims. Cf. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990) (stating that the district court should have declined pendant jurisdiction after dismissing the federal claims because of "the necessity to provide great deference and comity to state court forums to decide issues involving state law questions"). Here, those concerns for deference and comity to the state courts are even more compelling because the state-law issue that [the plaintiff] raises is whether the MEA violates the separation-of-powers doctrine contained in the Arkansas Constitution. That issue should be decided by the Arkansas courts, not by the federal courts.

Williams, 2010 WL 749563, at *4.

For all of the foregoing reasons, this Court should dismiss Grayson's claim that Alabama's lethal injection statute violates the separation of powers clause of the Alabama constitution.

**V.    In Addition, And In The Alternative, In The Event This Court Determines That Any Of Grayson's Claims Do Not Warrant Summary Dismissal, The Defendants Are Entitled To Summary Judgment On The Basis Of The Evidence Before This Court.**

To the extent that this Court considers the evidentiary presentation submitted with this motion, the State is entitled to a summary judgment.  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id., 477 U.S. at 322-23.

**A.    The defendants are entitled to summary judgment with regard to Grayson's Eighth Amendment claim.**

Grayson has failed to demonstrate that Alabama's lethal injection protocol is constitutionally infirm; nor has he established that the recent amendment allowing

the use of pentobarbital instead of sodium thiopental will cause a substantial risk of serious harm or that it will cause any unnecessary pain.  Further, even if Grayson's complaint raised a cognizable Eighth Amendment claim (which it does not), his claim would necessarily fail as a matter of law.  As discussed in detail below, Grayson cannot plead a claim that survives scrutiny under the United States Supreme Court's decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520 (2008) (upholding a lethal injection protocol substantially similar to Alabama's). Furthermore, the same evidence presented by Grayson concerning the recent executions of Blankenship and Powell was considered and rejected by the Eleventh Circuit.  DeYoung, 646 F.3d at 1325-26.  Specifically, the court held that "DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic."  DeYoung, 646 F.3d at 1327. This Court should follow this binding precedent and grant the defendants' motion for summary judgment.

Alabama, just like every other state that has recently carried out executions by lethal injection, has modified its execution protocol because the anesthetic drug sodium thiopental is no longer available.  The use of pentobarbital, a barbiturate just like sodium thiopental, ensures that the inmate is sufficiently anesthetized and will not cause an impermissible risk of harm.  See DeYoung, 646 F.3d at 1327

("As the district court succinctly found, Georgia's 'use of pentobarbital does not create a substantial risk of serious harm to inmates.'").

The standard for evaluating an Eighth Amendment claim in this context is whether the plaintiff inmate demonstrated "a substantial risk of serious harm," alternatively described as "an objectively intolerable risk of serious harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Baze, 553 U.S. at 50 (internal quotation omitted). The Supreme Court emphasized that the conditions at issue "must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." Id. (quotations omitted) (emphasis in original). The Court further explained: "simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual." Id. (quotation omitted). The Court, therefore, concluded that a federal court may grant a stay only if a lethal injection protocol "creates a demonstrated risk of severe pain … [and] that the risk is substantial when compared to the known and available alternatives." Id.

Recently, in Brewer v. Landrigan, 131 S.Ct. 445 (Oct. 26, 2010), the Supreme Court rejected a lethal injection challenge by an Arizona inmate who argued that a drug obtained from a foreign source for use in his execution was

unsafe.  Id.  The district court in that case "granted the restraining order because it was left to speculate as to the risk of harm" in light of the absence of proof establishing that the drug at issue would cause pain and suffering.  Id.  The Supreme Court vacated the stay, holding that "speculation cannot substitute for evidence that the use of the drug is sure or very likely to cause serious illness and needless suffering."  Id. (quoting Baze, 553 U.S. at 50).

In the case at hand, Grayson has not alleged any facts that would establish that Alabama's three-drug lethal injection protocol is constitutionally infirm.  The recent modification to the protocol, which permits the use of pentobarbital in place of sodium thiopental, does not affect this conclusion.  See Powell (Williams), 641 F.3d at 1258; Powell, 643 F.3d at 1304 (holding that the replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol).  As Dr. Dershwitz's affidavit demonstrates, the use of pentobarbital in Alabama's execution protocol fails to pose "a substantial risk of serious harm," or an "objectively intolerable risk of harm."  Baze, 553 U.S. at 50.  Dr. Dershwitz's affidavit establishes that the dose of pentobarbital is sufficient to render the inmate unconscious quickly and that the three drugs cause "rapid and painless death."  Ex. D at ¶ 5.  He further explained that where Alabama's amended protocol is properly administered, the inmate would be more than sufficiently anesthetized prior to the administration of the pancuronium

bromide and will not be able to feel the effects of the second and third drugs in the protocol.  Ex. D at ¶¶ 11, 14.  Indeed, Dr. Dershwitz opined that the dose of 2,500 milligrams of pentobarbital is lethal by itself in that it will cause a person to stop breathing.  Id. at ¶ 12.  Further, it is worth noting that pentobarbital is the most common drug of choice "for physician-assisted suicide in those jurisdictions where the practice is legal."  Ex. D at ¶ 13.  The expert witness reports presented by Grayson do not dispute these material facts.  See Doc. 12, Ex. A, Ex. B.  Although Grayson's expert witness reports contend that pentobarbital is designed to produce sedation and is not used as an anesthetic drug, they do not dispute the fact that pentobarbital will render the inmate unconscious.   Indeed, Dr. Heath has in previous testimony repeatedly criticized the use of the ultrashort-acting sodium thiopental and opined that longer lasting drugs such as pentobarbital should be used.  Exs. L, M.

In upholding the constitutionality of Kentucky's method of execution in Baze, the Supreme Court noted that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard."  Baze, 553 U.S. at 62.  While Alabama has slightly modified its protocol to allow for the use of pentobarbital when sodium thiopental is unavailable, Alabama's execution protocol remains virtually identical to Kentucky's.  As the Tenth Circuit recognized in Pavatt, sodium thiopental and

pentobarbital are similar drugs in that they are both classified as a barbiturate. Pavatt, 627 F.3d at 1337-38.   The second and third drugs in Alabama's and Kentucky's lethal injection protocols are pancuronium bromide and potassium chloride.   Ex D at ¶ 6(g) and 6(h); Baze, 553 U.S. at 44, 128 S.Ct. at 1527. Because Alabama's execution protocol is virtually identical to Kentucky's, Grayson has not established a "substantial risk of serious harm."   Baze, 553 U.S. at 49-50, 128 S.Ct. at 1530-31.   Consequently, the State is entitled to a judgment as a matter of law.

Since Alabama changed its method of execution to lethal injection in 2002, two individuals, Grantt Culliver and Anthony Patterson, have served as Senior Warden of the Holman Correctional Facility, where executions are carried out in Alabama.   Patterson has served as the Senior Warden at Holman since November of 2009, and at the time he prepared his affidavit, he had presided over 9 executions.   Ex. E at 1.   Before becoming Senior Warden, Patterson served as a member of the execution team in connection with ten other executions that took place between 2005 and 2009.   Ex. E at 2.   Warden Patterson stated that Alabama's lethal injection protocol was properly administered in all nineteen of the executions in which he has participated and that all of these executions "took place without mishap."   Ex. E at 2.   Grantt Culliver, the Senior Warden at Holman Correctional Facility from August of 2002 until November of 2009, presided over twenty

executions by lethal injection.  See Ex. F.  Warden Culliver stated that in all of these executions, the drugs were administered properly and none of the twenty executed inmates appeared to suffer any pain during the execution.  Id.

As shown in the affidavits submitted with this motion, Alabama's execution protocol has been properly administered in all twenty-nine of the executions by lethal injection that have taken place in this state, and further, the protocol is not inherently cruel and unusual.  Indeed, Grayson does not demonstrate that using pentobarbital will cause a substantial risk of serious harm.  Alabama eliminates the risk of unnecessary pain by using 2.5 grams of pentobarbital – which is by itself a lethal dose – to sufficiently anesthetize the inmate.  As an additional safeguard, after the pentobarbital is administered, a consciousness assessment is performed to ensure that the inmate is unconscious before the administration of the pancuronium bromide and potassium chloride.   Another district court has held that the consciousness assessment is a significant safeguard that is as good as or better for assessing the depth of anesthesia than using electronic monitors that measure brain activity.  See Dickens v. Brewer, No. CV-07-1770-PHX, 2009 WL 1904294, at *6 (D. Ariz. 2009).  As demonstrated above, the ADOC purposefully seeks to avoid any unnecessary pain and suffering during an execution.

The Eleventh Circuit has already rejected the same evidence presented by Grayson in its recent DeYoung opinion.  DeYoung, 646 F.3d at 1325-26.  The

court noted that the evidence concerning the execution of Roy Blankenship differed in the description of the type of movement and whether it occurred before or after the administration of the pentobarbital. Id.  It was undisputed, however, that "the movement occurred only a few times and all briefly during a total time period of three minutes." Id.  Furthermore, "[t]he evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered." Id.  The court in DeYoung did not mention Schulz's testimony even though Schulz was the only fact witness presented with regard to the Powell execution.

As in DeYoung, the evidence presented in the case at hand differs on some inconsequential facts.  Schulz and Freeman, Powell's counsel, contend that Powell raised his head for approximately a minute and looked confused and disoriented during that time period.  Doc. 1, Ex. O, Ex. P.  Anne Adams, General Counsel for ADOC, and Warden Patterson saw Powell raise his head for a few seconds as the pentobarbital began to be administered.  Ex. I, ¶ 17, Ex. E, ¶ 12.  Chaplain Summers held Powell's hand while praying, and stated that Powell released his hand after a minute or two which signified to the Chaplain that Powell was unconscious at that point.  Ex. J, ¶ 3.  One of Grayson's exhibits, an article published in the Birmingham News states that Powell raised his head for a few seconds.  Doc. 1, Ex. N.  Even if the accounts of Schulz and Freeman are truthful,

they do not establish "a substantial risk of serious harm from the pentobarbital, or even that [Powell] suffered any harm, much less serious harm." DeYoung, 646 F.3d at 1325. All of the evidence presented, both by Grayson and by the defendants, demonstrates that Powell was unconscious after the administration of the pentobarbital. See id. (holding that DeYoung failed to show that pentobarbital was ineffective as an anesthetic because there was no dispute that he was unconscious after the administration of the pentobarbital). There is absolutely no material factual dispute that Powell was unconscious before the administration of the second and third drugs in the execution protocol.

The court in DeYoung held that even if the claims there alleged were not untimely, "they fail as a matter of law." DeYoung, 646 F.3d at 1324. Grayson's Eighth Amendment claim should be dismissed because "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

**B.** **The defendants are entitled to summary judgment with regard to Grayson's Due Process claim.**

Grayson's Due Process claim is also meritless on its face, and the defendants are entitled to judgment as a matter of law. As discussed above, in subsection II(B) of this Argument, this Court and the Eleventh Circuit have repeatedly rejected virtually identical Due Process claims raised by death row inmates. E.g., Powell(Williams), 784 F.Supp. 2d at 1280 n. 5, 1282-83; Powell (Williams), 641

F.3d at 1257-58; <u>Valle</u>, 655 F.3d at 1237 n.13; <u>see also</u> <u>Grayson v. Allen</u>, 491 F.3d 1318, 1323-24 (11th Cir. 2007); <u>Jones v. Allen</u>, 485 F.3d 635, 640 n.3 (11th Cir. 2007).   There is no authority supporting the proposition that a condemned inmate has a due process right to receive notice and an opportunity to be heard regarding changes to an execution protocol.  <u>Powell(Williams)</u>, 784 F.Supp. 2d at 1280 n. 5, 1282-83; <u>Powell(Williams)</u>, 641 F.3d at 1257-58; <u>see also</u> <u>Valle</u>, 655 F.3d at 1237 n.13 (reiterating the holding in <u>Powell (Williams)</u>).   Indeed, in <u>Powell(Williams)</u>, this Court specifically held that a death row inmate is not entitled a copy of Alabama's lethal injection protocol.   <u>Powell(Williams)</u>, 784 F.Supp. 2d at 1280 n.5, aff'd 641 F.3d at 1258.  As in <u>Powell(Williams)</u>, Grayson's Due Process claim is meritless on its face. <u>See</u> <u>id.</u>

Furthermore, Grayson's Due Process claim is based on the false premise that the ADOC's failure to disclose Alabama's lethal injection protocol prohibits him from ascertaining the method of his execution and raising an Eighth Amendment claim.   These allegations are clearly false in light of the detailed information regarding the protocol contained in his complaint and in the exhibits attached to his complaint (which demonstrate that he has access to the information disclosed by the defendants in previous litigation challenging Alabama's lethal injection protocol).   Moreover, this Court's published opinion in <u>Powell(Williams)</u>, described the relevant portions of Alabama's lethal injection protocol.   <u>Powell</u>

(Williams), 784 F.Supp.2d at 1277.  Accordingly, the information Grayson needs to challenge the method of execution under the Eighth Amendment is readily available to him.  And, it is clear that he does, in fact, have sufficient knowledge about Alabama's execution protocol to formulate a challenge to that protocol.

Because Grayson's procedural due process claim fails as a matter of law, and because there is no dispute as to any material fact, it should be summarily dismissed.

### C.     The defendants are entitled to summary judgment with regard to Grayson's Equal Protection claim.

Grayson argues that Alabama's method of lethal injection violates his right to equal protection under the Fourteenth Amendment because the defendants have deviated from their written execution protocol, thereby burdening his right to be free from cruel and unusual punishment.  This claim stems from his allegation that during the June 16, 2010 execution of Eddie Powell, the execution team did not perform one of the three elements of the consciousness assessment called for in the protocol.  Specifically, Grayson alleges that witnesses did not observe Powell's arm being pinched during the consciousness assessment following the administration of the first drug.

Grayson has not established that there is a genuine dispute as to any material fact to support his Equal Protection claim.  His allegation that Powell's arm was not pinched is speculative at best.  It should be noted that neither Freeman nor

Schulz stated that the arm pinch portion of the consciousness assessment was not performed; their affidavits do not mention it at all. <u>See</u> Doc. 12, Ex. O, Ex. P. The fact that the affidavits do not mention the pinch test does not, and cannot, establish that the pinch test did not occur.

Moreover, at the <u>DeYoung</u> evidentiary hearing, Schulz testified that he was praying throughout the execution, which suggests that that he was likely distracted and did not see everything that took place during Powell's execution. Ex. K at 118. In addition, Schulz's testimony indicated that he looked away after the "guard" called out Powell's name and stroked Powell's left eyelash. Ex. K at 122. Even if Schulz was not distracted or looking away at the time of the pinch test, there is no indication that he necessarily would have been able to see the guard pinch Powell's arm. The protocol calls for the guard to pinch the inside of the inmate's arm. Unlike Anne Hill, who observed Powell's execution from a window directly in front of Powell, <u>see</u> Ex. I, Schulz and Freeman were in a room off to the side of the execution chamber. This indicates that they were likely not in a position from which they would be able to see a pinch to the <u>inside</u> of Powell's arm.

In any event, affidavits submitted with the instant motion establish that the pinch test was, in fact, performed. The affidavits of Anne Hill, ADOC's General Counsel, and Warden Patterson conclusively show that all parts of the

consciousness assessment, including the arm pinch, were performed during Powell's execution.   Ex. I, ¶ 18; Ex. E, ¶ 13.   These affidavits directly refute Grayson's conclusory, speculative allegation that Powell's arm was not pinched. Because no deviation from the protocol occurred during the Powell execution and Grayson has not presented any evidence supporting his allegation, Grayson's Equal Protection should be summarily dismissed.  See Fed. R. Civ. P. 56(c).

Furthermore, as discussed above, in subsection III(B) of this Argument, this claim is meritless as a matter of law.   Even if one assumes that the factual allegations underlying Grayson's claim are true, failing to pinch Powell's arm during his execution did not cause an Eighth Amendment violation.   Grayson's assertion that failure to pinch the inmate's arm prior to administering the second and third drugs puts the inmate at a substantial risk of serious harm is categorically false and misrepresents the United States Supreme Court's holding in Baze. Contrary to Grayson's representations, neither the "pinch test" nor any other particular consciousness assessment test is constitutionally required.  Indeed, Baze explicitly rejected this very argument.  Baze, 553 U.S. at 60.   And, all of the evidence in this case, including that submitted by Grayson, indicates that Powell's consciousness was assessed, and that he did not respond to the stimuli.   As demonstrated in Exs. E, I, J, and K, it is clear that Powell's execution did not proceed to the second drug until after he was fully unconscious.   The alleged

failure to pinch Powell during his execution did not result in a violation of the Eighth Amendment in Powell's case and does not impermissibly burden Grayson's right to be free from cruel and unusual punishment.

This claim should be summarily dismissed because there is no genuine dispute as to any material fact and the state defendants are entitled to a judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Grayson's last-minute action under 28 U.S.C. § 1983, or in the alternative, grant summary judgment in favor of the defendants.

Respectfully submitted,

Luther Strange
*Alabama Attorney General*


*s/  J. Clayton Crenshaw*
J. Clayton Crenshaw


*s/ Stephanie Reiland*
Stephanie Reiland
*Assistant Attorneys General*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following:   **John Palombi.**


*s/  J. Clayton Crenshaw*
J. Clayton Crenshaw
*Assistant Attorney General*

OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300 Office
(334) 353-3637 Fax
ccrenshaw@ago.state.al.us
sreiland@ago.state.al.us