IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CAREY DALE GRAYSON, | ) | |
| DEMETRIUS FRAZIER, | ) | |
| DAVID LEE ROBERTS, | ) | |
| ROBIN DION MYERS, and | ) | |
| GREGORY HUNT, | ) | CASE NOS.  2:12-CV-0316-WKW |
| | ) | 2:13-CV-0781-WKW |
| Plaintiffs, | ) | 2:14-CV-1028-WKW |
| | ) | 2:14-CV-1029-WKW |
| v. | ) | 2:14-CV-1030-WKW |
| | ) | |
| JEFFERSON S. DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

and

| | | |
|---|---|---|
| CHARLES LEE BURTON, | ) | |
| ROBERT BRYANT MELSON, | ) | |
| RONALD BERT SMITH, | ) | |
| GEOFFREY TODD WEST, | ) | |
| TORREY TWANE MCNABB, | ) | CASE NOS.  2:16-CV-0267-WKW |
| | ) | 2:16-CV-0268-WKW |
| Plaintiffs, | ) | 2:16-CV-0269-WKW |
| | ) | 2:16-CV-0270-WKW |
| v. | ) | 2:16-CV-0284-WKW |
| | ) | |
| JEFFERSON S. DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I. BACKGROUND

Plaintiffs Carey Dale Grayson, Demetrius Frazier, David Lee Roberts, Robin Dion Myers, and Gregory Hunt are Alabama death-row inmates who have been committed to the custody of the Alabama Department of Corrections ("ADOC") awaiting their presently unscheduled executions.  They each filed separate actions under 42 U.S.C. § 1983 challenging the constitutionality of Alabama's method-of-execution under the Eighth Amendment to the United States Constitution.  Because these actions involve common questions of fact and law, on September 5, 2015, the court consolidated these five cases for discovery and trial in order to promote judicial economy, eliminate duplication of discovery, and avoid unnecessary costs.  (*See* Doc. # 59.)

This matter is before the court on Defendants' Motion for Summary Judgment on Plaintiffs' Eighth Amendment claims.  (Doc. # 127.)  The motion has been fully briefed and is ripe for review.  Defendants' motion is due to be granted.

## A.   <u>Plaintiffs' Capital Litigation History</u>

Plaintiffs Grayson, Frazier, Roberts, Myers, and Hunt all have been convicted of capital murder and sentenced to death.  Grayson was convicted of capital murder for the February 1994 death of Vickie Deblieux committed during a kidnapping in the first degree.   *Grayson v. State*, 824 So. 2d 804 (Ala. Crim. App. 1999).  In

October 1996, Frazier was convicted of capital murder of Pauline Brown. *Frazier v. State*, 758 So. 2d 577 (Ala. Crim. App. 1999); *Ex parte Frazier*, 758 So. 2d 611 (Ala. 1999). In December 1992, Roberts was convicted on two counts of capital murder for the death of Annetra Jones, for murder committed during the commission of a robbery and arson. *Roberts v. State*, 735 So. 2d 1244, 1269 (Ala. Crim. App. 1997). In January 1994, Myers was convicted on two counts of capital murder for the death of Ludie Mae Tucker because the murder occurred during the commission of a robbery and burglary. *Myers v. State*, 699 So. 2d 1281 (Ala. Crim. App. 1996). In June 1990, Hunt was convicted on a three-count indictment for the capital murder of Karen Lane, committed during sexual abuse in the first degree and burglary in the first degree. *Hunt v. State*, 659 So. 2d 933 (Ala. Crim. App. 1994); *Ex Parte Hunt*, 659 So. 2d 960 (Ala. 1995).

Plaintiffs' direct appeals concluded many years ago,[1] and their state post-conviction and federal habeas proceedings have also been concluded for at least three years.[2]

---

[1] Grayson's direct appeal ended in 2002. *Grayson v. Alabama*, 537 U.S. 842 (2002). Frazier's direct appeal concluded in 2000. *Frazier v. Alabama*, 531 U.S. 843 (2000). Roberts's direct appeal ended in 1999. *Roberts v. Alabama*, 528 U.S. 939 (1999) (table). Myers's direct appeal ended in 1998. *Myers v. Alabama*, 522 U.S. 1054 (1998). Hunt's direct appeal ended in 1995. *Hunt v. Alabama*, 516 U.S. 880 (1995).

[2] *Grayson v. Thomas*, 132 S. Ct. 124 (2011); *Frazier v. Thomas,* No. 11-10111 (S. Ct. Oct. 1, 2012); *Roberts v. Thomas*, 133 S. Ct. 949 (2013); *Myers v. Thomas*, 132 S. Ct. 2771 (2012); *Hunt v. Thomas*, 133 S. Ct. 611 (2012).

3

**B.**     **Formation and Chronology of the _Midazolam Litigation_**

From 2002 until 2011, sodium thiopental was the first drug used in the ADOC's three-drug, lethal injection protocol.  In 2011, the ADOC amended its protocol by substituting pentobarbital for sodium thiopental as the first drug.  At that time, the ADOC made no amendment to the other two drugs administered, pancuronium bromide and potassium chloride.

In April 2012, Grayson filed a § 1983 complaint challenging the ADOC's substitution of pentobarbital for sodium thiopental, alleging an Eighth Amendment violation.  In October 2013, Frazier filed a similar § 1983 complaint challenging the ADOC's substitution of pentobarbital for sodium thiopental, also alleging an Eighth Amendment violation.

On September 10, 2014, the ADOC amended its execution protocol again, this time by substituting midazolam for pentobarbital as the first drug used in its three-drug, lethal-injection sequence, and by substituting rocuronium bromide for pancuronium bromide as the second drug.  On September 11, 2014, the State disclosed the ADOC's amended protocol in motions the State filed in the Alabama Supreme Court to set execution dates for several death-row inmates.  (Doc. # 160-1, ¶¶ 24–28.)

In October 2014, Plaintiffs Roberts, Myers, and Hunt filed separate § 1983 lawsuits challenging the ADOC's amended lethal-injection protocol employing

midazolam instead of pentobarbital, alleging an Eighth Amendment violation.[3] Subsequently, in January 2015, Frazier amended his complaint to challenge the ADOC's substitution of midazolam for pentobarbital, and in March 2015, Grayson followed suit, amending his complaint to challenge the ADOC's substitution of midazolam for pentobarbital.

In June 2015, the Supreme Court rendered its decision in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), and applied the Court's decision in *Baze v. Rees*, 553 U. S. 35 (2008), to Oklahoma's lethal-injection protocol (which is virtually identical to Alabama's protocol) and held that the plaintiffs failed to establish a likelihood of success on the merits of their claim that the use of midazolam violated the Eighth Amendment.  Post-*Glossip*, the lawsuits filed by Roberts, Myers, and Hunt were consolidated with the pending lawsuits of Grayson and Frazier to form what the court has termed the "Midazolam Litigation," with the Grayson case (12-cv-316), the first-filed of these five cases, designated as the lead case.  (Doc. # 59.) Following the close of discovery in the consolidated case, in compliance with the dispositive motions deadline established in the scheduling order (Doc. # 67), Defendants moved for summary judgment on Plaintiffs' Eighth Amendment claims. (Doc. # 127.)

---

[3] These Plaintiffs did not challenge the ADOC's amendment of the protocol substituting pancuronium bromide for rocuronium bromide, the second drug in the sequence.

C.   <u>**Plaintiffs' Claims**</u>

Plaintiffs' amended complaints all assert identical Eighth Amendment claims challenging the ADOC's current execution protocol, alleging that the ADOC's use of midazolam, the first drug to be administered, is unconstitutional.[4]   Specifically, Plaintiffs assert that midazolam will not properly anesthetize them so as to prevent them from feeling an unconstitutional level of pain associated with the injection of potassium chloride, the third drug.   On this premise, Plaintiffs claim that Defendants' current execution protocol creates a "substantial risk of serious harm," *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion), and violates their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.   Instead of the use of midazolam in a three-drug lethal injection protocol, Plaintiffs propose three alternative methods of execution, using either pentobarbital, sodium thiopental, or a 500-milligram dose of midazolam in a one-drug lethal injection protocol.

---

[4]   Grayson also asserts an equal protection claim under the Fourteenth Amendment, alleging that Defendants do not always perform all three steps of the consciousness assessment in the execution protocol.  Defendants have not challenged this claim with a dispositive motion.  The other four Plaintiffs did not raise a Fourteenth Amendment equal protection claim.

## II.  DISCUSSION

**A.**   **Defendants' Motion for Summary Judgment on Plaintiffs' Eighth Amendment Claims**

Defendants contend they are entitled to summary judgment on Plaintiffs' Eighth Amendment claims because Plaintiffs cannot establish the second prong of *Baze v. Rees*, 553 U.S. 35 (2008), *viz.*, the existence of a known and available alternative method of execution that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain."  *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).  Defendants assert that the evidence garnered in discovery unequivocally shows that there is no genuine dispute that two of Plaintiffs' proposed alternatives—one-drug protocols using either compounded pentobarbital or sodium thiopental—are unavailable to the ADOC, and that Plaintiffs' own evidence contradicts a 500-milligram dose of midazolam as the sole agent of execution. Defendants also point out that Plaintiffs have failed to produce evidence of a single source for either compounded pentobarbital or sodium thiopental that is willing and able to provide either drug to the ADOC, and that Plaintiffs have also failed to produce any admissible evidence that a one-drug midazolam protocol would significantly reduce any alleged risk of severe pain from "[t]he three-drug protocol approved in *Glossip* . . .  the very same protocol that [Plaintiffs] challenge[] here." *See Brooks v. Warden*, 810 F.3d 812, 818 (11th Cir. 2016).

7

1.    *Standard of Review*

Summary judgment is proper only when the record evidence, including depositions, affidavits, and other materials, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U. S. 317, 322 (1986); Fed. R. Civ. P. 56(a), (c).  "The moving party bears the burden of proof," *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007), and the court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant," *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007).

2.    *Standard for Establishing a § 1983 Method-of-Execution Claim*

Summarizing the *Baze/Glossip* test, to successfully challenge a method of execution, a prisoner must establish that the method presents a risk that is "'*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'"  *Glossip*, 135 S. Ct. at 2737 (emphasis in original). To prevail, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Id*.

Further, a prisoner "cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." *Baze*, 553

U. S. at 51.  The prisoner "must identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Id*. at 52.  In short, to survive summary judgment, Plaintiffs must point to admissible evidence that would, if credited, establish a risk and a known and available alternative method of execution that significantly reduces that risk.

Plaintiffs have proposed alternative, one-drug protocols using either compounded pentobarbital, sodium thiopental, or midazolam.  The evidence as to the availability or efficacy of each of these drugs is reviewed below.

### a.    *Alternative #1 – Pentobarbital/Compounded Pentobarbital*

Plaintiffs claim that since January 1, 2014, nearly forty executions have been performed nationwide "using a single large dose of pentobarbital, making it the most common method of execution in the United States" (Doc. # 48 at 16), and that several states, including Colorado, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Pennsylvania, South Dakota, and Texas "have used or intend to use compounded pentobarbital for executions."  (Doc. # 48 at 17.)

In recent years, commercially manufactured pentobarbital has become unavailable to states' departments of corrections for use in lethal-injection executions in the United States.  In a similar § 1983 method-of-execution case containing an Eighth Amendment claim virtually identical to Plaintiffs' Eighth Amendment claims, this court found that the ADOC's supply of commercially

manufactured pentobarbital, Nembutal®, expired around November 2013.  *See Arthur v. Dunn*, No. 2:11-cv-0438-WKW (M.D. Ala. Apr. 15, 2016) (Doc. # 359 at 17, ¶ 1).  Plaintiffs' proposed alternative concerns "compounded pentobarbital" rather than Nembutal®, the commercially manufactured pentobarbital.

Plaintiffs support their claim that compounded pentobarbital is a viable alternative with the report and testimony from their expert, Deborah L. Elder, Pharm.D.[5]  Dr. Elder is a registered pharmacist in the State of Georgia, is certified in compounding (Doc. # 127-6 at 1), and is a Clinical Associate Professor in the Pharmaceutical and Biomedical Department in the College of Pharmacy at the University of Georgia (UGA).  She has been on the faculty of UGA's College of Pharmacy since 2002.  (Elder Dep. 80: 8-10.)

Plaintiffs retained Dr. Elder to opine on the practicality of "the procedure for compounding pentobarbital using individual ingredients" that would be equivalent to commercially manufactured pentobarbital.  (Elder Dep. 15:13-22.)  Plaintiffs did not ask Dr. Elder to address whether compounded pentobarbital is available to the ADOC.  (Elder Dep. 16:19-23.)  Dr. Elder's report describes the regulations governing the compounding of pentobarbital sodium.[6]  (Doc. # 127-6 at 2-4.)  The

---

[5]  As discussed *infra*, Plaintiffs also rely on Dr. Elder to support their claim that sodium thiopental is an available alternative.

[6]  Sodium pentobarbital is the active pharmaceutical ingredient in compounded pentobarbital.  *See Arthur v. Dunn*, No. 2:11-cv-0438-WKW (M.D. Ala. Apr. 15, 2016) (Doc.

report also includes the formula and outlines the procedure for producing compounded pentobarbital from pentobarbital sodium. (Doc. # 127-6 at 4-5). Dr. Elder performed internet searches and attached to her report printouts from the websites of two pharmaceutical companies that listed pentobarbital sodium for sale. (Doc. # 127-7.) However, Dr. Elder provided no evidence that either of these companies actually had pentobarbital sodium available for sale on-line that could be shipped to an unknown compounding pharmacist. In fact, these printouts from the websites state that there are sales restrictions on the distribution of sodium pentobarbital[7] *Id.* Dr. Elder sent an e-mail to Sigma-Aldrich to inquire about the availability of pentobarbital sodium (Doc. # 127-8), but there is no evidence that she received a response to this e-mail.[8]

Dr. Elder also made a telephone call to Sigma-Aldrich's Drug Enforcement Administration (DEA) schedule department to ask what was required to comply with the screening process for the purchase of sodium thiopental and pentobarbital sodium. (Elder Dep. 69:12 – 70:4.) Dr. Elder was advised that the purchase of either

---

# 359 at 17, ¶ 4).

[7] The TOCRIS printout states: "This product is a DEA controlled substance and is not available for purchase online. Please inquire to place your order." (Doc. # 127-7.) Similarly, the Sigma-Aldrich printout states: "Sales restrictions may apply." *Id.*

[8] When deposed, Dr. Elder stated that she believed Sigma-Aldrich did respond to her December 28, 2015 e-mail, and that she believed she had provided that response to Plaintiffs' counsel. (Elder Dep. 65:6-13.) However, if Sigma-Aldrich responded to Dr. Elder's December 28 e-mail, it is not of record.

of these drugs requires a valid DEA license and that pentobarbital sodium also requires completion of a DEA 222 form.  (Elder Dep. 70:9-13.)  Dr. Elder was also informed that generally, Sigma-Aldrich's products are used for research and development purposes[9] and that the DEA compliance department requires the completion of a form stating how the product is to be used.  (Elder Dep. 70:14 – 71:16.)  As of the date of Dr. Elder's deposition, April 5, 2016, pentobarbital sodium was backordered, but might be available within thirty days.  (Elder Dep. 71:19-21.)

Plaintiffs' proof that compounded pentobarbital is available to the ADOC falls short.  Plaintiffs' statements that since January 1, 2014, nearly forty executions have been performed "using a single large dose of pentobarbital," and that ten states "have used or intend to use compounded pentobarbital for executions" (Doc. # 48 at 16-17), are inconsequential.  "[T]he fact that the drug was available in those states at some point over the past two years does not, without more, make it likely that it is available to Alabama now."  *Brooks v. Warden*, 810 F.3d 812, 819 (11th Cir. 2016). It is undisputed that in 2015, only four states – Georgia, Missouri, Texas, and Virginia[10] – were able to perform executions using compounded pentobarbital.  *See*

_____

[9]  The person to whom Dr. Elder spoke opined that Sigma-Aldrich products were to be used only for research and development purposes, but because this person did not work in the DEA compliance department, she could not be certain of that statement.  (Elder Dep. 70:25 – 71:4.)

[10] Virginia was unable to obtain compounded pentobarbital from its traditional suppliers, and was only able to carry out the execution because the Texas Department of Criminal Justice supplied Virginia with three vials of pentobarbital.  *See Prieto v. Clarke*, No. 3:15-cv-587-HEH (E.D. Va. October 1, 2015) (Doc. # 19 therein, Memorandum Opinion at 3).

Anne Adams Hill testimony in *Arthur v. Dunn*, No. 2:11-cv-0438-WKW (M.D. Ala. Jan. 12, 2016) (Doc. # 348 at 4).

Dr. Elder did not identify any pharmacist or supplier who could provide compounded pentobarbital to the ADOC. Neither Dr. Elder's report nor her testimony establishes that compounded pentobarbital is available to the ADOC. Plaintiffs have failed to raise a genuine dispute of material fact that compounded pentobarbital is a feasible alternative.

Defendants support their summary judgment motion with the testimony of Anne Adams Hill at the trial in *Arthur v. Dunn*, No. 2:11-cv-438 (M.D. Ala. Jan. 12, 2016) (Doc. # 348). Defendants rebutted Arthur's allegation that compounded pentobarbital was an available alternative with Hill's testimony. Hill, the ADOC's general counsel since March of 2011, testified as the ADOC's party representative. She was aware that in 2015, Georgia, Missouri, Texas, and Virginia performed executions using compounded pentobarbital. (*Arthur* Trial Tr. vol. 1, 98.) Hill testified that, in her recent efforts to obtain compounded pentobarbital for the ADOC's use in executions, she had contacted the departments of corrections in at least those four states. (*Arthur* Trial Tr. vol. 1, Doc. # 349 at 106.)

Elaborating, Hill testified that, as part of her job duties, she is routinely in contact with other departments of corrections on a variety of issues, including the subject of lethal injection generally, the availability of compounded pentobarbital,

13

and, in those states that have been able to obtain compounded pentobarbital, their willingness either to provide it to the ADOC or to provide their source to the ADOC. (*Arthur* Trial Tr. vol. 1, Doc. # 349 at 107.)  She reiterated that she has had these similar, ongoing, conversations not just recently, but "for some time."  (*Arthur* Trial Tr. vol. 1, Doc. # 349 at 109.)

In her quest to find a source for compounded pentobarbital, Hill has also contacted all eighteen accredited compounding pharmacies in Alabama, but her efforts were to no avail. "[N]one of the 18 were able to provide the Department of Corrections with compounded pentobarbital." (*Arthur* Trial Tr. vol. 1, Doc. # 349 at 149.)  In all, she has contacted at least twenty-nine potential sources to inquire about obtaining compounded pentobarbital, and all of those efforts failed.  (*Arthur* Trial Tr. vol. 1, Doc. # 349 at 158.)

The court credited Hill's testimony and made the following findings of fact concerning pentobarbital and compounded pentobarbital:

> 8. The ADOC has attempted to obtain compounded pentobarbital for use in executions from departments of corrections in at least four states, Georgia, Missouri, Texas, and Virginia, but those efforts were unsuccessful.
>
> 9. The ADOC has contacted all of the accredited compounding pharmacies in Alabama to ascertain whether any of these pharmacies would be willing and able to provide compounded pentobarbital to the ADOC, but those efforts have been unsuccessful.

14

> 10. Pentobarbital is not feasible and readily implemented as an execution drug in Alabama, nor is it readily available to the ADOC, either compounded or commercially.

*See Arthur v. Dunn*, No. 2:11-cv-438 (M.D. Ala. Apr. 15, 2016) (Doc. # 359 at 18-19.)

Plaintiffs' evidence obtained after Hill's testimony in the *Arthur* trial in January 2016, fails to establish that compounded pentobarbital has since become available to the ADOC. Dr. Elder's report and testimony obtained on April 5, 2016, did not demonstrate that pentobarbital, either compounded or commercially manufactured, is available to the ADOC. Further, testimony from Plaintiffs' expert anesthesiologist, Michael A. Forelich, M.D., M.S., obtained on March 23, 2016, is consistent with the court's finding in *Arthur* concerning the unavailability of pentobarbital in any form to the ADOC. Dr. Forelich testified that pentobarbital is unavailable in his clinical practice. (Forelich Dep. 116:20 – 117:8.) The court's earlier finding in *Arthur* that pentobarbital, either compounded or commercially manufactured, is not readily available to the ADOC is unchanged by the additional evidence offered in this case.

### b.   *Alternative #2 – Sodium Thiopental*

Although sodium thiopental has not been used in the ADOC's protocol since April 2011, Plaintiffs claim that it is an alternative for use in a single-drug protocol.

To support this claim, Plaintiffs rely on a May 2015 news article reporting that "the Nebraska Department of Corrections claims that it can obtain sodium thiopental to use in its protocol, and do so legally." (Doc. # 48 at 18.) However, Plaintiffs acknowledge that sodium thiopental is no longer made by any commercial drug manufacturer in the United States, but assert that sodium thiopental could be made by a compounding pharmacist or molecular chemist. (Doc. # 127-3 at 1-2.) Plaintiffs also state that there is no blanket prohibition *per se* on importing sodium thiopental, "if appropriate laws are followed." (Doc. # 127-3 at 2.) Plaintiffs acknowledge that no other State has performed an execution using a one-drug sodium thiopental protocol. *Id.*

As with pentobarbital, Plaintiffs rely on Dr. Elder to support their claim that sodium thiopental is a viable alternative for use in a one-drug protocol. However, Dr. Elder's five-page report focuses almost exclusively on sodium pentobarbital and compounded pentobarbital. Dr. Elder's attention to sodium thiopental is confined to the following note at the conclusion of her report:

> **NOTE:** Thiopental is a logical substitute to sodium pentobarbital. This agent is available through suppliers in the United States (U.S.) and India. The U.S. supplier lists availability with shipping date ranges of 2/11/16 to 3/11/16 and costs of $17.00 – 52.00 per 10 mg. Larger quantities are available by request.

(Doc. # 127-6 at 5.)

Dr. Elder testified that, although she had provided printouts from the websites of suppliers in India and the United States concerning sodium thiopental, she did not contact these companies directly to inquire about the availability of sodium thiopental, nor did she inquire about sales restrictions on this product. (Elder Dep. 50:18 – 51:8, 57:9 – 58:22.)  She also testified that she was "not aware of any of it being used right now" in clinical settings.  (Elder Dep. 51:9-15.)  Similar to pentobarbital, Dr. Elder testified that, when she called the company whose website listed sodium thiopental as a product for sale, she was informed that it was limited to research and development use and that a request to purchase the drug for other purposes would likely be denied.  (*Id*. at 70:5 – 71:16.)  In any event, Dr. Elder admitted that one of the internet printouts for sodium thiopental indicated that the product was discontinued, and that she did not contact the company to determine how much, if any, of the drug remained in stock.  (*Id*. at 73:21 – 74:15.)  Dr. Elder contradicts her own testimony that sodium thiopental is "available."

In considering the availability of sodium thiopental to the ADOC, the court takes judicial notice of a publication by the U.S. Food and Drug Administration (FDA) known as the FDA Orange Book, which contains a list of all approved drugs in the United States.  At the *Arthur* trial in January 2016, the court heard testimony from Arthur's expert, Gaylen M. Zentner, Ph.D., that sodium thiopental is no longer listed in the FDA Orange Book, meaning that it is not available legally in the United

States.  *See Arthur v. Dunn*, No. 2:11-cv-0438-WKW (M.D. Ala. Apr. 15, 2016)

(Doc. # 359 at 14.)   The court found Zentner's testimony to be credible, *id.*, and

made the following findings of fact concerning sodium thiopental:

> 11. Per the FDA Orange Book, sodium thiopental is no longer legally available in the United States.

> 12. While sodium thiopental may be available from an overseas supplier and could conceivably be imported into the United States, such importation requires the approval of the FDA. There was no evidence at trial that any state's department of corrections had obtained the FDA's approval to import sodium thiopental for use in performing its executions.

> 13. Sodium thiopental is unavailable to the ADOC for use in lethal injections.

*See Arthur v. Dunn*, No. 2:11-cv-0438-WKW (Apr. 15, 2016) (Doc. # 359 at 19).

Plaintiffs have failed to present any credible evidence that, after sodium

thiopental became illegal to manufacture commercially in the United States, any

state has successfully obtained sodium thiopental for use in an execution.  Plaintiffs

point to a May 14, 2015 newspaper article reporting that the Nebraska Department

of Corrections has obtained sodium thiopental to use in its protocol; however, a

newspaper article is inadmissible to prove the truth of the matter asserted.  *See Hope*

*For Families & Comm. Service, Inc. v. Warren*, 721 F. Supp. 2d 1979, n.114 (M.D.

Ala. 2010); *United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005). Moreover, that newspaper article is inconsequential old news.[11]

Further, given that sodium thiopental can no longer be manufactured legally in the United States, Plaintiffs have failed to demonstrate that sodium thiopental has been imported lawfully for use in an execution. Plaintiffs' proof of the availability of sodium thiopental is similar to the proof offered in the *Arthur* trial in January 2016, in that Plaintiffs have only provided evidence that sodium thiopental *may* be available from an overseas supplier and could conceivably be imported into the United States, but only with the FDA's approval. Plaintiffs have provided no evidence that any state's department of corrections has obtained the FDA's approval to import sodium thiopental for use in performing its executions.

In short, Plaintiffs' evidence obtained after the *Arthur* trial in January 2016, fails to establish that sodium thiopental has since become available to the ADOC. Plaintiffs' expert anesthesiologist, Michael A. Forelich, M.D., M.S., deposed on March 23, 2016, testified that sodium thiopental is unavailable in his clinical practice and that he has not used it for "maybe five years." (Forelich Dep. 117:9-21.) This evidence is consistent with and confirms the court's finding in *Arthur* that sodium thiopental is not readily available to the ADOC.

---

[11] The court takes judicial notice of the fact that on May 27, 2015, in passing LB 268, the Nebraska Legislature abolished the death penalty in Nebraska. (*See* nebraskalegislature.gov/bills/view_bill.php?DocumentID=25136 (last visited October 25, 2016).

c.    *Alternative #3 – Midazolam*

Plaintiffs' third proposed alternative is a 500-mg dose of midazolam administered in a single-drug protocol.  The basis for this proposal is the finding by a federal district court in Oklahoma that a 500-mg dose of midazolam alone would likely cause death in less than an hour.[12]  (Doc. # 48 at 18.)

Plaintiffs support this alternative with the report and testimony of Randall Tackett, Ph.D.  Dr. Tackett, a pharmacologist and toxicologist, is a professor at the University of Georgia (UGA) College of Pharmacy in the Department of Clinical and Administrative Pharmacy.  He has been on UGA's faculty since 1981.  (Doc. # 145-5.)   Dr. Tackett's report concerns the pharmacology of midazolam.   He concludes his report with the following statement:

> If midazolam was to be used as the sole agent for lethal injection, a loading dose between 2.5 and 3.75 g[rams] could be used followed by a continuous IV infusion until death.  This would be preferable to repeated boluses of midazolam until death, as the bolus method would result in spikes and dips in concentration while the continuous infusion method would provide a continuous increase in the drug until death.  This would be similar to the protocol mentioned above that is used for terminal sedation but would involve much higher doses which would result in death.  Death due to midazolam has been attributed to respiratory depression and cardiac arrest.

---

[12] The finding to which Plaintiffs refer is the trial court's finding made after a preliminary injunction hearing in *Warner v. Gross*, No. 5:14-cv-0665 (D. Okla. Dec. 19, 2014) (Doc. # 173 therein).   *Warner* was a challenge to Oklahoma's three-drug protocol, which is similar to Alabama's protocol.  There, the court heard testimony from defendants' expert, Dr. Roswell Lee Evans, that a 500-mg dose of midazolam will induce a coma.  The trial court credited Dr. Evans's testimony and found that a 500-mg dose of midazolam "alone would likely cause death by respiratory arrest within [thirty] minutes or an hour."  *Glossip*, 135 S. Ct. at 2736.

(Doc. # 145-5 at 3.)

When deposed, Dr. Tackett summarized his opinions concerning midazolam

and the 500-mg dose, as follows:

> Q.  Dr. Tackett, what are your conclusions in this case based on your report?
>
> A.  Well, based on my report is that I do think that one is midazolam; its mechanism of action is pretty well known. I would say as far as my conclusions with this report is that midazolam does have a variability of response. *I think that the recommended dose of 500 milligrams is too low. I do not -- have not seen a good scientific explanation for how the 500 milligrams was arrived at.*  If midazolam is going to be used, I guess my conclusion is if that is the sole agent for lethal injection, then I would think I would use the one document which is in the published peer-reviewed literature that gives an estimate of the LD50[13] that I would use that as the dose, and instead of an injection or multiple injections, I would use a continuous infusion as I indicated and carry that until death.

(Tackett Dep. 20:7-24 (footnote and emphasis added).)

Dr. Tackett opined that a 500-mg dose of midazolam is too low, presumably

to cause death.  He testified that, if midazolam were used in a one-drug protocol, he

would recommend a loading dose of between 2.5 and 3.75 grams, the equivalent of

between 2500 and 3750 milligrams of midazolam, a dose five to eight times larger

---

[13] Explaining the term LD50, Dr. Tackett stated that it is a dose that is determined by giving different doses to groups of animals, usually rats or mice, to ultimately arrive at a dose that will kill 50 percent of the selected group of animals: "You give different groups different [dose] ranges and you can determine – usually 24 hours later you come back and see how many are alive and then you can calculate what would be the dose at which 50 percent of the animals were killed. That's called the LD50."  (Tackett Dep. 80:12-21.)

than the 500-milligram dose Plaintiffs have pled as an alternative method of execution.  Dr. Tackett also recommended that this loading dose should be followed by continuous infusion until death.  (*Id.* at 80:22 – 81:15.)  However, Dr. Tackett makes no recommendation as to the amount of midazolam to be administered in the continuous infusion stage and the rate of its administration.

The opinion of Plaintiffs' own expert that a 500-mg dose of midazolam is too low refutes the feasibility of Plaintiffs' proposed alternative, and there is no other scientific evidence of record to support this novel alternative.  Dr. Tackett's report and opinion fail to support, and in fact undermine, Plaintiffs' claim that a 500-mg dose of midazolam in a one-drug protocol would result in significantly less risk of substantial pain than Alabama's present protocol, as *Glossip* requires.  Plaintiffs also have failed to raise a genuine dispute of material fact that a 500-mg dose of midazolam in a single-drug protocol is a feasible alternative that is readily implemented.

### 3.   *Summary of the Alternative Method Prong*

Post-*Baze* and *Glossip*, it is clear that before a prisoner is entitled to relief, he must also establish a remedy, that is, "the existence of a known and available alternative method of execution that would entail a significantly less severe risk." *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U. S. at 56-60).  A challenge to a method of execution that merely shows "a slightly or marginally safer alternative,"

*Baze*, 553 U. S. at 51, fails to meet the remedy test.  Further, "because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out."  *Glossip,* 135 S. Ct. at 2732–33 (quoting *Baze*, 553 U. S. at 47) (alteration omitted)).  Moreover, "because some risk of pain is inherent in any method of execution[,] . . . the Constitution does not require the avoidance of all risk of pain."  *Id*. at 2733 (citation omitted).

For the reasons explained above, Plaintiffs have failed to meet their burden of proof to survive summary judgment.  To the extent that Plaintiffs rely on a single-drug protocol using pentobarbital/compounded pentobarbital or sodium thiopental, based on the evidence presented in *Arthur v. Dunn*, No. 2:11-cv-0438-WKW (M.D. Ala. Apr. 15, 2016) (Doc. # 359 at 17, 19), the court has previously found that neither pentobarbital/compounded pentobarbital nor sodium thiopental was available to the ADOC.  The reports and opinions of Plaintiffs' experts, Dr. Deborah L. Elder, Dr. Randall Tackett, and Dr. Michael Forelich, obtained post-*Arthur*, in no way render the court's findings in *Arthur* inaccurate; in fact, this later-acquired evidence confirms the correctness of the findings in *Arthur*.  As to Plaintiffs' proposed alternative using a 500-mg bolus dose of midazolam, it is eviscerated by the opinion of their own expert, Dr. Tackett, who opined that a 500-mg dose is too low for a one-drug execution.  (Tackett Dep. 20:7-24.)

**4.**   *Alternative Method Evidence:  Hippocrates and Hypocrites*

The collision between the rulings of the United States Supreme Court and ethical rules for the medical profession provides no grounds for relief to Plaintiffs. Plaintiffs clearly bear the burden of proving a *known* and *available* alternative *method of execution* that *significantly* reduces the risk of *substantial pain* in execution (sometimes referred to by inmates as the "suicide burden."). *Grayson v. Dunn*, 156 F. Supp. 3d 1340, 1349 (M.D. Ala. 2015), *aff'd sub nom. Brooks v. Warden*, 810 F.3d 812 (11th Cir. 2016), *cert. denied sub nom. Brooks v. Dunn*, 136 S. Ct. 979 (2016).  To the extent that burden encroaches upon the medical realm, it is not accidental, and injury that accrues to a party accrues to the party with the burden of proof.  In what can only be described as an attack on the death penalty itself (which is legally impermissible in a last-ditch § 1983 action, *see Hill v. McDonough*, 547 U. S. 573 (2006)), death row inmates refuse to cooperate in making safe the means of their own death.  This is a legal and practical judgment arrived at by weighing one's own interests in survival.  But that tactic is blocked by *Glossip* and *Baze*:  "[T]hey argue that they need not identify a known and available method of execution that presents less risk.  But that argument is inconsistent with the controlling opinion in *Baze*."  *Glossip*, 135 S. Ct. at 2738.  If an alternative method involves medical procedures, it is the burden of the inmate to prove them.

The Hippocratic Oath is often interjected into the argument to say why medical personnel cannot opine on alternative methods of execution. But modern medicine has orphaned Hippocrates and his Oath, in the name of patient self-determination and choice, by countenancing medical procedures that the original Oath prohibited. For instance, the oldest version of the Oath says, "I will not give to a woman an abortive remedy." Today, that provision is history, aborted by modern medical ethicists. Likewise, modern medical ethicists have found pure magic in unleashing the genies of physician-assisted suicide, medical marijuana, drug and alcohol use—even abuse—during pregnancy and without personal responsibility, all in the name of liberty, self-determination, and choice. So much for the Oath *vis-à-vis* modern ethics and ethicists.

The modern version of the Oath does contemplate the rare but not extinct potential of taking life: "If it is given me to save a life, all thanks. But it may also be within my power to take a life; this awesome responsibility must be faced with great humbleness and awareness of my own frailty. Above all, I must not play at God." Peter Tyson, *The Hippocratic Oath Today*, http://www.pbs.org/wgbh/nova/body/hippocratic-oath-today.html (last visited Oct. 31, 2016) (attributing the oath, revised in 1964, to Louis Lasagna, then-Academic Dean of the School of Medicine at Tufts University and noting that the revised oath is used in many medical schools today).

Playing at Hippocrates and God in the same breath, the American Medical Association, which is opposed to human execution by any means (ironic, when the third leading cause of human death in the United States is medical error, at the rate of over 250,000 souls a year[14] (compared to 35 executions a year on average since 1976[15])), adopted Rule 9.7.3 which prohibits a physician from taking an "action" that would "assist, supervise, or contribute to the ability of another individual to directly cause the death of the condemned," including rendering technical advice regarding execution or consulting with or supervising lethal injection personnel. Rule 9.7.3(b), (i), (n).  Death row inmates and their expert medical witnesses could reflect upon whether "action" prohibited by Rule 9.7.3 would include testifying hypothetically, or testifying generally on how chemicals act upon the human body when dosed in specific amounts, or opining that a detailed sequence of specific amounts of drugs would or would not cause human death, or that, hypothetically, a specific drug regimen would compassionately ensure no measurable possibility of feeling pain during execution.  Surely, were they so inclined, clever counsel could devise a way to ethically and legally generate medical evidence of safe alternative

---

[14]   Letter from Martin A. Makary, M.D., Professor at Johns Hopkins University and Hospital, to Dr. Thomas Frieden, Director, U.S. Centers for Disease Control and Prevention, dated May 1, 2016, http://www.npr.org/sections/health-shots/2016/05/03/476636183/death-certificates-undercount-toll-of-medical-errors (last visited Oct. 31, 2016).

[15]   Death Penalty Information Center, http://www.deathpenaltyinfo.org/views-executions (last visited Oct. 31, 2016).

execution procedures.  Were it not so, it would be the first such evidentiary abyss in the history of mankind and lawyers.  But alas, the abolitionists (as Justice Scalia called them) continue social, legal and political experimentation at the sole and ultimate expense—by their own argument—of the condemned.

The medical community stood by passively as sodium thiopental and pentobarbital were ripped from its medical bag of compassionate pain management by a tiny cadre of death penalty abolitionists.  These valuable tools for alleviating sensation of pain were rendered unavailable to all patients, not just death row inmates.  Now complaints about midazolam from the same medical community ring hollow, especially with the galling development of the abolitionists suggesting the same sodium thiopental and pentobarbital as alternatives, knowing well they are now unavailable to states for purposes of execution protocols.  As Justice Scalia said in *Glossip*, it reminds one of the man "sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan."  *Glossip*, 135 S. Ct. at 2749 (Scalia, J., concurring).

The legal profession is not without sin in this.  While physicians take an oath not to "play at God," the United States Supreme Court famously embarked upon a divine journey to discern "the evolving standards of decency that mark the progress of a maturing society . . .", *Trop v. Dulles*, 356 U. S. 86, 101 (1958), "a task for which we are imminently ill suited."  *Glossip*, 135 S. Ct. at 2749 (Scalia, J.,

concurring).  According to Justice Scalia, "[t]hat case has caused more mischief to our jurisprudence, to our federal system, and to our society than any other that comes to mind."  *Id*.  And the hollow arguments from a debased medical community in death penalty cases are both the progeny of, and prompted by, just such standardless *Trop* jurisprudence as applied to the death penalty.

The medical profession may choose:  it could continue on the side of guerilla tactics against a clearly constitutional right of the state to execute criminals convicted of vile human desecration and death; or, it could choose to become part of a compassionate solution to perceived human suffering by rendering assistance to inmates facing the final human judgment, with "great humbleness and awareness of [one's] own frailty."

## III.  CONCLUSION

In the final analysis, Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claims because Plaintiffs have failed to present evidence that creates a genuine dispute of material fact as to an alternative method of execution, an essential prong of the *Baze/Glossip* test for an Eighth Amendment method-of-execution claim.  *Glossip*, 135 S. Ct. at 2739.  Accordingly, it is ORDERED that:

1.    Defendants' Motion for Summary Judgment on Plaintiffs' Eighth Amendment claims (Doc. # 127) is GRANTED.

2.     Judgment is entered in Defendants' favor on the Eighth Amendment claims of Plaintiffs Carey Dale Grayson, Demetrius Frazier, David Lee Roberts, Robin Dion Myers, and Gregory Hunt.

3.     Pursuant to Federal Rule of Civil Procedure 54(b), and the court's finding that there is no just reason for delay, a Final Judgment in Defendants' favor on all claims asserted by Demetrius Frazier, David Lee Roberts, Robin Dion Myers, and Gregory Hunt will be entered contemporaneously with this Memorandum Opinion and Order.

4.     All claims asserted by Plaintiffs Frazier, Roberts, Myers, and Hunt against Defendants having been resolved, the actions filed by Demetrius Frazier (2:13-cv-0781-WKW), David Lee Roberts (2:14-cv-1028-WKW), Robin Dion Myer (2:14-cv-1029-WKW), and Gregory Hunt (2:14-cv-1030-WKW) are DISMISSED.

5.     There being no just reason for delay, pursuant to Federal Rule of Civil Procedure 54(b), this is a final and appealable Order as to Plaintiffs Demetrius Frazier, David Lee Roberts, Robin Dion Myers, and Gregory Hunt.

6.     Grayson's Fourteenth Amendment claim remains pending.

DONE this 31st day of October, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE