# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

CAREY DALE GRAYSON,     )
                         )     CIVIL ACTION NO
                         )     2:12-CV-316-WKW
                         )
     Plaintiff,             )
                         )
v.                         )
                         )
JEFFERSON S. DUNN, *et al.*,     )
                         )
     Defendants.           )
                         )
and                      )
                         )
CHARLES LEE BURTON,     )
ROBERT BRYANT MELSON,     )
GEOFFREY TODD WEST,     )
TORREY TWANE MCNABB,     )
JEFFREY LYNN BORDEN,     )     CIVIL ACTION NO.
                         )     2:16-CV-267-WKW
     Plaintiffs,           )     2:16-CV-268-WKW
                         )     2:16-CV-270-WKW
                         )     2:16-CV-284-WKW
                         )     2:16-CV-733-WKW
                         )
v.                         )
                         )
JEFFERSON S. DUNN, *et al.*,     )
                         )
     Defendants.           )

## DEFENDANTS' OPPOSITION TO JEFFREY BORDEN'S REQUEST FOR STAY OF EXECUTION

Jeffery Lynn Borden is a death row inmate who is scheduled to be executed today by the State of Alabama.   Borden was convicted of capital murder and sentenced to death for a crime he committed nearly twenty-four years ago, fatally shooting his wife, Cheryl Borden, and her father, Roland Harris, in front of the Borden children on Christmas Eve.   Borden, who was separated from Cheryl at the time, arrived at the Harris home during a large family gathering to return their three children so that they could spend Christmas with Cheryl.   *Borden v. State*, 711 So. 2d 498, 501 (Ala. Crim. App. 1997).   When Cheryl began to help her children move their belongings from Borden's car, Borden took out a pistol and shot Cheryl in the back of the head.   *Id*.   Borden then chased Harris, who was also present in the front yard, to the front of the house, firing several shots at him.   *Id*. While Borden was shooting Harris, "the three children ran through the garage of the residence and came into the house through a back entrance, screaming that their father had shot their mother and that she was dead."   *Id*.

Borden has already unsuccessfully sought a stay of execution in another court.   Yesterday, the United States Supreme Court vacated a stay of execution issued by an Eleventh Circuit panel.   *See Dunn v. Borden*, No. 17A360 (Oct. 4, 2017).   Despite this ruling, Borden now seeks a stay of execution at the eleventh hour in this Court.   The Supreme Court's vacation of the Eleventh Circuit's stay

1

strongly weighs against any further request for a stay of execution, and this Court should reject Borden's attempt to obtain a second bite at the apple.

In any event, Borden has failed to establish that he is entitled to a stay of execution.  "A stay of execution is equitable relief which this Court may grant only if the moving party shows that: (1) he has a substantial likelihood of success on the merits: (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant: and (4) if issued, the injunction would be adverse to the public interest." *DeYoung v. Owens*, 646 F.3d 1319, 1324 (11th Cir. 2011) (internal quotation omitted).  Capital punishment, including capital punishment by lethal injection, generally is constitutional.  *See Baze v. Rees*, 553 U.S. 35, 47 (2008).  Because "[s]ome risk of pain is inherent in any method of execution," the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions," particularly where the pain results "by accident or as an inescapable consequence of death." *Id.* at 47, 50.

To prevail on an Eighth Amendment challenge to a lethal injection protocol, a condemned inmate must establish "an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.  *Id.* at 50 (quotation omitted).  To make this showing, an inmate must prove two things: (1) that the method of execution is "sure or very likely to cause serious illness and needless suffering" and (2) that there is

"an alternative [method of execution] that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015). As shown below, Borden cannot demonstrate a likelihood of success on either prong.

As a final introductory matter, contrary to his contention, Borden cannot show that the equities lie in favor of a stay of execution. Although Borden points to the fact that the Eleventh Circuit previously found that the equities lie in his favor, this argument is unpersuasive as that court's stay was vacated by the Supreme Court. Moreover, the fact that the Eleventh Circuit held that Borden's claim was not time-barred and that his *pleadings* stated a plausible claim under Rule 12(b)(6) does not establish a significant likelihood of success on the *merits* of this claim. As the Eleventh Circuit has previously noted, "pleadings do not constitute evidence." *Brooks v. Warden*, 810 F.3d 812, 818 (11th Cir. 2016). Indeed, Borden's case is no different than the situation in *Brooks* where the inmate presented nothing but his pleadings in support of his request for a stay. Similarly, Borden has presented no evidence supporting his claims, but again relies only on his pleadings. The problem for Borden is that the actual evidence presented in his case contradicts and refutes the allegations he raised in his complaint as explained more fully below. Thus, this Court must deny the equitable relief Borden seeks.

I.   **Borden has failed to establish a substantial likelihood of success on the merits on his Eighth Amendment claim.**

A.   **Borden cannot establish that the use of midazolam in Alabama's execution protocol is sure or very likely to cause needless pain and suffering.**

Borden is not entitled to a stay is because he cannot meet the first *Baze* prong of showing a substantial likelihood that the use of midazolam is "sure or very likely" to cause needless suffering.  He has failed to present any non-speculative evidence that would dispute the established fact that a 500-milligram dose of midazolam, as called for in the ADOC's three-drug protocol, will render an inmate fully unconscious before the second and third drugs are administered.  For several reasons, the stay should be denied.

First, as the Eleventh Circuit has held in denying a similar stay request from another inmate in the Midazolam Litigation, it is extremely unlikely that Borden could establish a substantial likelihood of success because "[t]he three-drug protocol approved in *Glossip* . . . is the very same protocol that [Borden] challenges here," making the requirement of establishing a substantial likelihood of success "an especially difficult burden to meet[.]" *Brooks*, 810 F.3d at 818.  Indeed, many of the arguments Borden advanced in his complaint, such as the allegation that midazolam is not used clinically as a sole anesthetic, are the same arguments that were rejected in *Glossip*, 135 S. Ct. at 2742 (holding that "the fact that a low dose of midazolam is not the *best* drug for maintaining unconsciousness during surgery says little about

whether a 500–milligram dose of midazolam is *constitutionally adequate* for purposes of conducting an execution.").

Moreover, both before and after *Glossip*, federal courts considering Eighth Amendment challenges to similar midazolam protocols have soundly rejected them in Ohio, Arkansas, and Florida. *See In re: Ohio Execution Protocol*, 860 F.3d 881, 884 (6th Cir. 2017); *McGehee v. Hutchinson*, 854 F.3d 488 (8th Cir. 2017); *Chavez v. Florida SP Warden*, 745 F.3d 167, 1272–73 (11th Cir. 2014) (holding that inmate "cannot show that the use of midazolam would allow him to feel sensations of suffocation and searing pain caused by the other two drugs in the 2013 Protocol, vecuronium bromide and potassium chloride"). In addition, Alabama has already carried out four executions using this protocol. Three of those executed inmates were co-plaintiffs in this case, and their stay requests were denied by both this Court and the Eleventh Circuit. *See Melson v. Dunn*, 137 S. Ct. 1664 (2017); *Grayson v. Warden*, 672 F. App'x 956, 968 (11th Cir. 2016) (unpublished); *Brooks*, 810 F.3d at 823. These facts alone foreclose any argument that Borden can establish a substantial likelihood of success on the merits.

Second, Borden has presented no evidence attached to his motion for a stay that would establish a likelihood of success on the merits. Borden relies solely on the expert report of Dr. Michael Frolich, which he attached to his complaint, Doc. 298 at 11. But Borden's allegation and this report are actually refuted by the

evidence developed in this case because Borden's own experts concede that a sufficient dose of midazolam will put a person in a drug-induced coma such that they will be unable to respond to noxious stimuli. Borden and his co-plaintiffs attached the reports of two experts, Drs. Frolich and Tackett, to their complaints. *See* Vol. 1 Tab 7B, 7F, 11.[1] Notably, while their reports noted some general characteristics and concerns with the drug, neither specifically opined that the use of midazolam in Alabama's three-drug protocol would likely result in pain. Indeed, in their depositions in this case, both doctors conceded that midazolam could effectively render a person in a drug-induced coma. Specifically, Dr. Frolich, a practicing anesthesiologist, testified as follows:

Q: … How would you define the term coma in a drug-induced context?

A: A lack of responsiveness to arousal with a variety of intense stimuli.

Doc. 145-7 at 36:15–19.

Later, Dr. Frolich testified:

Q: Okay. Generally, in a healthy adult, would you think 500 milligrams bolus of Midazolam would likely result in that person being put into a drug-induced coma?

A: I think that's a fair statement.

---

[1] Volume numbers refer to the Appellants' Appendix that was filed on appeal in the Eleventh Circuit.

*Id*. at 95:10–14.  Dr. Frolich did note the lack of scientific evidence regarding high doses of drugs and the possibility of perceiving pain, speculating, "[W]e don't know if pain is one of those functions that's bring preserved . . . in the very deep levels of anesthesia," *id*. at 36; 134:7–10, but such speculation cannot entitle Borden to a stay of execution.  *See Brewer v. Landrigan*, 562 U.S. 996 (2010) ("[S]peculation cannot substitute for evidence that the use of the drug is 'sure or very likely to cause serious illness and needless suffering.'") (*citing Baze v. Rees*, 553 U.S. 35, 50 (2008)). Moreover, Dr. Frolich admitted that he had previously given midazolam intravenously to induce unconsciousness prior to surgery while in residency.  *Id*. at 13–15.

Likewise, Dr. Tackett, a pharmacologist, also admitted that a large enough dose of midazolam could put a person in a coma:

> Q: All right. Would you agree or disagree with a definition of a coma as, quote, a state of unconsciousness where a person cannot be awakened, fails to respond normally to painful stimuli, light or sound, lacks a normal wake/sleep cycle, and does not initiate voluntary actions?
>
> A: I would say that characterizes a coma.
>
> Q: So part of the definition of a coma is that a person is so deeply unconscious that they cannot respond to noxious stimuli?
>
> A: That's what I would understand, yes, sir.
>
> . . .

> Q: So pursuant to the package insert, it's safe to say midazolam can put you into a deep sleep to which you are unable to respond to painful stimuli?
>
> A: It can put you into a coma, right.

Doc. 145-6 at 94:6–95:7.  The fact that both of Borden's experts concede that a large dose of midazolam can induce a coma in which a person is unresponsive to noxious stimuli demonstrates that he cannot establish a substantial likelihood of success of showing a "sure or very likely" risk of pain and suffering.[2]

Third, the evidence produced by the State in this case establishes that Borden cannot prove that the use of midazolam in the ADOC's execution protocol is sure or very likely to cause needless suffering because a properly administered 500-milligram dose of midazolam will render an inmate unconscious and insensate to pain.  The State has attached to its response a declaration from Dr. Daniel Buffington, an expert in clinical pharmacology.  Ex. A.  Dr. Buffington opines that "[t]he utilization of properly administered midazolam IV at a dose of 500 mg will render an individual unconscious."  *Id*. at 2.[3]  He noted that that the United States

---

[2] Borden attempts to refute this testimony from his own experts with generalized statements concerning what he believes a coma means, Doc. 298 at 11-2, but he provides no evidence to support his bare conclusions.

[3] Notably, even experts retained by inmates in other method-of-execution challenges have agreed that a sufficiently large dose of midazolam will result in complete unconsciousness.  *See Muhammad v. State*, 132 So. 3d 176, 193 (Fla. 2013) (inmate's expert testified that he has used midazolam in his clinical practice as a pre-anesthetic and anesthetic and that "in very high doses will completely ablate consciousness.").

Food and Drug Administration's (FDA) package insert lists anesthesia induction as one of the approved clinical indications for midazolam. *Id*. at 3-4. Thus, Dr. Buffington concluded that, even at "standard doses," midazolam was sufficient to result in a loss of consciousness. *Id*. at 6. He then noted that midazolam has been clinically observed to have a dose-dependent effect on a person's level of sedation, *id*. at 7, meaning that the greater the dose of midazolam, the greater the pharmacological effect on the person. Dr. Buffington further noted that "[t]here is no human data to support the assumption that administration of doses of midazolam 500 mg IV or greater would alter or abate the observed trends of increasing dose-dependent sedative effects of midazolam." *Id*. Finally, Dr. Buffington concluded that "[a]ny assertion that an individual being administered the ADOC execution procedures (including the use of midazolam 500 mg IV) would have the ability to experience, discern, or articulate the nature of discomfort (i.e., pain and suffering) or the degree of intensity is purely speculative." *Id*.

The State has also presented the declaration of Dr. Curt Harper, a certified forensic toxicologist, who currently is the Toxicology Discipline Chief for the Alabama Department of Forensic Sciences. Ex. B. Dr. Harper's report examined provided real-world evidence and data to establish that a 500 milligram dose of midazolam will result in unconsciousness. Dr. Harper noted established literature finding that the therapeutic range for midazolam as a sedative/hypnotic involved

blood concentration levels of 30–400 ng/mL. *Id*. at 3. Dr. Harper then reviewed the toxicology reports from eleven executions from Florida and determined that the average midazolam concentration from those cases was 1773 ng/mL, which fell "well above the sedative/hypnotic range, within the upper toxic range, and could cause death in some individuals." *Id*. Finally, Dr. Harper noted that literature supported the conclusion that "doses between 5 mg–75 mg of midazolam are sufficient to cause sedation and induce anesthesia." *Id*. at 4.

Accordingly, the expert medical and forensic evidence produced by the State establishes in light of the fact that much lower, clinical doses of midazolam are sufficient to induce unconsciousness and anesthesia, a 500-milligram dose of midazolam will render a person unconscious and insensate to pain. More importantly, this evidence demonstrates that Borden cannot establish a substantial likelihood of success on the merits.

**B.    Borden has failed to establish a substantial likelihood of success of demonstrating a known and available alternative.**

Borden's request for a stay must also be denied because he cannot establish a known and readily available alternative. While he alleges that one-drug protocols of pentobarbital, sodium thiopental, and midazolam are available, he has no evidence to support his contention. Pentobarbital and sodium thiopental are not available to the ADOC, and Borden has not provided any evidence that his one-drug midazolam protocol claim would be substantially safer than the ADOC's current method.

10

First, in regard to pentobarbital, in rejecting another request for a stay of execution, the Eleventh Circuit held, "As this Court has noted many times, and the Supreme Court reiterated in *Glossip*, both pentobarbital and sodium thiopental are unavailable for use in executions as a result of the advocacy of death penalty opponents." *Grayson*, 672 F. App'x at 964. Notably, during the Midazolam Litigation, into which Borden's case was consolidated, this Court found that "Plaintiffs' proof that compounded pentobarbital is available to the ADOC falls short." *Grayson v. Dunn*, 218 F. Supp. 3d 1321, 1328 (M.D. Ala. Oct, 31, 2016), vacated by *Frazier v. Warden*, 869 F.3d 1204 (11th Cir. 2017). As noted in this Court's opinion, one of the plaintiffs' experts "identif[ied] any pharmacist or supplier who could provide compounded pentobarbital to the ADOC." Thus, Borden cannot establish a substantial likelihood of success because it was his burden to show "that there is now a source for pentobarbital that would sell it to the ADOC for use in executions[.]" *Brooks*, 810 F.3d at 820. This he plainly failed to do and his request for a stay should be denied.

Borden notes that the Eleventh Circuit found there was a factual dispute as to the availability of pentobarbital in *Frazier*, but that holding does not entitle him to a stay. In seeking a stay, Borden must move beyond simply pointing to a factual dispute sufficient to survive summary judgment and show that he can demonstrate a substantial likelihood of success on the merits of his claim.

Finally, Borden's arguments concerning Dr. Buffington's deposition testimony do not show that it is substantially likely that compounded pentobarbital is available. Without question, Borden still has not identified a source for the drug, nor has he shown how Dr. Buffington's testimony identifies an actual source. Contrary to Borden's exaggerated claims, Dr. Buffington did not testify that he personally knows pharmacists willing to compound pentobarbital specifically for the ADOC, but rather that he, like Borden's expert Dr. Elder, has had discussions at various conferences with colleagues who have indicated willingness generally to compound drugs for use in lethal injections. Doc. 146-3 at 101:1–14. Dr. Buffington also testified that his practice was not equipped with the equipment to compound pentobarbital. *Id.* at 99:6–19. Moreover, the fact that Dr. Buffington can identify pharmacists who have the facilities and training to compound drugs and the fact that colleagues have made general comments during conferences or annual meetings that they would be willing to compound drugs for use in lethal injections does not show a substantial likelihood that compounded pentobarbital is feasible and readily available to the ADOC, particularly where Borden cannot identify an actual source for compounded pentobarbital willing to produce and sell it in Alabama for use in an execution.

In any event, since his deposition, Dr. Buffington has attempted to contact pharmacists to determine whether they would be capable and willing to provide the

ADOC with compounded pentobarbital, but he has been unsuccessful.   Dr. Buffington contacted at least fifteen different compounding pharmacists, none of which were willing to have their names provided to the ADOC regarding the compounding of pentobarbital for use in lethal injections.  Doc. 146-5.

Second, in regard to sodium thiopental, Borden has wholly failed to present any evidence, much less evidence showing a substantial likelihood of success on the merits.  Given the long, well-noted unavailability of sodium thiopental, Borden's contention that it could be acquired and used for an execution is simply ridiculous. He has presented no evidence that any other state uses this drug in this fashion, nor has he presented any evidence that any other state can even acquire the drug. Without question, Borden has failed to identify a source for the drug and he has presented nothing in his motion for stay establishing a source.  Even his expert, Dr. Frolich testified at his deposition that that sodium thiopental is unavailable in his practice.  Doc. 146 116:20-117:21.  Further, the Midazolam Litigation plaintiffs admitted in discovery that "sodium thiopental is not made by any commercial drug manufacturer in the United States," and Borden has not offered any evidence to refute that.  Doc. 127 at 22.  To the extent that Borden references news articles about other states unsuccessful attempts to obtain sodium thiopental, these claims are utterly meritless.  For a "newspaper assertion that a drug might have been available to others at some other time from India does not show a substantial likelihood that

13

the drug is 'readily available' to the ADOC." *Brooks*, 810 F.3d at 820; *see also Arthur v. Dunn*, 2:11-cv-438-WKW, 2016 WL 1551475 (M.D. Ala. Apr. 15, 2016) ("Evidence of [sodium thiopental's] availability from an overseas supplier is insufficient to satisfy *Glossip's* requirements. Additionally, newspaper accounts that sodium thiopental might have been available to other states at some other time from India do not establish that the drug is readily available to the ADOC.").

Third, Borden cannot establish a substantial likelihood of success on the merits of his claim that his alleged single-drug midazolam alternative is a significantly safer alternative method of execution. As an initial matter, Borden cannot make this showing because he cannot establish that Alabama's current method of execution is unconstitutional or results in any substantial risk of pain. The Eleventh Circuit twice has denied a stay of execution to Borden's co-plaintiffs on this basis, holding that there is "no likelihood (let alone a substantial likelihood) that he would be able to establish that a heretofore untested lethal injection protocol involving only midazolam is materially safer than a protocol that is identical to one approved by the Supreme Court not seven months ago." *Brooks*, 810 F.3d at 822 (noting the "fundamental tension" in the argument that "that midazolam alone can be used to render him unconscious and painlessly kill him, and in the same breath say that the drug ought not be used as the first drug because it will not render him insensate when used with two other drugs."); *see Grayson*, 672 F. App'x at 964

14

(holding that "it is apparent from the face of the complaint that Smith most likely will not be able to show that there is a 'feasible,' 'readily available' alternative method of execution that would substantially reduce the risk of an unconstitutional level of pain as required by the second prong of *Glossip*."). Thus, there is no likelihood that Borden will be able to establish a known and available alternative method of execution.

In his motion to stay, Borden points to testimony supporting the fact that midazolam by itself could be a "lethal agent." Doc. 298 at 14. But this argument misses the point and does not establish a substantial likelihood of success of showing a known and available alternative that significantly reduces a risk of alleged harm under *Baze* and *Glossip*. Simply the fact that a dose of midazolam may be eventually lethal says nothing about the relevant issue of whether this alternative method would significantly reduce of a risk of severe pain. Indeed, the evidence suggests that such an untested method would not be as effective as the current ADOC protocol, nor would it significantly reduce an alleged substantial risk of pain, as Dr. Buffington testified that there could be "patient-to-patient variability" on the time it would take a person to die from a 500-milligram bolus of midazolam and that there were "many variables" to consider in answering the question of whether such a protocol would be painless. Doc. 146-3 at 82: 2–7, 19–25.

Moreover, Borden's admission that "a midazolam-only protocol has never been used in an execution and, furthermore, that midazolam's ceiling effect may render it non-lethal deeply undercut [his] claims that it is a known, readily implementable, and materially safer lethal injection alternative." *Brooks*, 810 F.3d at 821-22.  Although Borden cites to Dr. Tackett in support of this alternative, he too failed to offer any evidence creating a material issue about whether a single-drug midazolam would be a significantly safe alternative.  Dr. Tackett's report simply states that that a continuous infusion of midazolam with a loading dose of 2.5 to 3.75 grams would be lethal.   Doc. 127-10 at 3.  His report is silent on whether or how that alternative would be safer.  This fact is notable when comparing Borden's alleged alternative to the ADOC's established three-drug protocol and whether he can show that his alleged alternative is substantially safer given that Dr. Tackett has admitted that a sufficient dose of midazolam would render someone in a coma.  This admission by Dr. Tackett confirms that there is no evidence to establish that the ADOC's three-drug protocol carries a significant risk of pain in the first place.  Finally, the Eleventh Circuit has already noted that Dr. Tackett admitted that there is a "paucity of information regarding lethal concentrations of midazolam," and that this statement affirmatively shows that single-dose midazolam is not a 'known' alternative that 'in fact significantly reduces a substantial risk of severe pain' as required by *Glossip*." *Grayson*, 672 F. App'x. at 965.  For these reasons, Borden

16

has failed to establish a substantial likelihood of success of establishing a known and available alternative, and thus, his request for a stay should be denied.

## II. Borden has failed to establish the remaining requirements for a stay of execution, and the stay will substantially harm the public and the State's interest in a timely enforcement of a criminal judgment.

Borden also has failed to meet the other remaining necessary requirements for a stay of execution to issue, namely establishing that an "injunction would not be adverse to the public interest." *Brooks*, 810 F.3d at 818. Here, a stay, particularly at this late hour, would substantially harm the public and victims' interest in a timely enforcement of a valid state-court judgment. The State has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Here, because "the State and the victims of crime have an important interest in the timely enforcement of a sentence," *id*., any stay would be contrary to the public's interest in this case. Borden murdered Cheryl Borden, his estranged wife, and Roland Harris, Cheryl's father, nearly twenty-four years ago on Christmas Eve in 1993, during a large family gathering. *Borden v. State*, 711 So. 2d 498, 500 (Ala. Crim. App. 1997). In front of their three children, Borden shot Cheryl in the back of the head. *Id*. Borden then chased Harris and fired several shots at him, which struck him in his back. *Id*. While Borden was shooting at Harris, "the three children ran through the garage of the residence and came into the house through

17

a back entrance, screaming that their father had shot their mother and that she was dead." *Id*.

In *Jones v. Allen*, 485 F.3d 635, 636 (11th Cir. 2007), the Eleventh Circuit denied a stay of execution to an inmate who murdered a father and a mother while witnessed by two of the couples' children.  The court held that "[n]ot only the State, but also the Nelson children, who watched Jones and his co-defendant kill their parents and attack their grandmother and who themselves were stabbed and shot, have a strong interest in seeing Jones's punishment exacted."  *Id*. at 641.  Similarly, the State and the surviving victims—particularly Cheryl Borden's children who witnessed this barbaric crime—have a strong interest in seeing Borden's lawful sentence be carried out.

Finally, Borden's reference to the fact that an Eleventh Circuit panel has previously held that his complaint was not barred by the statute of limitations does not mean that the equities weigh in his favor for a stay of execution.  To the contrary, Borden is a death-row inmate whose conviction because final in 1998, his post-conviction and federal habeas proceedings have been completed since 2012.  Thus, it was certainly foreseeable that his execution date would be set while his case was still pending.  *See McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008) (holding that the day a litigant's death sentence becomes final on direct review "is the date on which a capital defendant's § 1983 challenge to the method of his

execution will accrue because it is the date by which the relevant facts (i.e., the manner and certainty of execution under state law) should be apparent to a person with a reasonably prudent regard for his rights."). Moreover, the State's strong interest in carrying out a sentence of death in a timely manner "acquires an added moral dimension" when post-conviction proceedings have run their course. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).

Borden is on death row for a crime he committed in 1993. His crime was particularly heinous, involving the killing a mother and grandfather in front of children. His conviction is valid, and a competent state court with jurisdiction over his case properly set his execution date according to Alabama law. This Court should strongly consider Alabama's interest in enforcing its criminal judgment in weighing the equities. "If this court were to grant the motion to stay to allow [Borden] to proceed on his § 1983 challenge in district court, the implementation of the State's judgment would be delayed many months, if not years." *Jones*, 485 F.3d at 641. The "State and the surviving victims have waited long enough for some closure to these heinous crimes." *Id.* Thus, Borden's request for a stay should be denied.

## CONCLUSION

Wherefore, for the foregoing reasons, the State respectfully requests this

Court deny Borden's Emergency Motion to Stay Execution.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

**_/s/_ Thomas R. Govan, Jr.**
Thomas R. Govan, Jr.
*Deputy Attorney General*
Lauren A. Simpson
*Assistant Attorney General*
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that October 5, 2017, I served a copy of the foregoing brief upon counsel for the Plaintiff by filing the same via the Court's CM/ECF system, which shall cause the same to be electronically transmitted to: **John Anthony Palombi, and Spencer Hahn.**

*/s/* **Thomas R. Govan, Jr.**
Thomas R. Govan, Jr.
*Deputy Attorney General*
State of Alabama

OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300 Office
(334) 353-3637 Fax
tgovan@ago.state.al.us
lsimpson@ago.state.al.us